IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                  No. 17-CR-3237- JAP

JESUS FRANCISCO FERNANDEZ,

      Defendant.

## MEMORANDUM OPINION AND ORDER

On March 9, 2018, Defendant Jesus Francisco Fernandez filed a Motion for Order to Show Cause and Request for Evidentiary Hearing (Motion). (Doc. 25). In his Motion, Defendant requests that the Court order non-party Greyhound Lines, Inc. (Greyhound) to show cause why it should not be held in contempt for allegedly disobeying a subpoena, and requests an evidentiary hearing to determine whether an agency relationship exists between Greyhound and the Drug Enforcement Administration (DEA) and whether Greyhound destroyed exculpatory evidence. (Doc. 25 at 1). Greyhound filed a Response to the Motion and it is fully briefed.[1] The United States, though taking no position on the Motion, filed a brief addressing Defendant's agency argument.[2] (Doc. 31). The Court held an evidentiary hearing on June 19, 2018. Having

---

[1] *See* NONPARTY GREYHOUND LINES, INC'S RESPONSE TO DEFENDANT'S MOTION FOR ORDER TO SHOW CAUSE AND REQUEST FOR HEARING (Response) (Doc. 30); DEFENDANT'S REPLY TO GREYHOUND'S RESPONSE TO HIS MOTION FOR ORDER TO SHOW CAUSE AND REQUEST FOR EVIDENTIARY HEARING (Reply) (Doc. 32).
[2] *See* UNITED STATES' SUPPLEMENTAL BRIEF ADDRESSING GREYHOUND LINES, INC. AS AN AGENT (Doc. 31).

considered the parties' briefing,[3] arguments, and relevant case law, the Court will deny Defendant's Motion.

I.  BACKGROUND

On November 15, 2017, a federal grand jury returned an indictment charging Defendant with unlawfully, knowingly and intentionally possessing with intent to distribute a controlled substance, 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). (Doc. 10). On October 25, 2017, DEA Special Agent (SA) Jarrell Perry arrested Defendant while conducting drug interdiction at the Greyhound bus terminal in Albuquerque, New Mexico.[4] (Doc. 21 at 2, 4). SA Perry discovered methamphetamine inside Defendant's black duffel bag after Defendant allegedly consented to a search of the bag. (Doc. 21 at 4). SA Perry's initial seizure of the bag and evidence obtained subsequent to the seizure are the subjects of a separate motion to suppress that Defendant filed. (*See* Doc. 21).

On November 21, 2017, Defendant's counsel sent a letter to Greyhound asking Greyhound to preserve "[a]ll Greyhound surveillance security video and audio recordings made from 8:00 am to 1:00 pm on October 25, 2017 at the Albuquerque Greyhound bus terminal at 320 1st St. SW."  (Doc. 25-1; Def. Ex. G).  In addition to this general request, Defendant's counsel specified locations at the bus terminal and on the bus from which he wanted video and audio recordings. (*Id.*).  Defendant's counsel further requested a copy of the passenger manifest

---

[3] In addition to the Motion, Response, Reply and the United States' Supplemental Brief, the Court read and considered the following briefing from the parties and nonparty Greyhound: United States' MEMORANDUM BRIEF (Doc. 58); MR. FERNANDEZ'S BRIEF REGARDING THE GOVERNMENT'S TOUHY OBJECTIONS AND EXAMINATION OF EVIDENCE (Doc. 59); NONPARTY GREYHOUND LINES, INC.'S CLOSING ARGUMENT FOR HEARING ON DEFENDANT'S MOTION FOR ORDER TO SHOW CAUSE (Doc. 64); UNITED STATES' CLOSING ARGUMENTS ON MOTION FOR AN ORDER TO SHOW CAUSE (Doc. 65); and MR. FERNANDEZ'S CLOSING ARGUMENT REGARDING THE AGENCY RELATIONSHIP BETWEEN GREYHOUND LINES INC. AND THE DEA (Doc. 66).
[4] *See* MR. FERNANDEZ'S MOTION TO SUPPRESS (Doc. 21).

listing passengers on board the bus at the time it arrived in and departed from Albuquerque on October 25, 2017. (*Id.*).

Also on November 21, 2017, Defendant filed an ex parte motion for a subpoena *duces tecum* to the Custodian of Records for Greyhound Lines, Inc., *see* Doc. 12, which the Court granted on December 11, 2017, *see* Doc. 16. The subpoena was served on December 21, 2017.[5] (Doc. 25 ¶ 2). Greyhound responded to the subpoena on January 26, 2018 by producing five compact discs with surveillance video files and two discs with computer files related to the specific bus Defendant had taken. (Doc. 25 ¶ 4). Written on the discs Greyhound produced containing the surveillance video was "U.S. Department of Justice Drug Enforcement Administration" and "For Official Use Only." (Def. Ex. D).

Defendant's counsel determined that the production was incomplete. (Doc. 25 ¶ 5). By letter dated March 6, 2018, Greyhound explained that the Albuquerque bus terminal has 4 DVR machines recording video from a total of 52 cameras, but noted that a number of cameras were not properly functioning or did not record. (Ex. 2 to Doc. 30). Greyhound further explained that Ms. Marie Avila-Gomez,[6] Customer Experience Manager for Greyhound Albuquerque, was under the impression that she did not need to capture certain cameras, but "[i]t is not known at this time how she came to this understanding." (Doc. 25 ¶ 7; Ex. 2 to Doc. 30). As a result, the only footage provided was downloaded from DVR 1, cameras 1, 8, 9, 10, 11, 13, 14, 15 and 16. (Ex. 2 to Doc. 30). In an affidavit, Ms. Avila stated that she believed she had downloaded all of the requested footage from operational DVRs and only realized when later notified that footage from DVRs 2 and 3 failed to properly download. (Ex. 1 to Doc. 30). She further noted that the video surveillance system retains footage for twenty-eight to forty-five days, depending on the

---

[5] Greyhound claims that counsel received the subpoena on December 28, 2017. (*See* Doc. 30 at 3).
[6] Ms. Avila-Gomez is now referred to as Ms. Avila. She is no longer employed with Greyhound.

amount of activity, before the system overwrites the footage. (Ex. 1 to Doc. 30). Consequently, footage that was not retained in Ms. Avila's initial download is likely not retrievable. (Ex. 2 to Doc. 30).

On June 19, 2018, the Court held an evidentiary hearing addressing the incomplete production, and heard testimony from DEA Agents Perry and Jeffrey Armijo, Ms. Avila, and David Streiff, the Security Operations Manager for Greyhound in North America. The United States asserted privilege under the Department of Justice's *Touhy* regulations to a number of the questions defense counsel posed to SA Perry.

During the hearing, Ms. Avila clarified that she was under the impression from Mr. Streiff that she did not need to comply with preservation requests. (Tr. 28:24-29:4). Rather, Mr. Streiff instructed her to wait to act until she received a subpoena. (Tr. 19:8-14). Ms. Avila testified that the DEA never instructed her on how to address preservation requests or subpoenas initiated by defense attorneys, nor did the DEA provide any type of training to Greyhound employees on video preservation or otherwise. (Tr. 64:14-24; 75:14-17). All training for Greyhound employees comes from Greyhound itself. (Tr. 116:7-15).

Ms. Avila explained that the DEA "Official Use Only" discs had been in her office since before she started working with Greyhound, and she used them because they were the only discs she had available to her to record footage. (Tr. 43:1-7). Ms. Avila had previously used the DEA discs to download footage unrelated to a preservation request or a subpoena, such as when an individual was injured after a fall and when a child was abandoned at the terminal. (Tr. 43:10-13). SA Perry confirmed that he provided a prior Greyhound manager with compact discs as a courtesy, when, in response to SA Perry's request for video related to a DEA investigation, the manager responded that he did not have any discs. (Tr. 162:7-163:1). SA Perry intended for the

manager to use the discs for whatever he needed, in addition to using the discs to respond to DEA requests. (Tr. 163:2-9).

At Mr. Streiff's behest, Ms. Avila scheduled a meeting between DEA Agents Perry and Armijo, Mr. Streiff, and herself, which took place in April 2017. Mr. Streiff's email to Ms. Avila indicates that he wanted to meet with DEA agents "to discuss these Defendants Attorney's requests for video and information and what are [sic] future responses will be. We want to insure [sic] continued partnership with them but we need to go over some understandings with them." (Def. Ex. A). Ms. Avila was not directed to invite any other law enforcement agencies to the meeting. (Tr. 121:11-16; 122:2-20). Ms. Avila described the actual meeting as more of a "rapport building, getting to know" one another opportunity. (Tr. 39:21-40:6). She spoke with Mr. Streiff on the side about preservation requests and subpoenas and believes that the DEA agents may have overheard the conversation. (Tr. 66:25-67:14). Mr. Streiff also recalls this conversation as "almost an after effect as we were walking off." (Tr. 96:10-14).

An employee breakroom at the Greyhound bus station was made available to law enforcement officers. (Tr. 48:4-7). Ms. Avila made copies of the breakroom key for law enforcement officials, and SA Perry had a copy of the breakroom key. (Tr. 48:8-14; 154:16-18). Ms. Avila gave "verbal ongoing permission" to law enforcement officers to enter nonpublic areas of the terminal and warehouse unescorted, but also indicated that there generally was always an employee in every location of the terminal to observe an officer's movements. (Tr. 50:3-24). Ms. Avila would allow SA Perry back in the office area to visit with her. (Tr. 49:2-8). On one occasion near the holidays, SA Perry gave Ms. Avila a DEA patch and at some point he also gave her a DEA coin. (Tr. 49:6-11). Ms. Avila did not feel obligated to conduct her job in a certain way because SA Perry had given her these items. (Tr. 70:12-20).

5

It would be a violation of Greyhound policy to provide law enforcement officers like SA Perry with access to a passenger manifest. (Tr. 102:15-17). Ms. Avila never provided the passenger manifest to SA Perry, nor did she ever witness another employee give a copy of the manifest to SA Perry. (Tr. 54:2-5, 14-18). Ms. Avila is also unaware of any employees at the Albuquerque Greyhound station receiving financial compensation from law enforcement officers. (Tr. 55:2-5). And she herself has never received money from the DEA in exchange for information and is not a DEA informant. (Tr. 75:18-24). Yet, despite Greyhound policy and Ms. Avila's assertions, SA Perry confirmed that he receives copies of the passenger manifest. (Tr. 167:24-168:8). He also testified that on at least one past occasion he used an employee's computer to check his email. (Tr. 167:2-12).

Mr. Streiff indicated that while Greyhound currently receives federal money through the "Over-the-Road Bus Security Grant Program," none of that money is allocated for Albuquerque. (Tr. 80:10-81:19; 115:7-16). In fact, Albuquerque does not receive any federal funding for security. (Tr. 115:18-25). Greyhound created a Law Enforcement Operating Procedure to define the parameters of law enforcement conduct applicable to Greyhound facilities throughout the United States. (Tr. 89:10-17; 92:12-18; Gov't Ex. 2). This procedure was created by Mr. Streiff entirely without input from outside law enforcement agencies. (Tr. 104:4-15). Mr. Streiff testified that one objective of the April 2017 meeting with local Albuquerque DEA agents was to discuss the parameters where agents could and could not operate within the Greyhound facility. (Tr. 93:13-16). The DEA never instructed anyone at Greyhound on how to respond to preservation letters or subpoenas, and this matter was not discussed during the April 2017 meeting. (Tr. 110:4-19; 111:3-7). Mr. Streiff further stated that under the Greyhound Law Enforcement Operating Procedure law enforcement officers are not allowed to retrieve copies of

surveillance video on their own. (Tr. 112:18-113:2). SA Perry did recall one occasion when he viewed surveillance video inside the station as opposed to video received as part of a DEA subpoena. (Tr. 167:13-23).

Subsequent to the April 2017 meeting, Mr. Streiff maintained contact with SA Perry. (*See* Defense Exhibits I & E, Email Communications). Specifically, he asked SA Perry to provide information about DEA seizures and arrests at the Albuquerque station as part of his charge to determine the risk profile of the terminal and to "highlight the success of allowing our DEA to come in" and demonstrate "that these seizures were having a positive impact on Greyhound by not having [illegal drugs] transported on our buses." (Tr. 106:11-23). Mr. Streiff made the request as a professional courtesy, and SA Perry was under no obligation to comply. (Tr. 107:11-23). In one of these communications, SA Perry provided Mr. Streiff with his cell phone number. (Tr. 158:19-21). Mr. Streiff also makes similar requests of other agencies for criminal offense related information to aid in developing the bus terminal risk profile. (Tr. 117:22-118:9).

Mr. Streiff commented that the presence of law enforcement in Greyhound terminals is "inherently positive" and allows Mr. Streiff to "leverag[e] every resource that [he] can to ensure the safety of our passengers, our employees, and the comfort of the company itself[.]" (Tr. 120:6-16). Ultimately, Mr. Streiff emphasized that Greyhound welcomes law enforcement agencies in its terminals as part of its community outreach program. (Tr. 116:16-20; 117:12-21). Additionally, Greyhound partners with Traffic 911, an organization addressing child sex trafficking, Missing Children's Network, and nongovernmental organizations that work with runaway youth to reunite them with their families. (Tr. 117:1-6).

## II. DISCUSSION

"A [Fifth Amendment] due process violation occurs when the government fails to preserve constitutionally material evidence." *U.S. v. McIntosh*, 573 F. App'x 760, 762 (10th Cir. 2014). The government violates due process "when it destroys evidence that (1) 'possess[es] an exculpatory value that was apparent before [it] was destroyed' and (2) is 'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *U.S. v. Ward*, 182 F. App'x 779, 784-85 (10th Cir. 2006) (quoting *California v. Trombetta*, 467 U.S. 479, 489 (1984)). "[I]f the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was 'potentially useful' for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence." *U.S. v. Bohl*, 25 F.3d 904, 910 (10th Cir. 1994). Defendant claims that the missing video evidence is crucial to any defense he might have had that SA Perry unlawfully tampered with or even pre-searched the black duffel bag prior to passengers reboarding the bus. (Doc. 66 ¶ 19). However, because a Fifth Amendment violation requires state action, the threshold inquiry here is whether Greyhound qualifies as a governmental entity or agent. *See U.S. v. Alexander*. 447 F.3d 1290, 1294 (10th Cir. 2006) ("An agent of the government, like the government itself, is restrained by the language of the Constitution. Private parties are not.").

### A. Non-party Greyhound Bus Lines, Inc. is Not A Governmental Agent or Entity

Defendant argues that Greyhound and/or its employees operated in the role of a governmental actor when failing to preserve constitutionally material evidence. (Doc. 25 ¶ 10). Whether a private entity qualifies as a government actor is a fact-sensitive analysis guided by the totality of the circumstances. *Alexander*, 447 F.3d at 1298. Courts consider the following non-exclusive factors to determine agency:

> (1) the extent of the government's knowledge of, and participation in, the alleged agent's conduct; (2) the alleged agent's motivations; (3) the presence or absence of coercion as viewed from the suspect's perspective; and (4) other traditional indicia of agency, such as the parties' mutual manifestation of consent, either express or implied, to have the private party act on behalf of the government and the extent of control exercised by the government over the private party's actions.

*Id.* at 1295 (footnotes omitted).

In a recent Memorandum Opinion and Order, Chief United States District Court Judge William Johnson addressed the issue of agency between the DEA and Greyhound under a strikingly similar set of facts. *See U.S. v. Ramos-Burciaga*, Case No. 17-cr-2236-WJ, Doc. 66 (D. N.M. Apr. 26, 2018). Judge Johnson concluded that on the record before him there was insufficient evidence to establish an agency relationship between either Greyhound or Ms. Avila and the DEA. *See id.* at 8. Of particular importance, Judge Johnson noted that: (1) there was no evidence that SA Perry or any other government employee knew of the defense counsel's preservation request; (2) the government did not fund surveillance equipment in Albuquerque, nor did it train or advise Greyhound in video preservation or recording; (3) although the DEA gave Greyhound discs to respond to the DEA's subpoenas, there is no evidence that this influenced how Greyhound responded to preservation requests from third parties; (4) the DEA did not play a role in development of Greyhound's security procedures; (5) SA Perry was not allowed in the non-public areas of the station alone; and (6) none of the Greyhound managers knew of or consented to employees acting as confidential informants. *See id.* at 8-9.

Defendant admits that there is overlap between the evidence in *Ramos-Burciaga* and the evidence presented in his own case, but suggests that the United States produced additional discovery relevant to agency in this case. (Doc. 59 ¶¶ 19, 21-22). Additional evidence cited by Defendant includes: an email between Mr. Streiff and Ms. Avila requesting that Ms. Avila set up a meeting with the DEA agents (Def. Ex. A); an email from Ms. Avila regarding whether

9

security guards will have the ability to download video (Def. Ex. C); an email string in which SA Perry reports a drug seizure to Mr. Streiff, and also includes a request from Mr. Streiff for the "street value of all the drugs and money" seized to include in his report to the Greyhound president (Def. Ex. E); a March 21, 2018 email from the Albuquerque Greyhound maintenance bay manager, Andrew Sedillo, indicating that the DVR was replaced, the cameras seemed to be working, but that he did not know how to extract video from the new machine (Def. Ex. F); an email in which SA Perry provides Mr. Streiff with his cell phone number (Def. Ex. I); and a chart containing metadata from the seven discs produced by Greyhound, which Defendant claims demonstrates Greyhound's non-compliance with the subpoena (Def. Ex. H). (Doc. 59 ¶ 23).

Defendant also suggests that differences in testimony emerged at the June 19, 2018 hearing in this case from the testimony provided in the matter before Judge Johnson. For example, Ms. Avila testified that her employment with Greyhound was terminated following her testimony in the *Ramos-Burciaga* case. (Doc. 59 ¶ 25). She further stated that she was instructed to disregard preservation letters even though she knew that by doing so the video would likely be overwritten, and that she had requested training on how to respond to preservation letters and subpoenas but never received training. (*Id.*). Defendant notes that Mr. Streiff testified in *Ramos-Burciaga* that there were no law enforcement procedures in place at Greyhound before the April 2017 meeting with the DEA. (Doc. 59 ¶ 26). However, on June 19, 2018, SA Perry testified that he received the law enforcement procedure in October of 2016. (*Id.*). Despite Ms. Avila's testimony that the DEA was not permitted to access passenger manifests or the Greyhound internal *TRIPS* System, SA Perry testified that he still receives passenger manifests and on at least one occasion used a Greyhound employee's computer. (Doc. 59 ¶¶ 29-30). Defendant

argues that the evidence elicited in this case that was not available in *Ramos-Burciaga* suggests an agency relationship between Greyhound and the DEA. (Doc. 59 ¶ 31).

The Court disagrees and finds that the additional evidence cited by Defendant does not appreciably alter the agency analysis in this case as compared to the sound analysis conducted by Judge Johnson in *Ramos-Burciaga.* The facts presently before this Court, without more, are equally insufficient to establish an agency relationship between Greyhound, Ms. Avila, and the DEA. As in *Ramos-Burciaga*, here there is no evidence that the DEA had knowledge of Defendant's preservation request. Nor did the DEA instruct Greyhound or its employees on how to respond to preservation requests or subpoenas. SA Perry acknowledged that he provided a spindle of DEA compact discs to a former Greyhound manager at the Albuquerque terminal as a courtesy, and Ms. Avila stated that she used these discs when responding to the subpoena. But there is no indication that the use of these discs influenced Ms. Avila's actions with regards to the preservation request or subpoena in this case. Though Greyhound receives some federal grant money for security, none of that money is allocated to Albuquerque, and the DEA has no control over Greyhound's surveillance systems or security operations. Rather, Greyhound developed its own Law Enforcement Operating Procedure for use in its various facilities throughout the United States without input from outside law enforcement agencies. Training to Greyhound employees is conducted internally, and the DEA does not provide any training to Greyhound employees related to preservation requests, subpoenas, or otherwise. Although Mr. Streiff's request to Ms. Avila to set up the April 2017 meeting indicates that he wanted to "discuss these Defendants Attorney's requests for video and information and what are [sic] future responses will be," both Mr. Streiff and Ms. Avila described the actual subject matter of the meeting to be more of a

11

conversational meet and greet. (Def. Ex. A). Any discussion regarding third party requests for information occurred during a side conversation only between Mr. Streiff and Ms. Avila.

While it appears SA Perry had a friendly relationship with Ms. Avila, even occasionally giving her small tokens like a DEA coin and patch, Ms. Avila testified that she never accepted money in exchange for information and is not an informant for the DEA. She further testified that SA Perry and other law enforcement officials had access to a meeting room at the Greyhound terminal. But Ms. Avila viewed this relationship as part of the community engagement aspect of her job, believing that it was in Greyhound's best interest, her best interest, and the best interest of the passengers to have rapport with local law enforcement agencies in the event they were needed. (Tr. 27:20-25). Mr. Streiff similarly testified that the presence of law enforcement in Greyhound terminals is "inherently positive" and allows him to "leverag[e] every resource that [he] can to ensure the safety of our passengers, our employees, and the comfort of the company itself[.]" (Tr. 120:6-16). Mr. Streiff's request to SA Perry for arrest and drug seizure information to include in his reports to upper management appears to fall within the parameters of demonstrating a shared goal of combatting crime in Greyhound facilities. *See U.S. v. Shahid*, 117 F.3d 322, 325-26 (7th Cir. 1997) ("[E]ven if [a] private purpose should happen to coincide with the purposes of the government, this happy coincidence does not make a private actor an arm of the government.").

SA Perry testified that he receives a copy of the passenger manifest, but did not illuminate who provides him with this information, invoking privilege under the *Touhy* regulations. Nevertheless, Mr. Streiff testified that it would be against Greyhound policy for an employee to provide the DEA or any other law enforcement agency with a copy of the passenger manifest, or to accept financial compensation in exchange for information. Ms. Avila testified

that she is not aware of any employees at the Albuquerque Greyhound station receiving financial compensation from law enforcement officers. She was also unaware of any employees acting in the role of confidential informant. She confirmed that she was not a DEA confidential informant. If there is a confidential informant at Greyhound producing passenger manifests to SA Perry, the individual is taking these actions without approval and against Greyhound policy. An act of an unknown individual employee alone is insufficient to establish agency.

Finally, Ms. Avila was terminated from her employment with Greyhound following her testimony in the *Ramos-Burciaga* case. (Tr. 20:2-4). Ms. Avila lacked specific details regarding her termination, but believed that it was related to her testimony possibly "shed[ding] bad light on Greyhound." (Tr. 20:7-21:4). Mr. Streiff clarified that Ms. Avila's employment was not terminated because of issues specific to her court testimony. (Tr. 85:5-7). This additional development has no bearing on whether Greyhound or Ms. Avila were acting as agents of the government.

Based on the totality of the circumstances, including the additional evidence presented in this case that was not available to Judge Johnson in *Ramos-Burciaga*, the Court concludes that Defendant has failed to establish that Greyhound or Ms. Avila acted as agents of the DEA. Accordingly, any failure by Greyhound or Ms. Avila to properly preserve videotape cannot be attributed to the government.

### B. Asserted Privileges Under the *Touhy* Regulation

Defendant subpoenaed DEA agents to testify at the June 19, 2018 hearing. The parties do not dispute that Defendant's counsel complied with the requirements of *United States ex. rel. Touhy v. Ragen*, 340 U.S. 462 (1951) and 28 C.F.R. § 16.23(c). However, while agreeing to abide by the restrictions in the Department of Justice (DOJ) *Touhy* response-letter provided by

the United States, *see* Gov't Ex. 1, Defendant's counsel noted that the broad language assigned to "investigative techniques" in the letter was an area of potential disagreement. During SA Perry's testimony at that hearing, the United States invoked the confidential informant and law enforcement privileges under the *Touhy* regulations, and the Court sustained the United States' objections to certain questions on those grounds. Defendant's counsel challenged the scope of the *Touhy* regulations, suggesting an *in camera* hearing might be appropriate to allow for further questioning. After hearing argument from both sides regarding the scope and application of the *Touhy* regulations in a pretrial proceeding, the Court asked the parties for additional briefing on the issue. Having reviewed the parties' arguments, additional briefing, and relevant case law, the Court will decline to hold an *in camera* hearing.

In *Touhy*, the United States Supreme Court considered whether a subordinate official of the Department of Justice (DOJ) had the right to refuse to obey a subpoena *duces tecum* ordering production of DOJ documents in his possession in a federal prisoner habeas proceeding. 340 U.S. at 463. The FBI agent's refusal to obey the subpoena was based on an internal DOJ regulation under what is known as the Housekeeping Statute. *Id.* The United States Supreme Court upheld the Department of Justice's regulations as a valid exercise of the federal Housekeeping Statute, and held that the FBI agent could not be held in contempt for refusing to obey the subpoena where the FBI had not authorized disclosure under the DOJ regulations. *Touhy,* 340 U.S. at 468-69; *see also* 5 U.S.C. § 301 ("Housekeeping Statute") (providing authority for agencies to promulgate internal regulations "for the government of [the] department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property"). The Tenth Circuit has applied *Touhy* in criminal cases. *See, e.g., U.S. v. Springer*, 444 F. App'x 256, 263-64 (10th Cir.

14

2011) (holding that the defendants' inability to subpoena DOJ and Internal Revenue Service employees did not violate their Sixth Amendment rights where defendants failed to comply with required *Touhy* provisions).

The United States asserted both the informant and law enforcement privileges during the hearing and in supplemental briefing. The government has a privilege to withhold from disclosure the identity of persons who furnish information to law enforcement officers on criminal acts. *See Rovario v. U.S.*, 353 U.S. 53, 59 (1957). "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." *Id.* at 59. Nevertheless, the privilege is not absolute, and "[w]here the disclosure of an informer's identity…is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* The court must balance "the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* at 62. "In making the determination as to whether disclosure is necessary, the court must consider the particular circumstances of the case, including the crime charged, the possible defenses, and the significance of the informer's testimony." *U.S. v. Sinclair*, 109 F.3d 1527, 1538 (10th Cir. 1997) (internal quotation marks and citation omitted).

The law enforcement privilege similarly serves "to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise prevent interference with an investigation." *In re Dep't of Investigation of City of New York*, 856 F.2d 481, 484 (2d Cir. 1988). The law enforcement privilege, like the confidential

informant privilege, is qualified and "can be overcome if there is a compelling need for the information that outweighs the need for confidentiality." *In re United Telecomm., Inc. Sec. Litig.*, 799 F. Supp. 1206, 1208 (D. D.C. 1992); *see also Carbajal v. Warner*, No. 10-cv-02862-REB-KLM, 2015 WL 4055418, *1 (Jul. 2, 2015) ("The privilege may be overridden by the movant's substantial need for the documents and [his] inability to obtain their substantial equivalent by other means." (internal quotation marks and citation omitted)). The privilege protecting the identity of confidential informants and the law enforcement privilege are not necessarily synonymous. *See In re U.S. Dep't of Homeland Security*, 459 F.3d 565, 569 (5th Cir. 2006) ("Our case law has acknowledged the existence of a law enforcement privilege beyond that allowed for identities of confidential informants." (footnote omitted)).

In certain circumstances an *in camera* hearing is appropriate to allow the court "considerable flexibility in determining if disclosure [of privileged information] is warranted," "thereby protecting the State's interest in avoiding unnecessary disclosure, while at the same time it will safeguard defendant's right to the testimony of any accessible witness who may be significantly helpful to his defense." *Gaines v. Hess*, 662 F.2d 1364, 1369 (10th Cir. 1981). The Tenth Circuit has indicated that "[o]nly under circumstances in which nondisclosure would deprive the defendant of his due process right to a fundamentally fair trial is disclosure constitutionally mandated." *Id.* at 1368. And "an *in camera* hearing is not necessary if the Court already has the information necessary to determine if disclosure is required." *See Ramos-Burciaga*, 17-cr-2236 (Doc. 66 at 12) (citing *U.S. v. Tenorio-Angel*, 756 F.2d 1505, 1509 n. 7 (11th Cir. 1990) ("Such an *in camera* hearing, however, is not always required, but depends on whether the trial court has the information necessary to determine if disclosure of the informant's identity is required without holding an *in camera* hearing.")).

In this case, the United States' *Touhy* objections center on potential confidential sources at Greyhound utilized by SA Perry, and SA Perry's access to information such as Greyhound passenger manifests. (*See, e.g.,* Tr. 163:20-164:2; Tr. 168:10-18; 169:12-22; 170:23-171:2). The United States argues that disclosure of privileged information about confidential sources is not relevant to the Court's determination as to whether an agency relationship existed between the DEA and Greyhound. (Doc. 65 at 7). Defendant counters that "SA Perry's interaction, arrangements or agreements that he may have made with any Greyhound employee regarding the use of, or access to, the surveillance system" is relevant to the question of agency, as is any information about SA Perry's use of confidential or paid informants, his ability to move freely about the terminal, and his admitted access to a Greyhound computer terminal. (Doc. 59 ¶¶ 11, 15). Moreover, Defendant clarifies that he is not seeking the identity of potential informants, but rather, whether such informants exist at all and at what level of authority. (Doc. 59 ¶ 17).

The Court agrees with Judge Johnson's analysis on a very similar set of facts that "[e]ven if a Greyhound employee was a confidential informant and was paid to provide passenger information to the DEA, an agency relationship would still not be formed between the DEA and Greyhound." *Ramos-Burciaga*, Case No. 17-cr-2236-WJ, Doc. 66 at 13 (D. N.M. Apr. 26, 2018). Here, as in *Ramos-Burciaga*, credible witness testimony confirms that it is against Greyhound policy to provide proprietary information such as passenger manifests to law enforcement. SA Perry admitted that he has received, and continues to receive, passenger manifests. However, neither Ms. Avila nor Mr. Streiff were aware of such activity, and accordingly, any such action was performed without their knowledge or permission. Ms. Avila, as Customer Experience Manager at the Albuquerque terminal, was responsible for downloading video from the video recording system in response to subpoenas. Yet neither Ms. Avila nor Mr. Streiff was controlled,

directed, or advised by the DEA on security operations, video surveillance, or video preservation. Ms. Avila credibly testified that she herself was not a confidential informant, never received money from the DEA, and was not aware of any Greyhound employees at the Albuquerque Greyhound terminal who were informants or received compensation from the DEA. Mr. Streiff confirmed that it would be an ethical violation for a Greyhound employee to receive payments from the DEA.

Any information that could be derived from testimony during an *in camera* hearing pertaining to confidential sources or law enforcement techniques SA Perry may have utilized at Greyhound would not alter the Court's analysis and determination that there is no agency relationship between Greyhound or Ms. Avila and the DEA. Therefore, the need for the privileged information does not outweigh the interest in maintaining its confidentiality, and the Court will decline to hold an *in camera* hearing.

IT IS THEREFORE ORDERED that Defendant's Motion for Order to Show Cause (Doc. 25) is DENIED.

_____
THE HONORABLE JAMES A. PARKER