IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                                                No. 17-CR-3237- JAP

JESUS FRANCISCO FERNANDEZ,

        Defendant.


### MEMORANDUM OPINION AND ORDER

On November 15, 2017, a federal grand jury returned an indictment charging Defendant Jesus Francisco Fernandez with unlawfully, knowingly and intentionally possessing with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). (Doc. 10). On February 12, 2018, Defendant filed a Motion to Suppress and Request for Evidentiary Hearing (Doc. 21) (Motion), asking the Court to suppress: (1) all physical evidence that Drug Enforcement Administration (DEA) agents seized from Defendant on October 25, 2017 at the Albuquerque Greyhound bus station; and (2) all post-arrest statements Defendant made to DEA agents or officers on October 25, 2017. The United States opposes the Motion, and it is fully briefed.[1] The Court held an evidentiary hearing beginning on September 19, 2018 that continued on September 26, 2018. Having considered the parties' briefing, arguments, evidence, and relevant case law, the Court will deny Defendant's Motion.

---

[1] *See* THE GOVERNMENT'S RESPONSE IN OPPOSITION TO THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE FILED FEBRUARY 12, 2018 (Doc. 22) (Response); DEFENDANT'S REPLY TO UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS (Doc. 24) (Reply).

## I.     BACKGROUND

Federal Rule of Criminal Procedure 12(d) requires that, when factual issues are involved in deciding a motion, the Court must state its essential findings on the record. For the purpose of ruling on Defendant's Motion to Suppress, the Court makes the following factual findings based on the evidence in accordance with Rule 12(d):

On the morning of October 25, 2017, DEA Special Agents (SA) Jarrell Perry and Kirk Lemmon were conducting drug interdiction at the Greyhound bus terminal in Albuquerque, New Mexico. (Doc. 21 at 2). The agents waited for an eastbound bus from Phoenix scheduled to arrive in Albuquerque around 9:55 a.m. (*Id.*). When the bus arrived, passengers disembarked for a brief layover to allow for any necessary bus refueling, cleaning, and maintenance service. (*Id.* at 3). Special Agents Perry and Lemmon boarded the bus curbside after it had pulled out of the wash bay and began looking at the bags left by passengers inside the bus.

SA Perry noticed a black duffel bag with white trim bearing the brand name Protégé in the overhead common luggage area. SA Perry began looking for a name tag on the bag, picked it up, and noted that it was very heavy despite appearing to be only partially full. Because SA Lemmon did not typically participate in drug interdiction at the bus station, SA Perry handed the bag to SA Lemmon for a "teaching moment" to allow him to feel the bag's heft. SA Lemmon held the bag by its corners because the bottom was sagging. He then handed the bag back to SA Perry who returned the bag to its previous location in the overhead rack. SA Perry does not recall whether he smelled the bag, but SA Lemmon does not remember him doing so. Neither agent manipulated, squeezed, or opened the bag.

After the bus returned to the terminal for passenger reloading, the two agents again boarded the bus. SA Lemmon remained in the front driver's side area to provide security for SA

2

Perry who commonly handles all of the consensual encounters with passengers. (Def. Exs. A, B, & C). SA Perry moved to the back of the bus. (*Id.*). Both agents were wearing civilian clothes and their firearms were not visible to the public. SA Perry began approaching each passenger, generally introducing himself as "a police officer" and stating that "we check the bus here for security." (Def. Ex. D, 2:3). When Defendant boarded the bus, SA Lemmon noticed that he seemed "surprised" and "panicked." Defendant sat in a seat located approximately in the middle of the bus. The Protégé bag was stored three or four rows behind and on the opposite side of the aisle from Defendant's seat. Ten minutes after boarding, Defendant got up from his seat and went to the lavatory in the back of the bus. (Def. Ex. A, 10:48-10:58). SA Lemmon observed that Defendant poked his head out of the lavatory doorway, saw where SA Perry was located, and then retreated back into the lavatory. Defendant returned to his seat less than two minutes after he went to the lavatory.

When Defendant was seated again, SA Perry approached Defendant, introduced himself as a police officer, stated that he was checking the bus for security, and asked for permission to speak with Defendant. (Def. Ex. A, Def. Ex. D, 17:25-18:7). Defendant agreed. (Def. Ex. A, Def. Ex. D, 18:7). While speaking to Defendant, SA Perry stood somewhat to the rear of Defendant's seat and partially in the aisle. SA Perry asked Defendant several questions in English regarding his travel, and Defendant responded in thickly accented English. (Def. Ex. A, Def. Ex, D. 18:8-13). SA Perry noted that Defendant's bus ticket was under the name Frank Dreke. After SA Perry began speaking with Defendant, SA Perry recognized him from an encounter four or five days earlier. (Def. Ex. A, Def. Ex. D, 18:14-24). Defendant also recalled that encounter. During the prior encounter, Defendant was also traveling under the name Frank Dreke. He had been traveling with a black or brown duffel bag and consented to SA Perry conducting a pat down

search with negative results. When SA Perry requested identification during that prior encounter, Defendant handed medical paperwork to SA Perry that bore the name Jesus F. Fernandez Rodriguez. At that time, SA Perry did not ask Defendant any questions about the discrepancy in names. SA Perry spoke to Defendant in English during the first encounter a few days earlier, and Defendant had responded in English and appeared to understand SA Perry's questions.

During the October 25, 2017 encounter, after recognizing Defendant, SA Perry asked Defendant several questions regarding Defendant's travel and then began to question him regarding luggage in the following manner:

> SA: Ok. Do you have luggage, do you have luggage on the bus with us?
> JF: No, not (inaudible) I don't got nothing with me today.
> SA: Do you have luggage with you?
> JF: No.
> SA: Did you have luggage on the last trip?
> JF: Nah, I leave it at the house, it's a short trip back home.
> SA: Ok, so you don't have any luggage?
> JF: Nah.
> SA: No weapons, or anything on your body sir?
> JF: No, you want to check me again?
> SA: Do you give me permission to pat you down?
> JF: Yeah.
> SA: Ok, thank you.
> JF: Yeah.
> SA: Thank you. I thought you had a bag the other day though?
> JF: Nah.
> SA: Didn't you have a bag with you the other day?
> JF: (inaudible).
> SA: You did? What did you do with the bag?
> JF: (inaudible).
> SA: What kind of bag was it?
> JF: It's (inaudible) black, brown or something like that.
> SA: A black bag?
> JF: Yeah.

(Def. Ex. D, 19:9-20:7). SA Perry ended the encounter with Defendant and continued speaking with other passengers. (Def. Ex. A & D). When he was finished speaking with all of the passengers, he said to SA Lemmon "I'm gonna go get that bag." (Def. Ex. D, 25:9). SA Perry

retrieved the black Protégé bag from the common storage area and, starting from the rear of the bus, walked forward through the aisle of the bus showing the bag to each passenger and asking "Is this your bag?." (Def. Ex. D, 25:10-16). SA Perry again approached Defendant, this time with the Protégé bag, and the following conversation ensued:

> SA:    Ok, is this your bag sir? Is this your bag sir?
> JF:    Yeah, that's my bag.
> SA:    Your bag? Ok.
> JF:    You want to check it out?
> SA:    Ok, will you give me permission to search it?
> JF:    Yeah.
> SA:    Ok, would it be ok if I just set it up here?
> JF:    Yeah.

(Def. Ex. D, 25:17-24). SA Perry unzipped the bag and discovered several oblong shaped bundles wrapped in clear saran wrap and brown tape. (Def. Ex. I at 9). SA Perry immediately recognized the bundles as consistent with bundles of illegal narcotics. (Def. Ex. I at 9). Defendant then stated that it was not his bag. (Def. Ex. D, 26:1-3). SA Perry arrested Defendant and led him off of the bus with SA Lemmon's assistance. (Def. Ex. A).

SA Lemmon transported Defendant to the DEA Office where he was processed and interviewed by DEA Task Force Officer (TFO) Clarence Davis and TFO Frank Chavez. TFO Davis asked Defendant in Spanish whether he understood both Spanish and English, and Defendant indicated that he understood both, but responded in English. TFO Davis referred to an image of the DEA *Miranda*[2] warnings card he has stored in his phone and read the warnings directly to Defendant. Defendant indicated that he understood his rights and proceeded to answer TFO Davis' questions. The interview lasted approximately twenty-five minutes. However, the recording of the interview is incomplete and does not include the portion where TFO Davis advised Defendant of his rights under *Miranda*. (Gov. Exs. 13 & 14). TFO Davis explained that

---

[2] *See Miranda v. Arizona*, 385 U.S. 436 (1966).

there was there was an issue copying the video files to the computer which resulted in the loss of a majority of the recorded video segments. TFO Davis also acknowledged that he did not have Defendant sign a waiver of rights form.

SA Perry and SA Lemmon conducted a thorough search of the Protégé bag at the DEA Office. SA Lemmon documented this process through a series of photographs. (Def. Ex. H-1 through H-25). Ultimately, agents uncovered seven bundles from the bag having a combined gross weight of 3.9 kilograms. (Def. Ex. H-22). The agents also found medical paperwork in the bag bearing the name "Fernandez Rodriguez, Jesus F." (Def. Ex. H-21). The crystalline substance in one of the bundles field-tested positive for the presence of methamphetamine. The DEA South Central Lab subsequently conducted a forensic chemical analysis of the substance in the bundles, all of which tested positive for methamphetamine.

On November 15, 2017, a grand jury indicted Defendant on one count of unlawfully, knowingly and intentionally possessing with intent to distribute a controlled substance, 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine. On November 16, 2017, the United States filed an Information to Establish Prior Conviction Pursuant to 21 U.S.C. § 851. (Doc. 8). Defendant now seeks to suppress any tangible evidence DEA seized from him on October 25, 2017 and any statements he made at the DEA office.

## II.    ANALYSIS

Defendant's Motion raises a number of challenges. First, Defendant claims that DEA agents unlawfully seized the black Protégé bag. Defendant asserts that this unlawful seizure led to Defendant's consent to search the bag, SA Perry's discovery of contraband, Defendant's arrest, and his subsequent interrogation – a chain of events tainted by the alleged unlawful conduct without intervening events to break the causal connection. Defendant argues that, as a

result, any physical evidence and statements agents obtained should be suppressed as fruits of the poisonous tree. Second, Defendant argues that because there is no evidence that the DEA TFOs provided *Miranda* warnings prior to interrogating him at the DEA office, his statements should be suppressed. Finally, during the evidentiary hearings, Defendant suggested that one could infer that SA Perry unlawfully pre-searched the bag prior to the passengers reboarding the bus and argued that SA Perry's initial encounter with Defendant on October 25, 2017 was not consensual.

## A. Pre-Search of the Black Protégé Bag[3]

The Fourth Amendment protects the "right of the people to be secure in their…effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "Travelers have a legitimate expectation of privacy in their personal luggage, which the Fourth Amendment protects." *U.S. v. Nicholson*, 144 F.3d 632, 636 (10th Cir. 1998). Nevertheless, certain investigative techniques applied to a traveler's luggage do not offend the Fourth Amendment. For example, a visual inspection of an item in plain view, a dog sniff, and detection of odor through an officer's sense of smell do not constitute searches under the Fourth Amendment. *See id.* With regards to touching or handling a traveler's luggage, if the officer's manner of handling the bag is the sort that a traveler leaving the bag in its position reasonably might expect, the manner of touch will not be considered unreasonable. *See id.* However, "[a]ny subjective expectation that the bag would not be so handled given its location [is] not objectively reasonable." *Id.* at 637. "The circuits uniformly agree that an officer's touching of a bag's exterior does not necessarily constitute a search." *Id.* Rather, "[t]he degree of intrusion is the

---

[3] Defendant did not directly raise an unlawful "pre-search" challenge in his initial briefing but the Court addresses the argument in full here because Defendant's counsel suggested during closing argument that one could infer an improper warrantless "pre-search" of the bag before passengers again boarded the bus following the layover in Albuquerque Defendant's counsel nevertheless conceded that SA Perry testified that he did not manipulate or squeeze the bag.

determining factor as to whether an officer's contact with the exterior of luggage constitutes a search under the Fourth Amendment." *Id.* at 639.

In *United States v. Nicholson*, drug interdiction detectives boarded a Greyhound bus and began inspecting luggage in overhead racks of the passenger compartment after passengers disembarked during a layover. *Id.* at 634. One detective testified that he removed the defendant's carry-on bag from the overhead rack and "manipulated" it, detecting hard "tightly-wrapped" bundles which he believed to be illegal drugs. *Id.* at 635. The Tenth Circuit held that the officer's manner of manipulating the defendant's carry-on bag constituted an unreasonable search under the Fourth Amendment. *Id.* at 639. In reaching this conclusion, the court acknowledged that "placing a bag in an overhead rack of a commercial bus exposes it to certain intrusion," such as other passengers pushing or moving the bag to make room for their own bags. *Id.* But the *Nicholson* court determined that when the officer "removed Defendant's carry-on bag from the overhead rack and conducted a tactile examination…aimed at discovering the nature of the contents of the bag," the officer departed from the type of handling of a bag that a commercial bus passenger would reasonably expect. *Id.* (internal quotation marks and citation omitted); *see also Bond v. U.S.*, 529 U.S. 334, 339 (2000) (holding that an agent's physical manipulation of the petitioner's bag in an exploratory manner violated the Fourth Amendment).

In this case, as in *Nicholson*, SA Perry and SA Lemmon boarded the bus outside the wash bay area to look at bags passengers had left onboard. SA Perry testified that he removed the Protégé bag from the overhead rack in an effort to locate a name tag, causing him to note the bag's heft as compared to its size. However, there is no evidence here that the agents squeezed or manipulated the bag, or pressed in the sides of the bag with their hands to determine its contents in the manner found to be a search in *Nicholson.* It is not unusual on a common carrier for other passengers to push, move, and even momentarily remove an item from a common luggage area,

8

such as an overhead rack or compartment, in order to make room for their own carry-on bags. SA Perry's actions did not depart from the type of handling a commercial bus passenger would reasonably expect his baggage to be subjected to, and therefore did not constitute a search within the meaning of the Fourth Amendment.

**B. SA Perry's Initial Encounter with Defendant**

For the first time during closing argument, Defendant contended that SA Perry's initial contact with Defendant on October 25, 2017 was not consensual. "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen[.]" *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (internal quotation marks and citation omitted). Such consensual encounters do not implicate the Fourth Amendment. *U.S. v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017). "It is '[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen [that a court] may conclude that a 'seizure' has occurred.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). Courts consider a number of non-exclusive factors to determine whether a law enforcement-citizen encounter constitutes a seizure:

> the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers physically touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

*U.S. v. Lopez*, 443 F.3d 1280, 1284 (10th Cir. 2006) (citation omitted).

Defendant argues in part that rather than identify himself as a DEA agent conducting drug interdiction, SA Perry introduced himself as a police officer checking the bus for security

purposes and blocked Defendant's path when speaking with him, factors rendering the initial encounter with SA Perry involuntary. The Court is aware of a recent opinion of another judge in this district, *United States v. Easely,* 293 F. Supp. 3d 1288, 1304 (D.N.M. 2018), in which the court found that SA Perry's pattern of introducing himself as a police officer checking the bus for security "may mislead so called reasonable passengers into believing they are not free to decline or terminate the encounter." The *Easely* court determined that SA Perry misled passengers regarding the purpose of his search and weighed that factor in support of its conclusion that the defendant's consent to be searched and abandonment of her suitcase was involuntary. *Easely,* 293 F. Supp. 3d at 1305. The Court disagrees with this conclusion.[4]

Rather, having reviewed the totality of the circumstances in this case, the Court concludes that the initial encounter between Defendant and SA Perry on October 25, 2017 was voluntary. The encounter took place on the Greyhound bus in view of other passengers. SA Perry and SA Lemmon did not restrain Defendant in any way. From the video it is hard to see how SA Perry was positioned when speaking with Defendant, *see* Def. Ex. A, but SA Perry testified credibly that he was standing to the rear of Defendant's seat partially out of the aisle to avoid blocking Defendant. Both agents wore civilian clothes with firearms concealed and out of public view. SA Lemmon did not speak with Defendant at all during the initial encounter but rather remained at the front of the bus out of the aisle and doorway. The audio recording reveals that SA Perry spoke in a calm tone and asked Defendant if he could speak with him for a moment to which Defendant conceded. SA Perry looked briefly at Defendant's bus ticket before returning it.

---

[4] The suppression order at issue in *U.S. v. Easely* is currently on appeal before the Tenth Circuit and set for oral argument in November 2018. *See* COA No. 18-2020. In *U.S. v. Jimenez,* Cr. No. 17-2381-JCH, 2018 WL 770385, *5 (D.N.M. Feb. 7, 2018), another district court judge also disagreed with "the court's conclusion in *Easely* that a DEA agent improperly attempts to assert authority and confuse passengers when he identifies himself as a police or law enforcement officer who is checking the bus for 'security.'"

Throughout the encounter SA Perry maintained a calm and polite demeanor. Though SA Perry did not advise Defendant that he could terminate the encounter at any time, the remaining *Lopez* factors weigh heavily in favor of the Court's conclusion that the encounter was consensual and voluntary.

### C. Seizure of the Bag

Having determined that the initial encounter between Defendant and Perry was consensual, the Court must next decide whether SA Perry unlawfully seized the black Protégé bag. This analysis ultimately hinges on whether Defendant's repeated disclaimer of any luggage amounted to a voluntary abandonment of the bag.

Defendant contends that SA Perry seized Defendant's bag in violation of the Fourth Amendment when he took it from the common storage area of the bus and walked it down the aisle showing it to each bus passenger in an effort to identify the bag's owner. To support this argument, Defendant relies heavily on a factually similar, but distinguishable, Tenth Circuit case, *United States v. Hill*, 805 F.3d 935 (10th Cir. 2015). In *Hill*, a DEA agent removed a suitcase with no name tag from the common luggage area of an Amtrak train, carried it to the passenger area, and rolled it down the center aisle asking each passenger if the bag belonged to him or her. 805 F.3d at 936. All of the passengers, including the defendant, disclaimed ownership of the bag. *Id.* Determining that the bag was abandoned, the agent searched the bag, finding cocaine and items that linked the bag to the defendant. *Id.* The Tenth Circuit held that the agent's actions amounted to a seizure of the defendant's luggage. *Id.* at 939. Because the seizure occurred absent reasonable suspicion, exigent circumstances, or a warrant, it violated the Fourth Amendment. *Id.* at 939.

The Tenth Circuit in *Hill* explained that "[a] seizure within the contemplation of the Fourth Amendment occurs when there is some meaningful interference with an individual's

possessory interest in his property." *Id.* at 937. And "that a traveler's possessory interest in his luggage is at its zenith when the luggage is in his direct possession and at its nadir when the luggage has been checked with a common carrier." *Id.* at 938. Having chosen to stow his luggage in the common luggage area, the defendant's possessory interest in his suitcase was intermediate to a bag in his direct possession and one checked with Amtrak. *Id.* Accordingly, the defendant could expect that his bag might be repositioned or temporarily removed from the storage area as passengers sought to store or remove their own luggage, but he could also reasonably expect to have access to the bag at any time he chose. *Id.* The Tenth Circuit determined that the DEA agent's "actions, in taking the bag into his own dominion and control for the purpose of finding its owner and conducting narcotics interdiction, deviated significantly from a reasonable traveler's expectations as to how his bag would be treated in the common storage area and, concomitantly, deprived [the defendant] of his possessory interest in being able to access his luggage on his own schedule." *Id.* The Tenth Circuit continued that because the intrusion was at odds with a reasonable traveler's expectations, it was meaningful within the scope of the Fourth Amendment. *Id.* at 938-39.

While the Court agrees that the fact pattern in *Hill* is very similar to the facts presented here and makes this a close question, there is one key distinction: Defendant in this case expressed multiple times that he had no luggage *before* SA Perry grabbed the black Protégé bag from the overhead rack and began showing it to passengers asking if each was the owner. The United States claims that Defendant thereby abandoned the bag by disclaiming any possessory interest in it *prior* to SA Perry taking control of it. (Doc. 22 at 6). "Abandonment is akin to the issue of standing because a defendant lacks standing to complain of an illegal search or seizure of property which has been abandoned." *U.S. v. Garzon*, 119 F.3d 1446, 1449 (10th Cir. 1997).

"The test for abandonment subsumes both a subjective and an objective component." *Id.* But subjective intent aside, "[w]hen a person expressly denies having ownership of property, unless that denial of ownership is the result of a Fourth Amendment violation, it constitutes an abandonment of property." *Easely*, 293 F. Supp. 3d at 1301; *see also U.S. v. Denny*, 441 F.3d 1220, 1227 (10th Cir. 2006) (listing cases and noting that, "Defendant does not cite and we have not found a case in which a defendant's express disclaimer of ownership in response to a lawful police inquiry did not constitute abandonment of property in the Fourth Amendment context."). The burden is on the government to establish abandonment by a preponderance of the evidence. *See Denny*, 441 F.3d at 1226.

The United States has met its burden of establishing that Defendant abandoned the black Protégé bag prior to SA Perry taking the bag into his control. During his initial encounter with Defendant, and prior to grabbing the bag from the overhead rack, SA Perry asked Defendant three times if he had any "luggage," to which Defendant responded three times in English, clearly and unambiguously: (1)"No, not…I don't got nothing with me today," (2) "No," and (3) "Nah." (Def. Ex. D 19:9-16). Defendant argues that he did not abandon his bag by answering SA Perry's initial inquiries pertaining to "luggage" in the negative, particularly where the words "luggage" and "bag" may have different meanings to individuals for whom English is a second language, and where Defendant later acknowledged that he owned the Protégé bag when SA Perry physically showed it to him. (Doc. 24 at 3-4). Defendant suggests that his lack of subjective intent to abandon the bag is reflected in the fact that during his second encounter with SA Perry, Defendant immediately claimed the bag as his. (Doc. 24 at 5).

After reviewing the audio recordings and transcript of those recordings, the Court concludes that Defendant abandoned any possessory interest in the bag before SA Perry took it

13

from the overhead rack, into his control, and presented it to passengers. Prior to removing the Protégé bag from the overhead rack, SA Perry first spoke with all of the bus passengers and identified the owners of on-board baggage. No one, including Defendant and those passengers sitting in the immediate vicinity of the Protégé bag, claimed it. The bus was not crowded, yet the bag was located several rows behind Defendant's seat on the opposite side of the bus, indicating Defendant's subjective intent to distance himself from the bag. And Defendant clearly and unambiguously told SA Perry that he had nothing with him that day on the bus, manifesting an intent to abandon ownership of the bag in the overhead rack. *Cf. U.S. v. Fulani*, 368 F.3d 351, 354 (3d Cir. 2004) (concluding that a defendant abandoned ownership of his bag when he expressly disclaimed ownership of any bag located in the overhead rack of the bus).

The Court recognizes the challenges that can arise when communicating in one's non-native language.[5] But the evidence establishes that although Defendant spoke with a thick accent, he understood and responded appropriately to SA Perry's questions. Additionally, TFO Davis testified that prior to conducting the subsequent interview with Defendant at the DEA office, TFO Davis asked Defendant in Spanish if he understood English or Spanish. Replying in English, Defendant indicated that he understood both languages and then affirmatively chose to proceed with the interview in English. *See U.S. v. Ojeda-Ramos*, 455 F.3d 1178, 1187 (10th Cir. 2006) (rejecting the defendant's argument that any abandonment of a suitcase was rendered involuntary because he could not speak English, where the defendant answered several of the officer's questions in English and the officer understood those responses). Prior to taking the bag into his possession and showing it to passengers, SA Perry asked Defendant three times if he had any luggage and Defendant responded, clearly and without hesitation, that he did not have

---

[5] Although Defendant's counsel argued that Defendant was confused by SA Perry's use of the word "luggage" during his initial encounter compared to SA Perry's later choice of the word "bag," Defendant presented no evidence that he did not understand what SA Perry meant when he asked about "luggage."

anything with him that day. The Court acknowledges that Defendant readily claimed ownership of the black Protégé bag once SA Perry showed it to him, but that does not alter the Court's analysis with regards to SA Perry's actions. Curiously, perhaps realizing he was in trouble, Defendant again stated that the bag was not his after SA Perry located the bundles inside of the bag. (Def. Ex. D, 26:1-3 ("That's not my bag, that's not my bag.")).

The evidence before the Court demonstrates that Defendant intentionally distanced himself from the bag prior to SA Perry showing it to passengers, and any subjective expectation of privacy that Defendant might have had in the bag was not objectively reasonable under the circumstances. Because there was no prior Fourth Amendment violation, Defendant's abandonment of his possessory interest in the bag was voluntary. Warrantless seizure of abandoned property is not unreasonable under the Fourth Amendment. *See U.S. v. Hernandez*, 7 F.3d 944, 947 (10th Cir. 1993).

### D. Fruit of the Poisonous Tree

Defendant argues that the Court should suppress all tangible evidence seized from Defendant as well as his post-arrest statements to agents because agents violated his Fourth Amendment rights by unlawfully seizing the black Protégé bag, which the officers then exploited to obtain Defendant's consent to search the bag, which led to Defendant's arrest and subsequent interrogation at the DEA office. (Doc. 21 at 10-11). To suppress any tangible evidence and statements as fruit of an unlawful seizure, Defendant must show, first, that there was an unlawful seizure that violated Defendant's Fourth Amendment rights, *see U.S. v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006), "and, second, that a factual nexus exists between [the unlawful seizure] and the challenged evidence," *U.S. v. Mosley*, 743 F.3d 1317, 1323 (10th Cir. 2014) (internal quotation marks and citation omitted). As discussed above, Defendant has not met his

burden of showing that that his Fourth Amendment rights were violated, and accordingly Defendant cannot prevail on his claims that the methamphetamine and Defendant's statements should be suppressed as fruits of the poisonous tree.[6]  Consequently, the Court will not suppress the tangible evidence agents seized from Defendant on October 25, 2017.  However, Defendant alternatively seeks to suppress his post-arrest statements based on an alleged *Miranda* violation, which the Court addresses next.

### E.  Defendant's Post-Arrest Statements

The Fifth Amendment protects a person from being compelled to incriminate himself. U.S. Const. amend. V. "The Fifth Amendment privilege against self incrimination is fully applicable during a period of custodial interrogation." *U.S. v. Johnson*, 42 F.3d 1312, 1317 (10th Cir. 1994) (internal quotation marks and citation omitted). An individual may waive this privilege "provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "When a Miranda violation is alleged to have occurred, the burden of proof rests with the government to prove the validity of the waiver by a preponderance of the evidence." *Johnson*, 42 F.3d at 1318. The government must demonstrate "(1) that the waiver was voluntary in the sense that it was a product of free and deliberate choice rather than intimidation, coercion, or deception; and (2) that the waiver was made in full awareness of the nature of the right being waived and the consequences of waiving." *U.S. v. Hernandez*, 93 F.3d 1493, 1501 (10th Cir. 1996).

---

[6]Outside of the suggestion that Defendant's consent to search the bag was vitiated as the result of an unconstitutional seizure, Defendant does not make a separate argument that his consent for SA Perry to search his later-claimed bag was involuntary and invalid. Nor is there evidence to suggest involuntary consent. To the contrary, when SA Perry showed Defendant the bag, Defendant responded, "Yeah, that's my bag." Then, before SA Perry even asked for permission to search the bag, Defendant offered "You want to check it out?" (Def. Ex. D, 25:17-20). To confirm, SA Perry then unambiguously asked, "Ok, will you give me permission to search it?" and Defendant said "Yeah." (Def. Ex. D, 25:21-22).

The parties do not dispute that any post-arrest questioning of Defendant at the DEA office constituted custodial interrogation requiring *Miranda* warnings. Defendant asserts that there is no evidence that officers advised him of his *Miranda* warnings, and as such, his post-arrest statements must be suppressed.[7] (Doc. 21 at 11). Defendant explains that the United States produced an incomplete video of Defendant's interview which does not contain a *Miranda* waiver, as well as a "post-hoc report" based on "personal recollection" and "handwritten notes" not provided to Defendant. Defendant asserts that this incomplete evidence is insufficient to support a finding that Defendant voluntarily and knowingly waived his right to remain silent. (Doc. 21 at 11; Doc. 24 at 9).

The United States presented evidence at the hearing, through TFO Davis's testimony, that TFO Davis not only advised Defendant of his *Miranda* warnings, but that Defendant acknowledged that he understood his rights and voluntarily waived those rights.[8] As a preliminary matter, the Court found as credible TFO Davis's testimony and explanation of what may have rendered the video recording of the interview incomplete. TFO Davis testified that he carries an image of the DEA *Miranda* warnings card on his phone and that he read these to Defendant prior to the start of questioning, but after determining from Defendant his preferred language. At the hearing, TFO Davis read into the record what he had read to Defendant, and the Court finds the *Miranda* warnings were adequate. TFO Davis testified that his usual practice is to confirm understanding with the person being advised of his rights after reading each section of the *Miranda* warnings so that he can be confident the person comprehends. TFO Davis recalls Defendant responding affirmatively each time TFO Davis explicitly asked him if he understood his rights. Defendant still agreed to waive those rights and speak with TFO Davis. During the

---

[7] Defendant does not specify the statements he seeks to suppress, and it is unclear to the Court from the record whether Defendant made incriminating statements during the interrogation at the DEA office.

[8] Defendant did not present any evidence that conflicted with TFO Davis's testimony.

interview TFO Davis and Chavez were dressed in civilian clothing and their firearms were not visible. Defendant was not shackled or restrained. (Gov't Ex. 13). The available video segment reveals that TFO Davis spoke to Defendant in a normal tone of voice. (Gov't Ex. 13). The interview lasted approximately twenty-five minutes.

Under the totality of the circumstances, the Court finds by a preponderance of the evidence that TFO Davis administered to Defendant adequate *Miranda* warnings and that Defendant knowingly, intelligently, and voluntarily waived his Fifth Amendment privilege. *See Garcia v. Stewart,* Civ. No. 15-750-LH/KK, 2016 WL 9778188, *7 (D.N.M. Aug. 8, 2016) (rejecting petitioner's position that a deputy's sworn testimony was insufficient to prove that the deputy administered adequate *Miranda* warnings and that the prosecution must also present a waiver of rights form and/or a video recording as proof of this fact, and noting that "[t]he Fifth Amendment requires that a defendant receive adequate *Miranda* warnings before custodial interrogation, not that these warnings be phrased or documented in a particular way"). Accordingly, the Court will not suppress Defendant's post-arrest statements.

IT IS THEREFORE ORDERED that Mr. Fernandez's Motion to Suppress and Request for Evidentiary Hearing (Doc. 21) is DENIED.


_____
THE HONORABLE JAMES A. PARKER