1            IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF NEW MEXICO

3

4    UNITED STATES OF AMERICA,

5         Plaintiff,

6    vs.                    1:17-CR-3237-JAP

7    JESUS FRANCISCO FERNANDEZ,

8         Defendant.

9

10        Transcript of Jury Trial before The Honorable James A.
     Parker, Senior United States District Judge, held in
11   Albuquerque, Bernalillo County, New Mexico, commencing on
     Monday, March 4, 2019, at 1:07 p.m., and concluding at 5:01
12   p.m.

13

14   For the Plaintiff:  Samuel A. Hurtado, Esq.

15

16

17   For the Defendant:  John F. Robbenhaar, Esq.

18                       Esperanza S. Lujan, Esq.

19

20

21

22

23                     John De La Rosa, CCR
               United States Official Court Reporter
24              421 Gold Avenue, Southwest
               Albuquerque, New Mexico  87102
25                  Phone:  505.348.2249

1      (In open court.)

2           THE COURT:  Good afternoon, court's in session, have a

3  seat, please.

4           This is Number 2017-3237, United States of America

5  versus Jesus Francisco Fernandez.  Would counsel state their

6  appearances, please.

7           MR. HURTADO:  Good afternoon, Samuel Hurtado for the

8  United States.  Your Honor, Special Agent Perry is going to

9  join the United States at the prosecution's table; however, he

10  just stepped out for a moment.

11           THE COURT:  That's fine.

12           MR. ROBBENHAAR:  John Robbenhaar and Esperanza Lujan on

13  behalf of Mr. Fernandez.  Also at the table is Daniel Berg from

14  the Federal Defender's Office.

15           THE COURT:  Let me visit with you about the persons who

16  have reported for jury selection.  You have a list that shows

17  49 prospective jurors.  Is that correct?

18           MR. HURTADO:  Yes, sir, correct.

19           MR. ROBBENHAAR:  Yes, Your Honor.

20           THE COURT:  There were several that were excused for

21  various reasons.  There is one that I need to bring to your

22  attention.

23      (Off the record.)

24           THE COURT:  Let's see.  Number 37 on your list, Roy

25  Clamor --

1           Is that correct, Mr. Gonzales?

2           MR. GONZALES:  Yes, Your Honor.

3           THE COURT:  Okay.  Apparently is wearing shorts, and I

4    need your views on whether you would rather excuse him from

5    participation because of his attire.

6           MR. HURTADO:  Your Honor, the United States would not

7    oppose Mr. Clamor wearing shorts, assuming it's acceptable to

8    the court.

9           MR. ROBBENHAAR:  I don't want to -- I guess we wouldn't

10   oppose if the court let him go because of his shorts.

11          THE COURT:  What's the government's position on

12   excusing him?

13          MR. HURTADO:  No objection, Your Honor.

14          THE COURT:  Okay.  I'll excuse, then, juror Roy Clamor

15   because of his inappropriate attire.

16          Now, let me ask counsel, do you have questions about

17   any of the other persons who have reported for jury selection?

18   Mr. Hurtado?

19          MR. HURTADO:  No, sir.

20          MR. ROBBENHAAR:  No, Your Honor.

21          THE COURT:  I understand that the persons who reported

22   for jury selection are ready to proceed.  Anything I need to

23   take up before we begin voir dire examination?

24          MR. HURTADO:  Your Honor, would it be acceptable to

25   turn the podium around?  That way the parties could face the

1  venire.

2          THE COURT:  You mean when you're asking questions?

3          MR. HURTADO:  Yes, sir, correct.

4          THE COURT:  Sure, that's fine.

5          Anything else upon behalf of the government?

6          MR. HURTADO:  No, Your Honor.

7          THE COURT:  And Mr. Robbenhaar, anything else on behalf

8  of the defendant?

9          MR. ROBBENHAAR:  No, Your Honor.

10         THE COURT:  All right.  We'll be in recess while the

11  jury enters the courtroom.  We'll proceed with jury selection.

12         Court's in recess.

13     (Court recessed at 1:13 p.m. to 1:24 p.m.)

14     (In open court, venire present.)

15         THE COURT:  Good afternoon, court's in session.  Have a

16  seat, please.  I want to welcome all the persons who have

17  reported for jury selection this afternoon.  We're going to

18  select a jury in one case.  The trial will begin after

19  selection this afternoon.  It probably will conclude by

20  Wednesday, but possibly would go into Thursday.

21         Let me call the case at this time.  This is

22  Number 2017-3237, United States of America versus Jesus

23  Francisco Fernandez.  Would counsel state their appearances,

24  please.

25         MR. HURTADO:  Yes, sir.  Samuel Hurtado for the United

1    States.  And appearing with the United States this afternoon is

2    Special Agent Jay Perry from the DEA.

3          MR. ROBBENHAAR:  Good afternoon, Your Honor, John

4    Robbenhaar and Esperanza Lujan here on behalf of Jesus

5    Francisco Fernandez.  Also at counsel table is Daniel Berg from

6    the Federal Defender's Office.

7          THE COURT:  Let me begin by introducing myself and my

8    staff.  I am Jim Parker, one of the seven federal judges in the

9    District of New Mexico.

10          This afternoon, we have present Mr. -- let's see.  Here

11   he is at the back of the courtroom.  Mr. Juan Gonzales, our

12   courtroom deputy.  He's available to help you if you have

13   questions or need to make calls or anything like that.

14          Next to him is Barbara Ashley Phear.  She's waving her

15   hand at you.  She's also available to help.

16          Up front, we have Rachel Giron.  Would stand,

17   Ms. Giron?  Rachel is a lawyer.  She's one of my law clerks.

18   She'll be here through most of the trial.  She also is

19   available to help you during jury selection or after a jury is

20   selected.

21          Then Emily Carey.  Would you stand, please?  Ms. Carey

22   also is a lawyer.  Thank you, you may be seated.  And she will

23   be here to help this afternoon.

24          Let's see, I overlooked in the rear of the courtroom

25   Charlene Grasty who all of you have met already, so I don't

1    think I need to advise about her, but I do need to introduce

2    the busiest person in the courtroom, and that's Mr. John De La

3    Rosa.  Would you stand, please?

4            Now, you may have noticed a moment of silence while

5    Mr. De La Rosa was standing.  As I mentioned, he's the busiest

6    person in the courtroom because he's our court reporter.  And

7    he has to record everything that is said during these

8    proceedings.  So I didn't say anything while he was standing,

9    and he at the moment is taking down everything that is being

10   said.

11           Okay.  Let me tell you about this case.  The case, as I

12   mentioned, is the United States of America versus Jesus

13   Francisco Fernandez.  I'm going to read to you the indictment

14   in the case, but before I do that, I'm going to give you some

15   warnings.  An indictment is nothing more than a charge that

16   starts a criminal proceeding.  There are various ways that a

17   criminal proceeding can begin.  One is by the filing of an

18   information or a complaint.  Another is an indictment of a

19   grand jury, and that's what occurred in this case.

20           The indictment sets forth the charge against the

21   defendant.  It's not evidence in the case, and when I read it

22   to you, you must not accept it as evidence in the case.  But

23   this is what the indictment charges:

24           On or about October 25, 2017, in Bernalillo County in

25   the District of New Mexico, the defendant, Jesus Francisco

1    Fernandez, unlawfully, knowingly, and intentionally possessed

2    with intent to distribute a controlled substance, 500 grams and

3    more of a mixture and substance containing a detectable amount

4    of methamphetamine in violation of 21 United States Code

5    Sections 841(a)(1) and (b)(1)(A).

6           Now, again, I repeat, that is simply a charge.  It is

7    not evidence and must not be accepted by you as anything other

8    than a charge in the case.

9           Now, you have already heard who the players are, but

10   I'm going to introduce them again.  The United States of

11   America is represented by Assistant U.S. Attorney Samuel A.

12   Hurtado.  Now, Mr. Hurtado is standing.

13          You may have a seat if you wish.

14          MR. HURTADO:  Yes, sir.

15          THE COURT:  Let me ask you to raise your hand if you

16   know Mr. Hurtado personally or any members of his family.

17          Now, Mr. Hurtado is a member of the Office of the

18   United States Attorney for the District of New Mexico.  The

19   United States Attorney is Mr. John Anderson.  Please raise your

20   hand if you know Mr. Anderson.

21          Okay.  Second row over here.

22          MR. FELDEWERT:  Michael Feldewert, Your Honor.

23          THE COURT:  Tell us about your acquaintance with John

24   Anderson.

25          MR. FELDEWERT:  Your Honor, I'm with Holland & Hart in

1    Santa Fe.  Mr. Anderson was an associate of ours before he

2    joined the U.S. Attorney's Office.

3          THE COURT:  How long was he with Holland & Hart?

4          MR. FELDEWERT:  You're going to tax my memory here,

5    Judge.  Three or four years ago.

6          THE COURT:  Did you work with him while he was there?

7          MR. FELDEWERT:  Yes, sir.

8          THE COURT:  On a regular basis?

9          MR. FELDEWERT:  Yes, sir.

10          THE COURT:  Because of your acquaintance with

11    Mr. Anderson, do you think you would be able to put aside your

12    association and be an impartial juror in this case?

13          MR. FELDEWERT:  Yes, sir.

14          THE COURT:  If at the end of the case you were on the

15    jury and you found it difficult to reach a decision on the

16    evidence, do you think you might be inclined to vote for the

17    government simply because of your acquaintance with

18    Mr. Anderson?

19          MR. FELDEWERT:  No.

20          THE COURT:  All right.  Thank you very much.

21          Anyone else who is personally acquainted with

22    Mr. Anderson?

23          Now, there are quite a number of lawyers, Assistant

24    U.S. Attorneys, in the Office of the United States Attorney.

25    If you're acquainted with any of the other members of the

1    Office of the United States Attorney, would you please raise

2    your hand?

3              Let me ask Mr. Feldewert, do you know any other members

4    in the office?

5              MR. FELDEWERT:  I don't believe so.

6              THE COURT:  Thank you.

7              Also seated at the table with Mr. Hurtado is Special

8    Agent Jarrell Perry.  I'll ask him to stand again.

9              Thank you, Mr. Perry, you may be seated.

10             If any of you are personally acquainted with Mr. Perry

11   or any members of his family, would you please raise your hand?

12             Next, I'll introduce the defendant, Mr. Jesus Francisco

13   Fernandez.  Would you stand, sir?

14             Thank you, Mr. Fernandez, you may be seated.

15             If any of you are personally acquainted with the

16   defendant, Mr. Fernandez, or any members of his family, would

17   you please raise your hand?

18             The attorneys representing Mr. Fernandez are Mr. John

19   Robbenhaar and Ms. Esperanza Lujan.  Would you stand, please?

20             Thank you, you may be seated.

21             Both Mr. Robbenhaar and Ms. Lujan are members of the

22   Office of the Federal Public Defender.  The Federal Public

23   Defender is Mr. Steve McCue.  If any of you know personally

24   either Mr. Robbenhaar, Ms. Lujan or Mr. McCue, or any members

25   of their families, would you please raise your hand?

1          There are many members of the Office of the Federal

2     Public Defender.  If any of you are acquainted with any of the

3     other members of that office, would you please raise your hand?

4          Listen carefully while I identify the persons who may

5     testify before the jury as witnesses in this case, and if you

6     think if you know them, please raise your hand real high.

7          Special Agent Kirk Lemmon with the Drug Enforcement

8     Administration.  Do any of you know Special Agent Kirk Lemmon?

9          Paul Galat who is a forensic chemist.  Do any of you

10    know Paul Galat?

11         Lidia Fernandez.  If you are acquainted with Lidia

12    Fernandez, please raise your hand.

13         Let me ask counsel, are there any other potential

14    witnesses?

15         MR. HURTADO:  Not on behalf of the United States, Your

16    Honor.

17         MR. ROBBENHAAR:  No, Your Honor.

18         THE COURT:  Members of the jury, now that I have

19    identified the persons involved in this case and the witnesses

20    who may testify and the charge in the indictment, we need to

21    know whether you think you knew anything about this case before

22    you came to court today.  If any of think you have read about

23    it, heard about it, saw it on TV, heard about it word of mouth

24    or any other source, please raise your hand.

25         As I mentioned previously, this case probably will

1   conclude on Wednesday, but I need to make sure that the jurors

2   are available to serve into Thursday because that's a

3   possibility.  So I need to ask you to raise your hand if you

4   think you would be unable for any reason to serve on the jury

5   between now and Thursday throughout Thursday.

6          Let's start in the front row over here with Mr. Timothy

7   Cox.  Is that correct?

8          MR. COX:  Yes, sir.  May I approach the bench?

9          THE COURT:  Yes, you may.

10     (At the bench.)

11         MR. COX:  Thank you, Your Honor.  I apologize for not

12  putting this on the electronic form, but I'm going to request

13  excuse for medical reasons from my psychiatrist.  My wife of 38

14  years hung herself less than six months ago, and I'm in

15  treatment.

16         THE COURT:  You're going to be excused.  You will

17  receive credit for one day of jury service.  I'll let you go at

18  this time with my condolences.

19     (In open court.)

20         THE COURT:  Let's see.  Was there anyone else in the

21  front?

22         Yes, over here, we have Ms. Toya.  Is that correct?

23         MS. TOYA:  Yes, sir.

24         THE COURT:  Would you tell us why you might not be

25  available?

1          MS. TOYA:  I previously emailed that I have pre travel

2    on the 7th and 8th, which would be Thursday and Friday.

3          THE COURT:  That's right.  Go ahead and have a seat,

4    and I'll get back to you in a little bit.

5          MS. TOYA:  Thank you, sir.

6          THE COURT:  Anyone else in the front row on the left?

7    How about in the front row on the right?  Anyone raise their

8    hand?

9          Let's go back to the second row on the left, and let's

10   see, Mr. Feldewert, you raised your hand.

11         MR. FELDEWERT:  Yes, Your Honor.  I apologize.  I have

12   hearings scheduled before the Oil Conservation Division on

13   Thursday and witnesses coming in for hearing preparation on

14   Wednesday.  So if this trial is going to extend into Wednesday

15   or Thursday, I'm unable to be here.

16         THE COURT:  Okay.  Thank you.  Go ahead and have a

17   seat.

18         Anyone else in the second row?  Yes, I should have

19   started on the end with Mr. Myers.

20         Did you want to come up to the bench?

21         MR. CARRICO:  Yes.

22         THE COURT:  Okay.

23     (At the bench.)

24         MR. CARRICO:  I'm a self-employed.  I own a commercial

25   vehicle.  More than a couple of days will kill me financially.

1          THE COURT:  Where is your business?

2          MR. CARRICO:  In Albuquerque, Bernalillo County.

3          THE COURT:  What specifically is the business?

4          MR. CARRICO:  It's a trucking business.

5          THE COURT:  Mr. Hurtado, do you have any questions you

6    would like to ask?

7          MR. HURTADO:  Would it be difficult for you to

8    concentrate on this case if you were selected to be a juror

9    given the financial implications this would cause you?

10         MR. CARRICO:  I would be worried about my customers and

11   my income.

12         THE COURT:  Would that detract from your ability to

13   carefully listen to witnesses and the lawyers?

14         MR. CARRICO:  I would hope not, but...

15         THE COURT:  Can you give us assurance --

16         MR. CARRICO:  I can't say 100 percent yes, sir.

17         THE COURT:  Mr. Robbenhaar?

18         MR. ROBBENHAAR:  I hear that there is no one else who

19   can help you in your business?

20         MR. CARRICO:  No, because it's one truck by myself.  I

21   have to run so many miles a day and so much a day to pay the

22   bills.

23         MR. ROBBENHAAR:  I see.

24         MR. CARRICO:  That's my biggest problems.

25         MR. ROBBENHAAR:  Sounds like it would be a financial

1   hardship for you.

2          MR. CARRICO:  One day, like a day, I can live with; but

3   two or three days, it adds up quick.

4          THE COURT:  Go ahead and take your seat.  I want the

5   lawyers to stay up here.

6          THE COURT:  Let me ask, is there any objection to

7   excusing Mrs. Toya, who has travel plans on Thursday?  I don't

8   see this going that far.

9          MR. HURTADO:  I prefer to give keep her on given the

10   trial is not expected to go until Thursday.

11          MR. ROBBENHAAR:  I don't think it will go until

12   Thursday, but I don't oppose her being excused.

13          THE COURT:  Do you oppose her being excused?

14          MR. HURTADO:  No, sir.

15          THE COURT:  What about the lawyer, Mr. Feldewert?

16          MR. HURTADO:  He has hearing prep on Wednesday and

17   hearing on Thursday.  I wouldn't oppose letting him go as well.

18          THE COURT:  I'm going to excuse them, number 6,

19   Mrs. Toya and number 22, Mr. Feldewert, and number 20,

20   Mr. Carrico, at this time.  I'll let them leave the courtroom,

21   and we can take up Mr. Myers.

22          MR. ROBBENHAAR:  Was the last individual Mr. Carrico?

23   Got it.  Thank you.

24      (In open court.)

25          THE COURT:  Ms. Toya, Mr. Carrico, and Mr. Feldewert,

1    I'm going to excuse you from further participation in jury

2    selection at this time with my thanks for your appearance here

3    today.  Each of you will receive one day of credit for jury

4    service for having reported.  You may leave the courtroom at

5    this time.

6              THE COURT:  Now, Mr. Myers, I believe you raised your

7    hand as well?

8              MR. MYERS:  Yes.  May I approach the bench?

9              THE COURT:  Yes, you may.

10        (At the bench.)

11             THE COURT:  Yes, sir.

12             MR. MYERS:  Your Honor, right now, we're going through

13   an investigation with my stepdaughter for -- she has spina

14   bifida, and we just got her back from her dad, and it's sexual

15   abuse, and so we have to take her to her -- I don't know what

16   they call it, social worker, and we're supposed to meet with

17   them Wednesday.  And also, me and my wife, we commute back and

18   forth to Gallup every day for work, and we only have one

19   vehicle.

20             THE COURT:  Where do you live?

21             MR. MYERS:  Ramah.

22             THE COURT:  You drive from Ramah to Gallup?

23             MR. MYERS:  Yes, with what we're going through with her

24   kind of puts a halt on what we need to be here.

25             THE COURT:  How did you get here today?

1           MR. MYERS:  My wife actually got the day off.  We got

2    lucky, so she rode up here with me.

3           THE COURT:  If you were required to be on the jury, how

4    would you get here?

5           MR. MYERS:  That's the problem we're having, is a

6    second vehicle, because we've been working on buying one.  We

7    just don't have the funds to do it right now.

8           THE COURT:  Your appointment with the social worker is

9    on Wednesday?

10          MR. MYERS:  Yes.

11          THE COURT:  Mr. Hurtado, do you have any questions?

12          MR. HURTADO:  No, Your Honor, but the United States

13   would have no objection to releasing this juror.

14          MR. ROBBENHAAR:  We feel similarly, Judge.

15          THE COURT:  Mr. Myers, thank you for being here today.

16   I'm going to excuse you from further participation.  You can go

17   ahead and leave the courtroom and will get credit for one day

18   of jury service for having been here.

19          MR. MYERS:  Thank you, sir.  I appreciate it.

20      (In open court.)

21          THE COURT:  Let me ask, was there anyone I overlooked

22   in the first or second row on the left?  Yes, Mr. Charrette?

23          MR. CHARRETTE:  Yes, sir.  I'm not sure how late things

24   run, but I have a flight Thursday at 7:00 for a funeral on

25   Friday, Thursday leaving at 7:00 p.m.

1            THE COURT:  I'm pretty sure the case will have

2   concluded well in advance of that time.

3            Let's stick on the left-hand side in the last row.  Did

4   anyone raise their hand?

5            Let's go back over on this side, then, to the second

6   row.  Mr. Trujillo, you raised your hand, sir?

7            MR. TRUJILLO:  Yes, sir, may I approach?

8            THE COURT:  Yes, you may.

9      (At the bench.)

10           MR. TRUJILLO:  Hello, Judge.

11           THE COURT:  Excuse me just a second.  Go ahead.

12           MR. TRUJILLO:  First, I would like to say I'm happy to

13   be selected.  My one predicament is that I'm concerned if I

14   miss this week of work I will miss my mortgage payment as a low

15   income employee working part time.  That's my main concern.

16           THE COURT:  Who do you work for?

17           MR. TRUJILLO:  I work for a small local business called

18   Theresa's Frame Shop, so it is a small business.  I would also

19   leave her short staffed which I feel bad about.  But my main

20   thing is not being able to make my mortgage payment by not

21   having a check this week for that portion.

22           THE COURT:  Mr. Hurtado, do you have any questions?

23           MR. HURTADO:  No, sir, but that sounds like a

24   compelling reason to be excused, and I would offer no objection

25   if that's what the court would like to do.

1           MR. ROBBENHAAR:  Sounds like you are paid on an hourly

2    basis.

3           MR. TRUJILLO:  Yes.

4           MR. ROBBENHAAR:  I agree with Mr. Hurtado.

5           THE COURT:  Thank you for being here today.  You will

6    get credit for one day of jury service.  I'll excuse you with

7    my thanks at this time.

8      (In open court.)

9           THE COURT:  Was there anyone else in the second row

10   over here who raised their hand?  We have several, yes.  All

11   right, sir.

12          MR. MELENDREZ:  May I approach?

13          THE COURT:  Yes, you may.  Mr. Melendrez?

14          MR. MELENDREZ:  Yes.

15          THE COURT:  Come on up.

16     (At the bench.)

17          MR. MELENDREZ:  Your Honor, due to my mental health

18   issues, I believe that I'm --

19          THE COURT:  State it again.

20          MR. MELENDREZ:  Due to my mental health issues, I don't

21   believe I'm qualified to participate in such a trial.  I am on

22   the autism spectrum.  I have autism spectrum disorder.  I have

23   been diagnosed 35 -- 41, and I'm -- I've been on disability.  I

24   have a caregiver that comes to my house Mondays, Wednesdays,

25   and Fridays.  And in fact, he should be there right now.  He's

1    missing his employment.  So that will also happen again on

2    Wednesday, you see, so I am just going to leave it up to the

3    court whether or not I should participate or not.

4              THE COURT:  Let me ask you, does your affliction make

5    it difficult for you to pay attention to what's going on in

6    court?

7              MR. MELENDREZ:  Yes.  Due to my autism, I have issues

8    concentrating, and -- but I do have 150 IQ, though.

9              THE COURT:  Well, if you were on the jury, would you be

10   able to concentrate and pay attention to what the jurors are

11   seeing and answers to questions?

12             MR. MELENDREZ:  Yes.

13             THE COURT:  When would you not be able to pay close

14   attention in the trial?

15             MR. MELENDREZ:  As of right now, this white noise that

16   you are playing is giving me a little bit of anxiety, so it's

17   verbal stimulation.  Large groups or people talking at once

18   gives me anxiety.  I'm on medication for that.  And I'm on

19   antidepressants as well.  So I'm not sure -- I'm just going to

20   leave it up to you if you think I'm qualified or not, but

21   really, this is adding a lot of stress.  I walked here, you

22   know.  So it's exacerbating the -- my anxiety levels a little

23   bit.

24             THE COURT:  Have you been on any juries previously?

25             MR. MELENDREZ:  Never.

1          THE COURT:  Mr. Hurtado, do you have any questions?

2          MR. HURTADO:  I don't have any questions, Your Honor.

3          THE COURT:  Mr. Robbenhaar?

4          MR. ROBBENHAAR:  I'm hearing you indicate that a

5    combination of being on medication plus the situation back home

6    is raising your anxiety.

7          MR. MELENDREZ:  Yes, it is.

8          MR. ROBBENHAAR:  How are you feeling right now?

9          MR. MELENDREZ:  I have anxiety right now.  I'm on

10   medication.

11         MR. ROBBENHAAR:  This is a noise that might occur

12   somewhat during the trial on occasion.  Okay.  Being in a room

13   with a group of people, does that make things worse or better?

14         MR. MELENDREZ:  It depends on people that understand

15   autism and other people that don't understand autism.  They can

16   be a little aggressive with their speech.

17         MR. ROBBENHAAR:  If you were to be selected, would you

18   be disappointed?

19         MR. MELENDREZ:  No.

20         THE COURT:  Go ahead and take your seat.  I'll get back

21   to you.

22         MR. ROBBENHAAR:  Do you want us to remain, Judge?

23         THE COURT:  No.

24      (In open court.)

25         THE COURT:  Ms. Savedra, did you raise your hand?

1          MS. SAVEDRA:  Yes.

2          THE COURT:  Do you want to tell us from there what your

3    concerns are?

4          MS. SAVEDRA:  May I approach the bench?

5          THE COURT:  Yes, you may.

6          MS. SAVEDRA:  So I watch my daughter during the

7    evenings, and tomorrow, I'm scheduled for work, and I don't

8    know about the rest of my week since they have not posted my

9    work schedule.  I don't know about Wednesday and Thursday

10   whether I work or not, and I don't know how long it will last.

11   I have to watch my daughter in the evening.

12         THE COURT:  What time do you pick up your daughter?

13         MS. SAVEDRA:  I watch her in the evening from 5:00

14   until the next day.

15         THE COURT:  For whom do you work?

16         MS. SAVEDRA:  Main Event Entertainment.

17         THE COURT:  What hours do you work?

18         MS. SAVEDRA:  From opening until about 5:00.

19         THE COURT:  If you were required to be on the jury,

20   would your employer find someone to do your work for you?

21         MS. SAVEDRA:  Possibly, but I would have to talk to my

22   manager.

23         THE COURT:  Let me ask Mr. Hurtado if you have any

24   questions.

25         MR. HURTADO:  I don't have any questions, Your Honor,

1    but under the circumstances, the United States would not oppose

2    excusing this juror.

3              THE COURT:  Mr. Robbenhaar?

4              MR. ROBBENHAAR:  We would agree with that, Your Honor.

5              THE COURT:  All right.  Mrs. Savedra, I'm going to

6    excuse at this time from further participation.  I thank you

7    for being here, and you will get credit for one day of jury

8    service.

9              MS. SAVEDRA:  Thank you.

10      (In open court.)

11             THE COURT:  Mr. Sandoval, did you raise your hand, sir?

12   Anyone else on the second row?  Yes, looks like Mr. Hay.

13             MR. HAY:  Yes.  Your Honor, I just wanted to mention I

14   am an independent contractor, and as such, missing about a week

15   of work is a financial hardship on myself and my ability to

16   meet deadlines.

17             THE COURT:  What type of work do you do?

18             MR. HAY:  It's computer-built network.

19             THE COURT:  If you're absent, is there anyone else you

20   can --

21             MR. HAY:  There is not.  I'm by myself.

22             THE COURT:  Thank you, Mr. Hay.  Have a seat.

23             Did I overlook anyone in the second row on the left?

24   How about the third row?  Please raise your hand.

25             Anyone else who would have difficulty serving

1    definitely into Wednesday, but possibly also into Thursday?

2         The next questions relate to prior jury service.  If

3    you have been on a jury before, would you please raise your

4    hand?  Quite a number of you have.  I'm going to ask each of

5    you separately to stand and tell us about your prior jury

6    service, and what we need to know are just the basics, whether

7    it was a civil case or a criminal case like this one, and a

8    very brief description.  For example, if it were a civil case

9    involving an employment dispute, that would be enough.  If it

10   were a criminal case involving a bank robbery, that would be

11   sufficient.

12        So let's begin over here in the front row.  Let's see,

13   was it Ms. Hackman?  Did you raise your hand?  Nobody raised

14   their hand in the front row?

15        Let's go back to the second row, then.  Ms. Shade, did

16   you raise your hand?

17        MS. SHADE:  Yes, sir.

18        THE COURT:  Would you tell us, please, what juries you

19   were on and what they were were about?

20        MS. SHADE:  I have been on a municipal jury, grand

21   jury, and there was one other one.  One dealt with drug

22   possession, and the grand jury was multiple over a period of

23   time.  The municipal, I cannot remember.  It was like a long

24   time ago.

25        THE COURT:  Okay.  Well, let me explain to all the

1    jurors because they may not be aware of this.  There are

2    different types of juries.  We're selecting a jury in a case

3    today called a petit jury in which the jurors are going to

4    decide whether the government has proved the guilt of the

5    defendant.  Now, that's different from the grand jury that

6    Ms. Shade mentioned.  The grand jury does not make decisions on

7    whether a person is proven to be guilty or not.  The grand jury

8    simply determines whether there is enough evidence to allow the

9    case to proceed.  So the grand jury normally hears a number of

10   presentations from the U.S. Attorney or other prosecuting

11   agencies and makes a decision whether the case should go on to

12   a petit jury such as we're selecting today.

13           Anything else, Ms. Shade, you recall about the other

14   cases?

15           MS. SHADE:  No, sir.

16           THE COURT:  Do you remember if the municipal court was

17   a criminal or a civil case?

18           MS. SHADE:  It was a civil.

19           THE COURT:  Somebody was suing somebody else?

20           MS. SHADE:  Yes.

21           THE COURT:  What was it about?  Do you recall?

22           MS. SHADE:  I do not.  Sorry.

23           THE COURT:  You mentioned another one that I couldn't

24   determine what court it was in.

25           MS. SHADE:  I believe it was a petit because it dealt

1    with a criminal case.

2              THE COURT:  Do you remember the charge in the case?

3              MS. SHADE:  It was possession of drugs.

4              THE COURT:  How long ago were you on that jury?

5              MS. SHADE:  Probably 10 years ago.

6              THE COURT:  Was that here in Albuquerque?

7              MS. SHADE:  No, sir, it was in Clovis.

8              THE COURT:  And what was the result?

9              MS. SHADE:  He was found guilty.  And I was forewoman.

10             THE COURT:  Anything else you want to mention about the

11   cases on which you served?

12             MS. SHADE:  No, sir.

13             THE COURT:  Thank you very much, Ms. Shade.

14             Was there anyone else on the second row over here who

15   has been on a jury?  How about the last row?  Raise your hand

16   again.  Let's start with Mr. --

17             MR. HUDSON:  Hudson, Your Honor.  Sean Hudson.

18             THE COURT:  Mr. Hudson, go ahead.

19             MR. HUDSON:  Yes, sir.  I was a third member of a

20   summary court-martial in the military.  It was a drug case.  I

21   was one of three adjudicators assigned to that case.  It was a

22   violation of the uniform code of military justice for illegal

23   drug use, and the member was found guilty.

24             THE COURT:  How long ago was that trial?

25             MR. HUDSON:  The trial was in approximately 18 years

1   ago, 12 years ago.

2          THE COURT:  Where was it?

3          MR. HUDSON:  It was on board the USS Shreveport out of

4   Norfolk, Virginia.

5          THE COURT:  Tell me again the type of drug.

6          MR. HUDSON:  Marijuana.

7          THE COURT:  Have you been on any other court-martials?

8          MR. HUDSON:  I was a legal clerk for many years -- not

9   many years, for one year.  I saw the processing of many

10  court-martials but was never part of the actual court-martial.

11         THE COURT:  That's the only one where you were an

12  adjudicator?

13         MR. HUDSON:  Yes, sir.

14         THE COURT:  The result was what?

15         MR. HUDSON:  Found guilty.

16         THE COURT:  Is there anything about that experience

17  that would make it difficult for you to be an impartial juror

18  in a case like this involving drugs?

19         MR. HUDSON:  No, sir.

20         THE COURT:  If you were on the jury, could you assure

21  the parties that you would set aside your prior experience and

22  not let that influence you in making a decision in this case?

23         MR. HUDSON:  By an explanation, sir, or a simple

24  answer?

25         THE COURT:  I'm sorry?

 1          MR. HUDSON:  Just by a yes or no or an explanation?

 2          THE COURT:  If you can just tell us whether that would

 3   affect your ability to serve impartially.

 4          MR. HUDSON:  No, sir, I don't believe so.

 5          THE COURT:  Thank you very much.  You may have a seat.

 6          Let's see, I think we have Mr. Vanevery who raised his

 7   hand.

 8          MR. VANEVERY:  Yes, I served on a jury about 20 years

 9   ago in the State of Florida.  It was for a breaking and

10   entering charge.

11          THE COURT:  And what was the result in that case?

12          MR. VANEVERY:  He was found not guilty.

13          THE COURT:  Anything about your experience as a juror

14   in that case that would make it difficult for you to be a fair

15   and impartial juror in this case?

16          MR. VANEVERY:  I don't believe so.

17          THE COURT:  Thank you, Mr. Vanevery.

18          Now, have I overlooked anyone on this side of the

19   aisle?  Yes, let's go back to Mr. Ledoux.

20          MR. LEDOUX:  Correct.  This was about 10 years ago, was

21   in the municipal court in Taos.  It was a civil case, a child

22   abuse case.  The individual was found not guilty.

23          THE COURT:  Have you been on any other juries?

24          MR. LEDOUX:  No.

25          THE COURT:  All right.  Thank you very much.  You may

 1   be seated.

 2          Now, I think somebody else raised their hand on this

 3   side.  That's Ms. Valdez?

 4          MS. VALDEZ:  Yes, sir.

 5          THE COURT:  Go ahead.

 6          MS. VALDEZ:  I served on a jury, I believe it was a

 7   criminal case in municipal court.  This was about 18 years ago.

 8   It was a theft.

 9          THE COURT:  What was the result of the trial?

10          MS. VALDEZ:  He was found not guilty.

11          THE COURT:  And was that here in Albuquerque?

12          MS. VALDEZ:  No, it was up north in Tierra Amarilla.

13          THE COURT:  All right.  Have you ever been on any other

14   juries?

15          MS. VALDEZ:  No.

16          THE COURT:  Thank you very much, Ms. Valdez.

17          Now, have I overlooked anyone on this side of the

18   aisle?  I think we have a hand in the back.  Ms. Lopez?

19          MS. LOPEZ:  Yes, sir.  I served on a civil case and

20   also a criminal case.

21          THE COURT:  Tell us first about the civil case.

22          MS. LOPEZ:  The civil case was I guess an employment

23   case.  A law firm was suing a former client for payment.

24          THE COURT:  And where was that trial?

25          MS. LOPEZ:  District court.

1           THE COURT:  Here in Albuquerque?

2           MS. LOPEZ:  Yes, sir.

3           THE COURT:  Right across the intersection?

4           MS. LOPEZ:  Yes, sir.

5           THE COURT:  What was the criminal case?

6           MS. LOPEZ:  The criminal case was a traffic and

7    narcotics violation, so a DWI and possession.

8           THE COURT:  What court was that?

9           MS. LOPEZ:  Albuquerque Metro.

10          THE COURT:  That's over this way across the street.

11          MS. LOPEZ:  Yes.

12          THE COURT:  How long ago was that one?

13          MS. LOPEZ:  Two years, I believe.

14          THE COURT:  Tell me the result in that case.

15          MS. LOPEZ:  Not guilty of the narcotics violation and

16   guilty of the DWI.

17          THE COURT:  All right.  Those are the only cases you

18   have served?

19          MS. LOPEZ:  Yes, sir.

20          THE COURT:  Anything about your experience as a juror

21   in those cases that would make it difficult for you to be an

22   impartial juror in this case?

23          MS. LOPEZ:  No, sir.

24          THE COURT:  All right.  Thank you, Ms. Lopez.

25          Let's go to the other side of the aisle in the front

1    row.  Did any of you raise your hand about being on juries

2    before?

3            All right.  Let's start with Ms. Austin.

4            MS. AUSTIN:  It's been over 30 years, I was on two

5    trials for Federal District Court.  Both of them were

6    possession of narcotics with intent to distribute, and both

7    were found guilty.

8            THE COURT:  Here in Albuquerque?

9            MS. AUSTIN:  Yes.

10           THE COURT:  Do you remember the nature of the drugs

11   involved in the case?

12           MS. AUSTIN:  I believe they were both heroin.  I'm

13   positive one was, but I can't recall for sure on the other one.

14           THE COURT:  Anything about your service in those cases

15   that would make it difficult for you to be fair and impartial

16   in a drug case like this one?

17           MS. AUSTIN:  No, sir.

18           THE COURT:  All right.  Thank you very much,

19   Ms. Austin.

20           Now, let's see, Ms. Salazar, did you raise your hand?

21   Ms. Shaffer?

22           MS. SHAFFER:  Yes, Your Honor.  I was on a jury in the

23   Second Judicial District Court probably about 20 years ago, and

24   it was a hit-and-run case, and it turned out I was the

25   alternate juror, so I don't know what the verdict was.

1           THE COURT:  Is that the only case in which you have

2   been selected to be a juror?

3           MS. AUSTIN:  Yes.

4           THE COURT:  Anything about that experience that would

5   make it difficult for you to be an impartial juror in this

6   case?

7           MS. AUSTIN:  No, Your Honor.

8           THE COURT:  Thank you, Ms. Shaffer.  Anyone else in the

9   front row who raised their hand?  How about the second row?

10  Let's start with Ms. Verhulst.

11          MS. VERHULST:  Yes, Your Honor.  I'm going to tell my

12  age here.  It's been about 43 years that I sat, and I don't

13  remember anything about the case.  I believe it was theft,

14  but...

15          THE COURT:  Where was the trial?

16          MS. VERHULST:  Here in Albuquerque.  I was a college

17  student at the time.

18          THE COURT:  Do you remember the result?

19          MS. VERHULST:  He was found not guilty.

20          THE COURT:  The last question is how did they let a

21  two-year-old on the jury?

22          MS. VERHULST:  Thank you, sir.  I appreciate that.

23          THE COURT:  Thank you, you may be seated.

24          Anyone else in the second row?  Please raise your hand

25  high if you were on a jury.  How about the third row?  I think

1   there was a hand.  I couldn't really tell.

2          Let's see, that's Ms. Keith?  Is that correct?

3          MS. KEITH:  Yes.  I was in a juvenile court as a juror

4   for kidnapping and rape, and he got guilty of the kidnapping

5   and not guilty on the rape.

6          THE COURT:  How long ago was that?

7          MS. KEITH:  Probably about five or six years ago in

8   Albuquerque.

9          THE COURT:  Do you remember what courthouse you were

10  in?

11         MS. KEITH:  I think it was on Second Street, Fourth

12  Street.  It wasn't over here.

13         THE COURT:  Right.  Anything about that experience that

14  would make it difficult for you to be an impartial juror in

15  this case?

16         MS. KEITH:  No, sir.

17         THE COURT:  Thank you, Ms. Keith.

18         Anyone else in the last row who raised their hand?

19  Anyone else at all?  Please raise your hand real high if you

20  have been on a jury and I have not visited with you yet.

21         Next, I need to ask you to raise your hand high if you

22  have ever worked in law enforcement.  Please raise your hand

23  high.  We have several.  There is one on this side.

24         Let's start back here with Mr. Hudson.

25         MR. HUDSON:  Yes, Your Honor.  I served as officer in

1    charge of Naval police force at a Naval air base in Pensacola

2    for one year.

3             THE COURT:  Do you remember the year?

4             MR. HUDSON:  The year was 2001, and I was also an air

5    terrorism officer for most of my career.

6             THE COURT:  Does that experience predispose you to

7    favor the side of the prosecution in a case like this?

8             MR. HUDSON:  I don't believe so, sir.

9             THE COURT:  If you were selected to be on the jury,

10   could you assure both sides that you would decide the case

11   solely on the basis of the evidence without being influenced by

12   your prior experience?

13            MR. HUDSON:  Yes, sir.

14            THE COURT:  Thank you, Mr. Hudson.

15            Now, before we go to the other side of the aisle,

16   please raise your hand high if you have ever worked in law

17   enforcement on this side.

18            Let's go to the other side.  Raise your hand high if

19   you worked in law enforcement previously.

20            MS. DESIMONE:  Your Honor, I don't know if this counts,

21   but I worked for Metropolitan Court for 11 years.  I did work

22   in the civil division, and I did work in criminal.  So -- but

23   that's...

24            THE COURT:  What type of work did you do?

25            MS. DESIMONE:  I was a court clerk 2.

1          THE COURT:  Did you ever testify in any of the cases?

2          MS. DESIMONE:  No, I didn't.  No, I clerked for a

3    couple of judges, but then mostly I worked in civil for nine

4    years and criminal for two.

5          THE COURT:  Anything about your work particularly in

6    the criminal division that would make it difficult for you to

7    be fair and impartial in a case like this?

8          MS. DESIMONE:  No, sir.

9          THE COURT:  Thank you Ms. Desimone.

10          Now, let's see, in the next row, please raise your hand

11    if you have worked in law enforcement.  Mr. Guerra?

12          MR. GUERRA:  I was a livestock inspector for the State

13    of New Mexico Livestock Board for approximately six years, I

14    believe.

15          THE COURT:  Where were you based?

16          MR. GUERRA:  Las Cruces.

17          THE COURT:  Did it ever require you to be a witness in

18    court?

19          MR. GUERRA:  Arresting officer.

20          THE COURT:  Did you participate in any trials in any

21    way?

22          MR. GUERRA:  Grand jury.

23          THE COURT:  I'm sorry?

24          MR. GUERRA:  Grand jury.

25          THE COURT:  Was there anything about that experience

 1   that would cause you to favor one side or the other in a case

 2   like this?

 3          MR. GUERRA:  No, sir.

 4          THE COURT:  All right.  Thank you, you may be seated.

 5          Anyone else who raised their hand in response to the

 6   question about work in law enforcement?

 7          We have in the front row here Ms. Salazar.

 8          MS. SALAZAR:  Your Honor, I worked for children's court

 9   Second Judicial District Court on Second Street for 20 years.

10          THE COURT:  What was the nature of your work?

11          MS. SALAZAR:  I was the program director.  I oversaw

12   the program for the impoundment of girls.

13          THE COURT:  Did you ever testify in court?

14          MS. SALAZAR:  I did when I had to perform drug tests

15   for the court.  I would have to go in front of the judge to let

16   them know what the results were.

17          THE COURT:  Okay.  How long did you do that?

18          MS. SALAZAR:  20 years.  I just retired about a year

19   and a half ago.

20          THE COURT:  How long did you work on the drug matters?

21          MS. SALAZAR:  For 20 years.

22          THE COURT:  The whole time?

23          MS. SALAZAR:  Yes.

24          THE COURT:  And how often did you testify in court

25   about that?

1          MR. GUERRA:  Not often.  Maybe a couple of times a

2   year.  It just depended if they asked me to do a drug test.

3          THE COURT:  The jury in this case may hear the

4   testimony of a forensic chemist.  If you were on the jury,

5   would you tend to give the testimony of that person more or

6   less weight than you would give to other witnesses simply

7   because the person is a forensic chemist?

8          MS. SALAZAR:  I would say yes.

9          THE COURT:  You think because -- can you explain your

10  answer?

11         MS. SALAZAR:  Well, because of the way we were trained

12  to do drug tests.  I guess it would have to be the testimony on

13  how the drug test was performed, if it was performed where they

14  actually were there in the room, then I would give it more

15  weight than if they were not.

16         THE COURT:  Let me ask you to come up to the bench to

17  visit me and the lawyers, please.

18     (At the bench.)

19         MS. SALAZAR:  I guess when we did drug tests, if it

20  wasn't a field drug test where we actually void into the cup,

21  it wasn't considered a valid drug test.  So therefore, if they

22  actually watched them void into the cup and gave the results, I

23  would probably give more weight to that than if it wasn't.

24  So -- and it's just because of the way we were trained.

25         THE COURT:  What were you detecting?  Just alcohol?

1           MS. SALAZAR:  No, it was usually a seven-to-eight-panel

2      drug test, so we were detecting -- plus we were detecting

3      anywhere from heroin, opiates to methamphetamines to

4      amphetamines to alcohol, THC.

5           THE COURT:  Let me ask Mr. Hurtado, do you have any

6      questions you would like to ask?

7           MR. HURTADO:  Would you keep an open mind and listen to

8      all the evidence and testimony before coming to an opinion one

9      way or the other?

10          MS. SALAZAR:  Yes.  I would.

11          MR. HURTADO:  Thank you.

12          THE COURT:  Mr. Robbenhaar?

13          MR. ROBBENHAAR:  Sounds like the testing you would do

14     is urinalysis testing.  Were these just presumptive, or was

15     this a laboratory test that would come back days later?

16          MS. SALAZAR:  No, it was right there.

17          MR. ROBBENHAAR:  If there were testimony in this case

18     concerning that, do you feel that your experience might affect

19     how you view the testimony?

20          MS. SALAZAR:  No, sir.

21          MR. ROBBENHAAR:  Because you have personally done some

22     of this stuff.

23          MS. SALAZAR:  I would keep an open mind.

24          MR. ROBBENHAAR:  All right.  Would you give -- the

25     chemist that Judge Parker was mentioning did a much more

1    thorough test.  Would you -- just in lieu of his stature or

2    position, would you give that person more -- assign more

3    credibility to that person?

4          MS. SALAZAR:  No, sir, I would look at what the testing

5    was.

6          MR. ROBBENHAAR:  All right.

7          THE COURT:  Thank you, Ms. Salazar.  You may have a

8    seat.

9      (In open court.)

10          THE COURT:  Let me ask, anyone else who worked in law

11   enforcement who I have not acknowledged, please raise your hand

12   high.

13          Now, the corollary to that question is if you have any

14   close family members who have worked or are presently working

15   in law enforcement, we need to be aware of that.  So if you

16   have parents, children, siblings who have worked in law

17   enforcement, please raise your hand.

18          Let's start on this side over here.  The second row on

19   the end, we have Ms. Otzenberger.  Is that right?

20          MS. OTZENBERGER:  Yes.  May I approach the bench?

21          THE COURT:  Sure.

22      (At the bench.)

23          MS. OTZENBERGER:  Hi.  My son and daughter-in-law are

24   detectives with APD.  My son Joshua was on the drug enforcement

25   team with APD.

1          THE COURT:  Did he discuss his cases with you?

2          MS. OTZENBERGER:  No, sir.

3          THE COURT:  Do you know if he ever worked on a case

4     involving methamphetamine?

5          MS. OTZENBERGER:  I'm not familiar with the drugs.  I

6     know he did make several drug busts, but I don't really pay

7     attention because it worries me.

8          THE COURT:  Tell us about that.  Would it worry you

9     being on this jury about methamphetamine?  You will hear

10    evidence about methamphetamine.

11         MS. OTZENBERGER:  No, sir.

12         THE COURT:  Mr. Hurtado, do you have any questions?

13         MR. HURTADO:  Is there anything about the relationship

14    with your son that would cause you to be biased either for or

15    against the prosecution in this case?

16         MS. OTZENBERGER:  No, sir.

17         MR. HURTADO:  Would you agree to keep an open mind and

18    listen to all the evidence in the case?

19         MS. OTZENBERGER:  Yes, sir.

20         MR. HURTADO:  Thank you.

21         THE COURT:  Mr. Robbenhaar?

22         MR. ROBBENHAAR:  Ms. Otzenberger, your son has been

23    with APD for a number of years, right?

24         MS. OTZENBERGER:  Yes, sir.

25         MR. ROBBENHAAR:  How long has he been with APD?

1          MS. OTZENBERGER:  He's about four years to retire, so

2    he's excited.

3          MR. ROBBENHAAR:  Is your daughter-in-law, his wife,

4    also with APD?

5          MS. OTZENBERGER:  Yes, sir.

6          MR. ROBBENHAAR:  They both are drug detectives?

7          MS. OTZENBERGER:  No, sir.  Joshua is currently in the

8    military with the reserves, and he works with the Navy SEALs,

9    but in his time with APD, he guards the mayor.  Deeann, his

10   wife, does the Department of Justice requirements for APD.  But

11   they are both detectives.  I don't know anything else.

12         THE COURT:  Do you know if they have ever worked with

13   the Drug Enforcement Administration?

14         MS. OTZENBERGER:  Administration?  I don't know that

15   part.

16         THE COURT:  DEA.

17         MS. OTZENBERGER:  I think so.  Wouldn't they?

18   Logically, if you find drugs, wouldn't you work with that crew?

19         THE COURT:  Possibly, I guess.  Maybe Mr. Hurtado would

20   know more about that.

21         MR. HURTADO:  No, sir, I couldn't say.

22         THE COURT:  Bottom line, anything about your -- the

23   work of your son or daughter-in-law that would influence you to

24   make a decision one way or the other in this case?

25         MS. OTZENBERGER:  No, sir.

1          MR. ROBBENHAAR:  If I can follow up on that.  Let's

2     say, for example, the jury reached a not guilty verdict in this

3     case.  Do you think you would feel a little pressure from your

4     son or daughter-in-law?

5          MS. OTZENBERGER:  No, sir.

6          THE COURT:  Thank you.

7          MS. OTZENBERGER:  You're welcome.  Thank you for coming

8     to work.

9       (In open court.)

10         THE COURT:  Was there anyone else on this side who

11     raised their hand?

12         Yes, we do have a hand in the back row.  That's

13     Ms. Gonzales.  Is that correct?

14         MS. GONZALES:  Yes, sir.  My oldest brother, I believe

15     worked 18 years with New Mexico State Police, and then a number

16     of years with Espanola PD, and then a few years with Santa Fe

17     PD, and then he worked in Santa Fe with the U.S. Marshals, and

18     he's currently in Denver with the U.S. Marshals as well.

19         THE COURT:  Now, he's had a long history in law

20     enforcement.  Has he discussed his cases with you?

21         MS. GONZALES:  No.

22         THE COURT:  Is there anything about the work of your

23     brother in law enforcement that would cause you to favor the

24     side of the government in a case like this?

25         MS. GONZALES:  No.

1          THE COURT:  If you were on the jury, could you assure

2     the participants in the trial that you would decide the case

3     solely on the basis of the evidence without being influenced by

4     your brother's work in law enforcement?

5          MS. GONZALES:  Yes.

6          THE COURT:  Thank you.  You may be seated.

7          Now, anyone else on this side of the aisle who raised

8     their hand?  How about on the other side of the aisle?  Close

9     relatives work in law enforcement.

10          Let's start with the front row with Ms. Archuleta.

11          MS. ARCHULETA:  Well, I don't think this counts, but my

12     daughter worked at APD in the office, I think records, back in

13     like maybe 15, 18 years ago, and probably for about a couple of

14     years.  She works for the city.

15          THE COURT:  Did she ever discuss any cases she worked

16     on with you?

17          MS. ARCHULETA:  No.

18          THE COURT:  Thank you very much, Ms. Archuleta.

19          Ms. Desimone?

20          MS. DESIMONE:  Yes, Your Honor.  My father was sheriff

21     of Las Vegas, Nevada.  I'm sorry.  New Mexico.  It just comes

22     out.  But I was not raised with him.  He and my mother divorced

23     when I was very young, so -- but I did get to get back with him

24     after several years, and he was no longer -- he was retired,

25     and he did die 20 years ago, cancer of the pancreas.

1            THE COURT:  Was there anything about your father's

2     former service in law enforcement that would predispose you to

3     favor either side in a case like this?

4            MS. DESIMONE:  Absolutely not.

5            THE COURT:  Thank you very much, Ms. Desimone.

6            How about in the second row on this side?  Anybody

7     there who raised their hand?  Ms. Verhulst?

8            MS. VERHULST:  Yeah, here we go again.  Okay.  Both of

9     my son-in-laws were officers.  My stepdaughter divorced her

10    husband, I believe in 2011, and he is remarried, left the

11    service and gone to Arizona.  My daughter is currently married

12    to an APS officer, the lead officer at Del Norte High School,

13    and he was with APD, the horse-mounted unit, for 25 years.

14            THE COURT:  Now, you have quite a number of members of

15    your family in law enforcement.  Is there anything about their

16    work in law enforcement that would make it difficult for you to

17    be an impartial juror in a case like this one?

18            MS. VERHULST:  Nothing that would make a difference.

19    The one thing I've learned from both of them is that there is

20    two sides to every story, and you've got to listen to all of

21    it.

22            THE COURT:  Thank you, Ms. Verhulst.  Anyone else in

23    the second row who raised their hand?  How about the third row?

24    Did I overlook anyone?

25            Mr. Bower, is that correct?  Bowyer.

1          MS. BOWYER:  Perhaps not direct law enforcement.  My

2     uncle is a district judge in the District of New Mexico,

3     perhaps federal judge.

4          THE COURT:  Is there anything about your uncle's

5     service in the judiciary that would make it difficult for you

6     to be a fair juror in a case like this?

7          MS. BOWYER:  No, Your Honor.

8          THE COURT:  Thank you, you may be seated.

9          Please raise your hand if you know anyone who works for

10    the Drug Enforcement Administration, the DEA.

11         If you have ever worked for the DEA, please raise your

12    hand.

13         If you have ever had any encounters with agents of the

14    DEA, would you please raise your hand?

15         Let's see, back here, we have Mr. Hudson.

16         MR. HUDSON:  Your Honor, I worked at two embassies, and

17    there was field agents assigned to the embassy.  My interaction

18    with them was very low to be honest.

19         THE COURT:  How well acquainted did you get with the

20    DEA agents you just mentioned?

21         MR. HUDSON:  Personally, I can't recall any names, but

22    as far as just being at an embassy and knowing the different

23    folks that worked there.  Other than that, not very well, sir.

24         THE COURT:  Anything about that association that would

25    make it hard for you to be a fair and impartial juror in this

1   case?

2           MR. HUDSON:  No, sir.

3           THE COURT:  Thank you, Mr. Hudson.

4           Anyone else who raised their hand?  Let's see over on

5   this side in the front row, Ms. Salazar.

6           MS. SALAZAR:  When I worked at children's court, I did

7   have interaction with DEA agents.  If it was -- if it pertained

8   to a case with one of the young ladies that I was working with.

9           THE COURT:  Do you recall any specific agents of the

10  DEA?

11          MS. SALAZAR:  No, I don't.  And it was minimal contact.

12          THE COURT:  Thank you very much, Ms. Salazar.

13          Somebody else raised their hand over here as well.  I

14  think Mr. Hay.

15          MR. HAY:  Yes, Your Honor.  For a number of years, I

16  was a volunteer with the search and rescue dog team, and there

17  were a couple of missions we were searching for somebody who

18  was a person of interest of the DEA.  I never worked directly

19  with DEA officers.

20          THE COURT:  Do you remember any of the DEA agents by

21  name that you had contact with?

22          MR. HAY:  No, sir, I do not.

23          THE COURT:  Thank you, Mr. Hay.

24          Raise your hand if you have ever been to the bus depot

25  here in Albuquerque which is at the intersection of Central

1    Avenue and First.  Okay.  We have quite a number who have.

2              Let's start on this side.  Mr. Callahan?  Go ahead.

3    What has been your experience there?

4              MR. CALLAHAN:  Pretty good experience.  I mean, just

5    hopping on buses, you know.

6              THE COURT:  Have you ever ridden -- caught a bus there

7    or come back to Albuquerque?

8              MR. CALLAHAN:  I have ridden one, yeah.

9              THE COURT:  How frequently have you done that?

10             MR. CALLAHAN:  I did it more when I was going to UNM,

11   just a couple of times.

12             THE COURT:  Now, is that a city bus that would go up

13   and down Central?

14             MR. CALLAHAN:  Yes, sir.

15             THE COURT:  Have you ever caught a bus that comes to

16   the depot there from out of state or out of town?

17             MR. CALLAHAN:  No, sir.

18             THE COURT:  Have you ever been in the depot?  Inside?

19             MR. CALLAHAN:  I don't believe so.

20             THE COURT:  When is the last time that you were at the

21   depot?

22             MR. CALLAHAN:  Probably about five, six years ago.

23             THE COURT:  Okay.  Thank you very much.  You may be

24   seated.

25             Is there anyone else on this side of the aisle that's

1  gone to the depot.  Ms. Lopez?

2          MS. LOPEZ:  Yes, sir.  When my children were going to

3  high school, they rode the bus to the depot, and I would pick

4  them up there.

5          THE COURT:  That's the city bus, I guess?

6          MS. LOPEZ:  Correct.  Never going out of town or

7  anything.

8          THE COURT:  Have you ever been inside the depot?

9          MS. LOPEZ:  Yes, but not for very long.  I don't recall

10  what it was for.

11          THE COURT:  When is the last time you were in the

12  depot?

13          MS. LOPEZ:  Oh, gosh.  15 years ago.  It's been a

14  while.

15          THE COURT:  Thank you, Ms. Lopez.

16          Let's see, anyone else on this side of the aisle?

17  Raise your hand real high if you have been at the depot.

18          Let's go to the front row over here.  Anyone in the

19  front row who has been at the Albuquerque depot?  Ms. Salazar?

20          MS. SALAZAR:  Yes, Your Honor.  If we had one of our

21  young ladies who absconded, then we would sometimes drive

22  around and look for them because they were in danger, so

23  therefore, we would drive by the depot to look.

24          THE COURT:  Why would you think they would be at the

25  depot?

1              MS. SALAZAR:  That's where a lot of them hung out.

2              THE COURT:  Do you know why?

3              MS. SALAZAR:  A variety of reasons.  Because sometimes

4    there was a lot of drug activity there.

5              THE COURT:  Have you ever been inside the depot?

6              MS. SALAZAR:  Yes, Your Honor.

7              THE COURT:  When is the last time?

8              MS. SALAZAR:  It's probably been about three or four

9    years.

10             THE COURT:  And the reason?

11             MS. SALAZAR:  To look to see if we could find some of

12   our young ladies.

13             THE COURT:  Did any of the young ladies you're talking

14   about ever leave the depot on a bus to go out of Albuquerque?

15             MS. SALAZAR:  No, sir.

16             THE COURT:  Or any of them arrive in a bus?

17             MS. SALAZAR:  No, sir, not that we knew of.

18             THE COURT:  Thank you, Ms. Salazar.

19             Ms. Archuleta?

20             MS. ARCHULETA:  I'm assuming that you mean the

21   Greyhound bus depot and not the city bus depot.

22             THE COURT:  I'm talking about the Greyhound Bus depot.

23             MS. ARCHULETA:  Then excuse me.

24             THE COURT:  Have you ever been inside of it?

25             MS. ARCHULETA:  I don't think so.  I've been inside the

1    city bus depot.

2              THE COURT:  But not the Greyhound Bus?  Okay.

3              Ms. Desimone?

4              MS. DESIMONE:  Yes, Your Honor.  About five years ago,

5    I took the Greyhound Bus to Las Cruces to visit relatives.  But

6    that was it.  And the only time I've been in the depot.  I've

7    never been in the bus station.

8              THE COURT:  Do you know if any officers searched the

9    bus before you departed Albuquerque?

10             MS. DESIMONE:  Well, I know they came on and took one

11   gentleman out, but they didn't find anything.  So I guess he

12   was okay.  But, yeah, we did.

13             THE COURT:  What do you remember about that experience?

14             MS. DESIMONE:  What do I remember about what, sir?

15             THE COURT:  That experience where somebody took a

16   person off the bus.

17             MS. DESIMONE:  I wasn't sure what it was, I'll be

18   honest with you.  You know.  They came on, and I thought they

19   were looking for green cards is what I thought, and, no, they

20   told this gentleman he had to come with them.  They went out,

21   and I remember looking out the window, and I see them peeking

22   in his suitcase, but they didn't find anything.  So he got back

23   on the bus.  His suitcase went back in.  So, no.  It was really

24   kind of a relief to be honest with you.  It was like whoof.

25   But that was it.

1           THE COURT:  Thank you very much.

2           Let's talk to Ms. Shaffer for a minute.

3           MS. SHAFFER:  About six or seven years ago when my son

4    was going to school at New Mexico State, we took him to the bus

5    station and picked him up from the bus station several times.

6           THE COURT:  Did you ever go inside the depot?

7           MS. SHAFFER:  Yes.

8           THE COURT:  For what reason did you enter the depot?

9           MS. SHAFFER:  Just to wait until he got off the bus or

10   put him on a bus.

11          THE COURT:  Did you ever observe any officers taking

12   people off the bus?

13          MS. SHAFFER:  Not that I recall.

14          THE COURT:  Thank you, Ms. Shaffer.

15          All right.  Is there anyone else on this side who has

16   been at the depot?

17          Yes, we have Ms. Rasmussen.  Is that correct?

18          MS. RASMUSSEN:  Yes, sir.  In 1981, I took a Greyhound

19   Bus out of the depot here in Albuquerque to Colorado Springs.

20   I was inside the bus depot to purchase my ticket and to wait

21   for my bus.

22          THE COURT:  Anything else you remember about that

23   experience?

24          MS. RASMUSSEN:  No.

25          THE COURT:  Do you remember anybody searching

1    passengers?

2           MS. RASMUSSEN:  Not that bus, no.

3           THE COURT:  Thank you, Ms. Rasmussen.

4           Anyone else on the right side?  Yes, we do have a

5    couple more.  Mr. Melendrez.

6           MR. MELENDREZ:  I've taken a Greyhound Bus to Las

7    Cruces more than once in the last two to three years to go

8    visit family in El Paso.  And so then I have to commute back to

9    Albuquerque from El Paso, so I've seen pretty much the whole

10   gist of it, to say the least.

11          THE COURT:  Let me ask you to speak more directly into

12   your microphone.  Then also tell us about whether you ever

13   observed any officers taking people off the bus or searching

14   luggage.

15          MR. MELENDREZ:  I have.  I have observed a random check

16   on a bus.

17          THE COURT:  Let me ask you to come up here to the bench

18   and tell us about that, please.

19          MR. MELENDREZ:  Sure.

20      (At the bench.)

21          THE COURT:  Mr. Hurtado, do you have any questions you

22   would like to ask?

23          MR. HURTADO:  No, sir.

24          THE COURT:  Mr. Robbenhaar?

25          MR. ROBBENHAAR:  Your initial reaction was that "I've

1    seen a lot."  You've had some experience.

2         MR. MELENDREZ:  I've been on the bus a lot, I've seen a

3    lot, and I haven't had very good experiences on the Greyhound

4    Bus.

5         MR. ROBBENHAAR:  How many times do you think you've

6    gone up and down from El Paso to Albuquerque?

7         MR. MELENDREZ:  Three or four times in the last five

8    years.

9         MR. ROBBENHAAR:  Okay.  And you just said you haven't

10   had a great experience.  Can you describe that?

11        MR. MELENDREZ:  One time, I went to the bus depot, and

12   they booked me a ride to go from Albuquerque to Las Cruces -- I

13   mean from Albuquerque to El Paso, and then I showed up at my

14   departure, and they had canceled me and rescheduled it.  They

15   rescheduled it in the middle of the night, around five o'clock

16   at night.

17        So I had to walk from my apartment downtown to the

18   Greyhound Bus, and I had fallen, and because it was raining.  I

19   had a fractured hand, so I had to go to the doctor to have it

20   fixed.  And anyway, it turned out I get to the bus depot, and

21   they canceled my ride again and didn't reimburse me my money

22   back, the Greyhound company, and I had to walk back home.  And

23   my mother had to drive from El Paso to Albuquerque to pick me

24   up to take me to my destination.  That was one time.  I was not

25   reimbursed that money either.  I did not make my trip.  They

1   canceled it twice.  My mom was worried because I had broken my

2   hand in the middle of the night trying to weasel my way over

3   there to the bus depot.

4           THE COURT:  Let me ask you, in any of these trips, did

5   you observe any law enforcement officers talking to the

6   passengers?

7           MR. MELENDREZ:  Of course.

8           THE COURT:  When you say "of course," what do you mean

9   by that?

10          MR. MELENDREZ:  I have seen that.

11          THE COURT:  Was that a regular occurrence?

12          MR. MELENDREZ:  When you come back from El Paso to

13  Albuquerque, there is a mandatory stop at the checkpoint, and

14  the buses have to comply.  So I've been through that

15  compliance.

16          THE COURT:  Have you ever seen law enforcement officers

17  searching luggage?

18          MR. MELENDREZ:  I have.

19          THE COURT:  What do you remember about that?

20          MR. MELENDREZ:  I remember one time a law enforcement

21  officer forced his way onto a bus and demanded to look at

22  somebody's bag.  And this person, I think it was a man, was

23  adamant that he had no right to check his bag at all, under no

24  circumstances he had any right.  The officer was very

25  aggressive with him and said that he did have that right.  And

1    eventually, I think he had to comply with the officer.  That's

2    all I saw, the altercation between that police officer and the

3    passenger.

4           THE COURT:  Do you remember if the police officer found

5    anything?

6           MR. MELENDREZ:  I do not.

7           THE COURT:  Mr. Hurtado, do you have any questions?

8           MR. HURTADO:  Earlier, you addressed the judge and

9    indicated that you had some mental health issues.  Are you

10   still experiencing a great deal of anxiety as you speak before

11   the members of the panel here as well as addressing the court

12   here at the bench?

13          MR. MELENDREZ:  Of course.

14          MR. HURTADO:  Would you --

15          THE COURT:  Let me ask, what do you mean by "of

16   course"?

17          MR. MELENDREZ:  I live every day dealing with anxiety.

18   I'm on medication because I have chronic anxiety, and it's been

19   treated.  If I don't take my medicine, then it gets worse, my

20   anxiety levels get worse.

21          MR. HURTADO:  I'll just ask you point-blank, would you

22   feel more comfortable if you were excused from this trial?

23          MR. MELENDREZ:  That's an interesting question.  Yes, I

24   would.

25          MR. HURTADO:  Thank you.

1           THE COURT:  Mr. Robbenhaar?

2           MR. ROBBENHAAR:  No further questions, Judge.

3           THE COURT:  Go ahead and have a seat.  Anyone else who

4    raised their hand in response to the question about being in

5    the bus depot here in town?  The Greyhound Bus depot.

6           I think Ms. Keith, is that correct?

7           MR. CASSIN:  My name is Kevin Cassin.  The night before

8    I got married in 1986, we were at the bus station for three

9    hours waiting for a late bus for my mother-in-law to come in to

10   the wedding.  We were in the bus station.  We left early

11   because we got married the next day, and it was two o'clock in

12   the morning, the bus still wasn't there.

13          THE COURT:  During that wait for your mother-in-law,

14   did you see any law enforcement officers?

15          MR. CASSIN:  No, there was no excitement.

16          THE COURT:  All right.  Thank you very much,

17   Mr. Cassin.

18          MR. CASSIN:  You're welcome.

19          THE COURT:  Now, did I overlook anyone over here?

20   Ms. Delpilar?

21          MR. DELPILAR:  About six years ago, I was over there

22   picking somebody up from the bus station.

23          THE COURT:  And did you observe any law enforcement

24   officers when you were there?

25          MR. DELPILAR:  No.

1          THE COURT:  Thank you, Ms. Delpilar.

2          Anyone else who I have overlooked?

3          If you have ever been charged with a drug offense,

4   would you please raise your hand.

5          Let's see, Ms. Danielson, is that correct?

6          MS. DANIELSON:  Yes.

7          THE COURT:  Would you rather discuss that at the bench?

8          MS. DANIELSON:  Please.

9          THE COURT:  Please come up.

10     (At the bench.)

11         THE COURT:  Just a minute.

12         MS. DANIELSON:  Okay.

13         THE COURT:  Tell us what occurred.

14         MS. DANIELSON:  So it's -- I had -- my husband was in

15   prison at the correctional facility.  I had an empty bottle

16   with me that was a controlled substance, but since I had the

17   bottle, I was charged with bringing contraband onto a federal

18   property.

19         THE COURT:  How long ago was that?

20         MS. DANIELSON:  It was in 2016.  September 2016.

21         THE COURT:  Almost three years ago.

22         MS. DANIELSON:  Yes.

23         THE COURT:  What happened?

24         MS. DANIELSON:  It's still going.  It keeps getting

25   continued.  I guess the DA just quit out there or something,

1    and so it is still outgoing.

2            THE COURT:  That's in state court?

3            MS. DANIELSON:  Yes, sir.

4            THE COURT:  Mr. Hurtado, do you have any questions?

5            MR. HURTADO:  Given your experience and your pending

6    criminal charge, have you formed an opinion about law

7    enforcement?

8            MS. DANIELSON:  No.

9            MR. HURTADO:  If you were selected, do you think you

10   could be fair and impartial?

11           MR. HURTADO:  Absolutely, yes.

12           MR. ROBBENHAAR:  He asked the question.

13           THE COURT:  Thank you, Ms. Danielson, you may have a

14   seat.

15      (In open court.)

16           THE COURT:  Anyone else who raised their hand in

17   response to the question about whether you have been charged

18   with a drug offense?

19           Now, I need to ask also the corollary of that.  If any

20   of your family members, parents, siblings, children, have been

21   charged with a drug offense, would you please raise your hand?

22           Let's start over here in the front row with

23   Ms. Archuleta.  You are welcome to come up to the bench if you

24   rather discuss it here, but if you would rather do it from

25   there, that's fine, too.

```
 1              MS. ARCHULETA:  This is fine.  My sister and her

 2    husband were heroin addicts, and for years, many, many years,

 3    and he was in prison, I think maybe three times.  But I was

 4    estranged from her very early, probably 1986 or so, and -- but

 5    I'm not sure if she was charged, but I know her ex-husband --

 6    and they are both deceased now, but I know her ex-husband, he

 7    was her husband at the time, was I think in prison for

 8    trafficking.

 9              THE COURT:  Anything about that experience with your

10    sister and former brother-in-law that would predispose you to

11    favor either side in a case like this?

12              MS. ARCHULETA:  No, sir.

13              THE COURT:  If you were on the jury, could you assure

14    both sides that you would decide the case solely on the basis

15    of the evidence in this case without being influenced by the

16    experience of your sister and former brother-in-law?

17              MS. ARCHULETA:  Yes, sir.

18              THE COURT:  Thank you, Ms. Archuleta.

19              Did someone else over here raise their hand?

20    Ms. Desimone.

21              MS. DESIMONE:  I have a huge family, so, yes, I have a

22    cousin who was arrested, a heroin addict.  I have a nephew who

23    is a heroin addict, and I've got another cousin who is a heroin

24    addict.  So I know the one was arrested for controlled

25    substance, and I don't -- I think that her case was
```

1   disappeared.  She's homeless.  She's out there somewhere.  You

2   know.  Because it's been hard for the family.  She won't

3   straighten out.  So that's -- I just thought I should mention

4   that.

5           THE COURT:  Well, is there anything about that family

6   experience with the use of drugs that would make it difficult

7   for you to be a fair juror in a case like this that involves

8   drugs?

9           MS. DESIMONE:  Well, Your Honor, I know the age we're

10  living in, and I know that, you know, it's out there, so, no, I

11  don't really believe that it would affect me.  I would have to

12  take everything into account.

13          THE COURT:  Well, can you assure the parties in the

14  case that if you were on the jury you would decide the case

15  solely on the basis of the evidence and not be influenced by

16  your family's experience?

17          MS. DESIMONE:  Yes, sir, I could.

18          THE COURT:  Thank you, Ms. Desimone.

19          Let's see, I believe there is someone in the second row

20  who raised their hand.  Please raise your hand high in the

21  second row.  Third row?  Ms. Delpilar.

22          MR. DELPILAR:  My sister's grandson has been in prison

23  twice for drugs.

24          THE COURT:  Is there anything about that that would

25  make it difficult for you to be an impartial juror in this

1   case?

2          MR. DELPILAR:  No.

3          THE COURT:  Thank you, Ms. Delpilar.

4          And Mr. Cassin?

5          MR. CASSIN:  My oldest son is a -- let's see, he's

6   addicted to OxyContin and other man-made forms of heroin as

7   well as heroin.  He was released from prison last year and is

8   currently living in Oklahoma with his mother.

9          THE COURT:  Now, is there anything about your son's

10  experience with the use of drugs that would make it difficult

11  for you to be a fair juror in a case like this?

12         MR. CASSIN:  No, I would listen to both sides of the

13  story and be able to make a decision that way.

14         THE COURT:  Thank you very much, Mr. Cassin.

15         Anyone else I've overlooked?  Please raise your hand

16  high.

17         The charge in this case involves methamphetamine.  If

18  any of you have such strong feelings about methamphetamine that

19  would make it hard for you to serve as an impartial juror, we

20  need to know that.  Would you please raise your hand if you

21  have strong feelings about methamphetamine such that simply

22  because it's involved you would not be able to hear the case?

23         In the back row back here, is that Ms. Keith?  Is that

24  correct?

25         MS. KEITH:  Yes.  One of my friends was in a car wreck,

1   and he was high on stuff, and he would be here today if that

2   didn't happen to him.

3           THE COURT:  Is that something that would be in your

4   memory if you were on the jury in this case?

5           MS. KEITH:  Yeah, I think so.

6           THE COURT:  Do you think that that might influence you

7   in reaching a decision?

8           MS. KEITH:  Yeah.  I want to be fair to the person.

9           THE COURT:  Okay.  Thank you for your candor,

10  Ms. Keith.  I'm going to excuse you from further participation

11  at this time.

12          Anyone else who has feelings like Ms. Keith about

13  methamphetamine?  Please raise your hand high if you do.

14          If you have any bad experience with law enforcement,

15  would you please raise your hand?  Anybody had a bad experience

16  with law enforcement that sticks in your mind?

17          If you were on the jury, you would hear certain

18  instructions that you must follow.  One is that a defendant in

19  a case like this is presumed to be not guilty of the charge

20  brought against the defendant, and the jury cannot find that

21  person guilty unless the government proves the defendant's

22  guilt beyond a reasonable doubt.  Now, that's a high standard.

23  It's not beyond all possible doubt, but it is a high standard.

24          Would any of you have difficulty following that

25  instruction if you were on the jury?  Please raise your hand if

1   you would.

2          Now, there are some related instructions.  One is that

3   because a defendant is presumed to be not guilty and because

4   it's up to the government to prove the defendant's guilt, the

5   defendant does not have to testify in a case.  And if the

6   defendant chooses not to testify, the jury may not consider

7   that in any way in reaching a decision because, again, it is

8   the government's responsibility to prove a defendant's guilt.

9   It is not the defendant's responsibility to testify on the

10  defendant's own behalf.

11         Would any of you have difficulty following that

12  instruction if you were on the jury?

13         Now, there is a closely related instruction which is

14  that a defendant has no obligation to present any evidence in

15  the case.  Doesn't have to testify.  Doesn't have to call any

16  witnesses.  Because, again, it is the government's obligation

17  to prove guilt.  It's not the defendant's obligation to prove

18  his innocence.

19         Would any of you have difficulty following that

20  instruction if you were on the jury?  Please raise your hand if

21  you would.

22         Now, I need to ask you to raise your hand -- well, I do

23  have another question I overlooked.  Would any of you give

24  either more or less weight to the testimony of a law

25  enforcement officer than you would to other witnesses simply

1   because the witness is a law enforcement officer?  If you think

2   you would give more or less weight to the testimony of a law

3   enforcement officer, please raise your hand.  More or less.

4        The last question I'm going to ask is can you think of

5   any other reason that would make it difficult for you to be a

6   fair and impartial juror in a case like this?  Please raise

7   your hand if you have any other reason that we have not

8   discussed.

9        Let me ask the lawyers to come up to the bench for just

10   a minute.

11      (At the bench.)

12        THE COURT:  Okay.  We have quite a number of jurors,

13   and unless there is an objection, I would like to excuse number

14   30, who is Mr. Melendrez.  I'm very concerned about his autism

15   condition and the medication that he takes.

16        MR. HURTADO:  No objection, Your Honor.

17        MR. ROBBENHAAR:  I guess I was leaning that way

18   initially, but I did hear him say that he thinks he could be

19   fair and impartial, and I think sit through this.  He does get

20   anxious, but he is medicated, so I guess I'll object to his

21   recusal or excusal at this time.

22        THE COURT:  I would like to excuse number 26, Mr. Hay,

23   who is an IT employee who, as I understand it, he's either the

24   sole employee or needs to avoid missing any work.  Any

25   objection to excusing Mr. Hay?

1          MR. HURTADO:  No objection, Your Honor.

2          MR. ROBBENHAAR:  No objection, Your Honor.

3          THE COURT:  While we're up here, let me ask if the

4    government has any other persons you believe should be excused

5    for cause.

6          MR. HURTADO:  Other than Mr. Melendrez, which the court

7    has already addressed, the United States has no other issues.

8          MR. ROBBENHAAR:  May I get my seating chart for just a

9    moment?

10          THE COURT:  Yes.

11          MR. HURTADO:  I'll do the same, Your Honor.

12          MR. ROBBENHAAR:  Your Honor, there might be arguments

13    that we would have for cause against some of the jurors, but

14    it's kind of difficult to organize our thoughts right now with

15    the jury waiting.  I don't know if the court would --

16          THE COURT:  Who did you have in mind?

17          MR. ROBBENHAAR:  Well, we had some thoughts on -- let

18    me look at my notes.  Number 13, Ms. Salazar, for example, with

19    her exposure to the drug testing and her experience in the

20    court system, I would raise a concern with her and ask that she

21    be excused.

22          THE COURT:  What's the government's position on

23    Ms. Salazar?

24          MR. HURTADO:  As I recall, Ms. Salazar was asked about

25    the effect, if any, that the DEA forensic chemist would have in

1   this case.  It is the recollection of the United States that

2   Ms. Salazar indicated that she could be fair and impartial and

3   would listen to all the evidence before coming to a conclusion

4   about the defendant's guilt or innocence.

5          THE COURT:  She did say that.  So you do object to

6   excusing her?

7          MR. HURTADO:  That is correct.  The United States would

8   object.

9          THE COURT:  Mr. Robbenhaar, any others?

10          MR. ROBBENHAAR:  No.  I just feel that based upon her

11   extensive experience in the court system doing this kind of

12   work on occasion, she said she testified a couple of times a

13   year over the course of 20 years, I think it was, I just think

14   it's too close to home for her given that drugs and drug

15   testing is a feature of this case.

16          THE COURT:  Any others who you would propose to excuse

17   for cause?

18          MR. HURTADO:  Are you addressing the government?

19          THE COURT:  Both of you.

20          MR. ROBBENHAAR:  If I may.  Ms. Otzenberger is the

21   mother of an APD police officer.  She's number...

22          MR. HURTADO:  18.

23          MR. ROBBENHAAR:  Thank you.  Her daughter-in-law who

24   was also a police officer with APD.  Apparently, they are in

25   drugs.  Now, Ms. Otzenberger did state that she didn't talk

1    about details with her son but does believe that son and

2    step -- daughter-in-law have occasion to work with DEA and that

3    she's very worried about him when he's involved in drug cases.

4    I just think that notwithstanding her assurance that she could

5    put that aside, I think the experience is too close to home,

6    and I would argue that we should let her go on this case.

7         MR. HURTADO:  The United States would oppose, Your

8    Honor.  The United States recognizes that Ms. Otzenberger did

9    in fact say she had a son and daughter-in-law who worked for

10   APD.  However, she did state in no uncertain terms that she

11   could be fair and impartial, and the parties have no reason not

12   to take at face value the representation she's made to the

13   court.  As such, the United States would oppose striking

14   Ms. Otzenberger for cause.

15        Your Honor, may I go back to Mr. Melendrez, juror

16   number 30?

17        THE COURT:  You may.

18        MR. ROBBENHAAR:  On Otzenberger, she did say, if I

19   recall also, that she doesn't ask the details about her son's

20   job because it would worry her too much, which causes me to

21   worry about her ability to be a fair and impartial juror here.

22        THE COURT:  What's your response?

23        MR. HURTADO:  I don't see how those two things are

24   related, Your Honor.  The case that's going to be presented

25   before the jury deals with facts and circumstances that are not

1    related to any of the cases that Ms. Otzenberger's son and

2    daughter-in-law have worked.  This is its own case, and it

3    should rest on its own merits.  Again, at the end of the day,

4    she said she could be fair and impartial.

5            THE COURT:  Anything else?

6            MR. ROBBENHAAR:  Nothing further, Judge.

7            THE COURT:  Now, what questions do you wish to ask?

8            MR. HURTADO:  Your Honor, I just wanted to ask about

9    reasonable doubt, just follow up on some of the points you

10   raised.  Also, I would like to ask about direct versus

11   circumstantial evidence, and I want to ensure that the jurors

12   will consider circumstantial evidence in this case.  Oh, and

13   also, I want to go over the fact that scientific testing --

14   there is no specific type of evidence that is required for the

15   United States to meet its burden of proof.  For example, DNA

16   evidence or fingerprint evidence.  And those are the main

17   areas.

18           MR. ROBBENHAAR:  Would you repeat that?  I'm sorry, I

19   didn't understand.

20           MR. HURTADO:  No, that's okay.  So the United States

21   plans to question the venire about the United States' burden of

22   proof which is beyond a reasonable doubt.  I plan to ask about

23   whether the jurors will promise to hold the United States to

24   its burden of proof and not to impose a heavier burden on the

25   United States such as beyond a shadow of a doubt or beyond all

1    possible doubt.

2              Connected to that --

3              THE COURT:  Why don't you ask that in terms of whether

4    they would assure you that they would follow the court

5    instructions about reasonable doubt.

6              MR. HURTADO:  Sure.

7              MR. ROBBENHAAR:  I think couching it in terms of DNA or

8    the lack of DNA testing or fingerprinting, I think is starting

9    to bias the jury one way or the other.

10             MR. HURTADO:  I would like to go into that because if

11   there is a juror out there who absolutely requires that DNA --

12             THE COURT:  Why don't you ask that in that fashion:

13   Are there any among you who would require the government to

14   prove that before --

15             MR. HURTADO:  Yes, sir.  May I come again on juror

16   Mr. Melendrez, juror number 30?  I wanted to go back to him.  I

17   understand Mr. Robbenhaar's objections, but --

18             THE COURT:  You can ask him him more questions if you

19   wish, too.

20             MR. HURTADO:  Sure.  Very well.

21             THE COURT:  Anything else?

22             MR. HURTADO:  That's it, thank you, sir.

23             MR. ROBBENHAAR:  Judge, I think I would ask a few

24   questions to follow up on the court's questioning about the

25   criminal justice system and the burdens that you discussed, the

1   right to remain silent, the government's burden of proof beyond

2   a reasonable doubt.  I also want to talk a little bit, follow

3   up on what the court talked about the case if the defendant

4   does not testify.

5        Another issue that I think is important that at least

6   needs touching upon is Mr. Fernandez is being assisted by a

7   court interpreter.  I would just like to know if there is any

8   bias inherent to the jury due to the fact that English is not

9   his first language.

10        THE COURT:  That's fine.

11        MR. ROBBENHAAR:  I think you went through the prior

12   jury service and the logistics.  The court did ask a series of

13   questions about whether the jury would give more weight to a

14   law enforcement officer just in lieu of his position as a law

15   enforcement officer.  I would like to follow up with maybe a

16   handful, two or three questions on that issue to try to flesh

17   that out a bit.

18        THE COURT:  How would you ask that?

19        MR. ROBBENHAAR:  Does the government -- let me phrase

20   it this way.  Could a law enforcement officer ever make a

21   mistake?  I think you asked the jurors has anyone ever felt

22   that they were falsely accused.  You may not have used those

23   specific words, but I think that theme came up, and that's what

24   I would be getting at.

25        THE COURT:  Any objection?

1          MR. HURTADO:  No, sir.

2          THE COURT:  Go ahead and have a seat.  We'll proceed.

3       (In open court.)

4          THE COURT:  Ladies and gentlemen, the lawyers have just

5    a few questions to ask of you, and after they finish their

6    questions, we will then recess for a while.  It will be about

7    25 to 30 minutes while the lawyers and I select the jury in the

8    case.  During that time, you will have an opportunity to leave

9    the courtroom and use the rest rooms or whatever you need to

10   do.

11          Mr. Hurtado, are you ready to ask the government's

12   questions?

13          MR. HURTADO:  Yes, sir.  May it please the court.

14          THE COURT:  Come on up as to the lectern and face the

15   ladies and gentlemen.

16          MR. HURTADO:  Ladies and gentlemen, good afternoon.

17   Please allow me to reintroduce myself.  My name is Samuel

18   Hurtado.  I am a prosecutor for the U.S. Attorney's Office.

19   With me today is Special Agent Jay Perry.  He is a 20-year

20   veteran with the DEA.

21          I wanted to follow up with a few of the points that the

22   judge raised with you earlier today.  As an initial matter, the

23   only thing that the prosecution is looking for today is people

24   who can be fair and impartial.  The United States is really

25   looking for nothing else.  So the questions that I'm going to

1   ask you are designed to simply assess your ability to be fair

2   and impartial.

3          Please understand, I'm not trying to single anybody out

4   or try to embarrass you, so if I ask a particular question and

5   you are not comfortable answering that question, there is

6   nothing wrong with simply raising your hand and asking to

7   approach the bench as some of you already have.

8          So with that said, first, I want to address the burden

9   of proof in this case.  At the close of this trial, the judge

10  will instruct you on the burden of proof.  The United States

11  prosecution has the burden of proving this case beyond a

12  reasonable doubt.  That is a burden that I willingly accept and

13  look forward to proving.

14         With that said, however, the burden of proof is not

15  beyond all possible doubt or beyond a shadow of a doubt.  Is

16  there anybody here who believes that the United States should

17  be held to a higher standard than proof beyond a reasonable

18  doubt?  Please note that I'm not judging you.  If you believe

19  that the United States does have to prove this case beyond all

20  possible doubt or beyond a shadow of a doubt, it's okay to say

21  so.  This may not be the trial for you.  But it's okay to say

22  that, and that's all I want to know.  So one more time, is

23  there anybody here who believes that the United States should

24  be held to proving this case beyond all possible doubt or

25  beyond a shadow of a doubt?

1           As I look around, there are no hands up, and it does

2   not appear that anybody is responding to that question.

3           Does anybody here watch television programs like "Law

4   and Order" or "CSI," anything like that?  Can I see some hands

5   go up?  All right.  I'm noting that there are a lot of hands

6   going up.  I just want to be up front and let you know that

7   this trial will not be like an episode of "CSI."

8           I know everyone is laughing, but the reason I mention

9   that is there is actually a perception among the public that

10  believes that a crime scene investigator can really solve a

11  case in under 60 minutes using high tech scientific techniques.

12  I can assure you, it's not done that way.

13          With that said, is there anybody here who watches "CSI"

14  or "Law and Order," and you must absolutely have DNA evidence,

15  that the prosecution must present before you can convict a

16  defendant?  Anybody here who needs to see DNA evidence or

17  fingerprint evidence before you can find a defendant guilty?

18  All right.  I'm noting that no hands are going up.

19          So with that said, I would like to ask you to please

20  make the prosecution a promise, and that promise is as follows:

21  Do you promise to hold the United States to its burden of

22  proving the defendant guilty beyond a reasonable doubt?  If you

23  agree at this time, please say, "Yes, I promise."

24          Is there anybody here who said, "No, I do not promise,"

25  or anybody who did not answer at all?  It's okay if you said

1   no.  I'm noting no responses.

2          Now, moving on to my next category of questions

3   concerns direct versus circumstantial evidence.  As a general

4   rule, the law does not distinguish between direct evidence and

5   circumstantial evidence.  The law simply requires you to find

6   the facts in accord with all the evidence that has been proved

7   in a case.  So let me illustrate some examples.  Direct

8   evidence is something like eyewitness testimony.  Something

9   that you personally witnessed.  That would be an example of

10  direct evidence.

11         By contrast, circumstantial evidence refers to the

12  proof of a chain of facts which point to the existence or

13  nonexistence of other certain facts.  I think an example would

14  help illustrate what I mean by circumstantial and direct

15  evidence.  So, for example, an example of direct evidence is as

16  follows:  Let's say that you are baby-sitting a very small

17  toddler at home, and you carry that toddler into the kitchen,

18  and you put that toddler on the floor, and you see a jar of

19  cookies next to that toddler, and you tell that toddler, "Do

20  not eat those cookies, little toddler."  And the toddler

21  doesn't listen to you.  He opens the lid to the cookie jar,

22  reaches his hand inside, and begins eating the cookies.

23  Because you witnessed that toddler eating the cookies, that is

24  an example of direct evidence.  Do you understand so far?  Yes?

25         An example of circumstantial evidence would be let's

1    say you're baby-sitting that same toddler, and you put him on

2    the floor, and there is also a jar of cookies next to that

3    toddler, and you tell that toddler, "Do not eat those cookies,

4    young toddler." You then step outside for a few moments. When

5    you come back inside, you see that the cookie jar is empty.

6    You see that there is a trail of cookies leading from the

7    cookie jar to the little toddler. The little toddler has

8    cookie crumbs all over his bib and in his hair. He's got

9    chocolate chips all over his mouth, and there is nobody else in

10   the kitchen. You are permitted in this trial to draw

11   reasonable inferences from the testimony and exhibits. So in

12   my toddler example, even though you did not see that toddler

13   eat the cookies, you can make the reasonable inference that he

14   ate the cookies. That's an example of circumstantial evidence.

15   Does everyone understand that? Okay.

16            Is there anybody who believes that the United States

17   prosecution should only prove its case with direct evidence as

18   opposed to circumstantial evidence? Again, if you believe that

19   the government must prove only through direct evidence, it's

20   okay. This may not be the trial for you. But it's okay to

21   think that. Anybody here who would require only direct

22   evidence for the government to prove its case-in-chief, please

23   raise your hand at this time. I'm noting that nobody is

24   raising their hand.

25            So with that said, I want you to please make me another

1   promise.  Do you promise to consider circumstantial evidence in

2   this case in addition to direct evidence?  If you agree at this

3   time, please say, "Yes, I promise."  Is there anybody who said,

4   "No, I do not promise"?  Once again, it's okay to say, "No, I

5   don't promise.  I want to see fingerprint evidence.  I want to

6   see direct evidence.  I want to see DNA.  I want to see video."

7   It's okay to say that if you believe that.  Anybody here?

8           All right.  Noting no responses, I'll move on.

9           Judge Parker will, if you are selected to serve on the

10  jury, instruct you on the law that you are to follow.  Again,

11  I'm going to ask you to make me another promise.  Will you

12  please promise to follow the law as it is instructed to you by

13  the judge?  If you promise, please say, "Yes, I promise."

14          Is there anybody who said, "No, I do not promise"?

15          Please bear with me for a few moments.

16          Law enforcement officers such as Agent Perry routinely

17  conduct investigations aboard the public means of

18  transportation such as the Amtrak station or in this case the

19  Greyhound Bus Station.  Does anybody have a problem with law

20  enforcement conducting these types of investigations aboard

21  public means of transportation like the Greyhound Bus?

22          I am noting no responses again.  All right.  This is

23  going a lot faster than I had anticipated.  I have no further

24  questions for you.  Thank you very much.

25          THE COURT:  Mr. Robbenhaar, you may ask questions, but

1    I overlooked excusing Mr. Hay.  You have some work obligations

2    that you expressed, and we've agreed that you may be excused

3    from further participation.  So I thank you for being here.

4    You will get credit for one day of jury service for having been

5    here.

6         MR. ROBBENHAAR:  Good afternoon, folks.  I'll try to

7    keep this brief.  I know we've been in here a couple of hours

8    already, but I wanted to follow up with some of the questions

9    that Judge Parker asked you, but also that Mr. Hurtado asked

10   you.  One of his questions was about the television shows you

11   might watch.  I don't watch a lot of TV, I'm going to be honest

12   with you, but I've heard "Law and Order."  I know that show,

13   and I know "CSI" and some of the others.  It seems to me that

14   some of those shows or maybe the majority of those shows are

15   really told from the prosecution's perspective.  I'm not sure

16   if one of those courtroom drama shows or those kind of shows

17   are told from the defense perspective.  You have -- in our

18   criminal justice system, you have the prosecution and the

19   defense, and you see that playing out before you.

20        Does anyone feel differently for one side or the other?

21   And that's a really broad question.  But do you feel like the

22   trust lays more heavily on one side or the other?

23        And if these are questions that you don't want to

24   answer publicly, we all understand.  And as you have seen, we

25   can come up to the bench.

1          I mean, defense lawyers, is there anything that comes

2     to mind when you hear of defense lawyers?  Or criminal defense

3     lawyers?  No?

4          Ms. Verhulst, I saw you gesturing or saying -- you

5     know, with a facial expression.  I don't mean to put you on the

6     spot.

7          MS. VERHULST:  No, that's okay.  That's kind of an

8     interesting question, because I think they all have a role to

9     play, and they all participate based on the direction things go

10    for their client, be it the United States or be it the defense,

11    and, yeah, just kind of interesting.  That's why I smiled.

12         MR. ROBBENHAAR:  Yeah.  And we are from the Federal

13    Defender's Office here in town.  You've been a juror on a

14    number of cases.

15         MS. VERHULST:  I was on a jury once.  Remember, I'm the

16    two-year-old that sat on a jury 40-some years ago.

17         MR. ROBBENHAAR:  Are you the toddler with the crumbs?

18         MS. VERHULST:  But nobody saw me.

19         MR. ROBBENHAAR:  Thank you, Ms. Verhulst.

20         Earlier, I think Judge Parker asked you or maybe one of

21    us asked you that if you happened to have some friends or

22    family in law enforcement, and you might side with the defense

23    on this case, would that be a problem.  Could that be a problem

24    for you?  Does anyone feel that because of maybe family issues

25    or friend issues, neighborhood issues, that might be a problem

1   for you to come home and say, "Yeah, we found him not guilty"?

2   No answers for that one.  Okay.

3          One final related question on that topic.  When you

4   walked into the courtroom today, I don't think you were told

5   whether it was a criminal or civil case, but if I'm wrong, the

6   moment you knew it was a criminal case, did anyone think to him

7   or herself, "I wonder what he did?"  Anybody have that kind of

8   gut feeling, gut reaction?  Ms. Desimone, I'm seeing you nod

9   your head a little bit.  Let's wait for the microphone.  Okay?

10          MS. DESIMONE:  Yes, of course, it's curiosity.  It's

11  human nature.  You know, I saw him, and I wondered, I did.  So

12  to answer your question.

13          MR. ROBBENHAAR:  The way I asked it, though, I wonder

14  what he did.  You have already heard that Mr. Fernandez is

15  presumed innocent or presumed not guilty.  Does that change

16  your feelings?

17          MS. DESIMONE:  I guess it will, because now I would

18  have to say, seeing as you how you put that it way, it's like I

19  wonder what he's accused of.

20          MR. ROBBENHAAR:  Aha.  Do you see the difference?

21          MS. DESIMONE:  Yes, I do.  Thank you for pointing that

22  out.

23          MR. ROBBENHAAR:  Thank you for helping me point it out.

24          Did anybody else have that same kind of thinking

25  process when they walked into the courtroom today?  Okay.

1          Now, a couple of questions I would like to ask about

2    law enforcement.   There has been some talk earlier about

3    whether people have been accused of a crime.   Let me ask you

4    this.   Does anyone ever feel or have felt that they are -- have

5    been falsely accused?   Maybe not a crime, but falsely accused.

6    Does anyone want to offer an example of feeling like they were

7    falsely accused?   Put you on the spot.

8          Okay.   Would you all admit that it can happen, that you

9    were falsely accused of something, whether it is criminal

10   conduct or something not criminal?   Okay.   I'm hearing a lot of

11   yeses.

12         Let me rephrase that.   Sometimes we're the object of

13   feeling like we're accused of something that we didn't feel we

14   did.   Have you ever jumped to the conclusion about somebody or

15   some event only to find out later that what you initially

16   thought may not have been the actual proof?   I'm seeing a lot

17   of people nodding.   Anyone bold enough to offer an example?

18         Ms. Archuleta?

19         MS. ARCHULETA:   Yeah, a close friend of mine, her

20   grandson was arrested, and they, I guess, assumed that he was a

21   murderer.

22         MR. ROBBENHAAR:   They being?

23         MS. ARCHULETA:   I don't know.

24         MR. ROBBENHAAR:   Are you saying the police?

25         MS. ARCHULETA:   The police.   He was in jail or in

1    prison for I think almost a year, and then they found out who

2    the real person was, and he got off.  But I think the time that

3    he was in there for when he got arrested, I think everybody

4    just assumed that he did that.  Then my friend knew he didn't.

5    But apparently, he's -- he was innocent.

6            MR. ROBBENHAAR:  How does that make you feel, that

7    process and that experience.

8            MS. ARCHULETA:  I guess it made me feel bad that I even

9    thought -- even though my friend was trying to convince me he

10   didn't do it.  Not that I said anything, you know, that I

11   believed that he did or anything like that, but she was pretty

12   convinced that he didn't, and I thought, poor thing, you know.

13   But then afterwards, I felt really bad about the fact that, you

14   know, I thought he had.

15           MR. ROBBENHAAR:  Thank you very much, Ms. Archuleta.

16           Anybody else have a similar experience where maybe they

17   have seen this kind of situation occur?

18           Okay.  Now, I know Judge Parker asked you or mentioned

19   earlier that Mr. Fernandez does not need to testify.  As we

20   know, and we've heard this talked about, the burden is entirely

21   on the government over here at this table.  Would anybody hold

22   it against him or this table, the defense table, if we just sat

23   with our arms crossed?  I don't know if that's going to happen,

24   I doubt that's going to happen, but you see what I'm saying?

25   Like really, it's entirely on the government here.  Would you

1    expect something from the defense?

2            I'm seeing a hand by Mr. Charrette?

3            MR. CHARRETTE:  Yeah, I think he needs to fight for his

4    rights if he's being accused of something.  I think he has to

5    have a voice, or you have to have a voice.

6            MR. ROBBENHAAR:  And if he didn't stand up to your

7    expectation or your hope, how would you -- how would that

8    change your thought or make you feel?  That's a poorly worded

9    question, I'm sorry.

10           MR. CHARRETTE:  I don't know how to answer it.  But I

11   just think that if you're being accused of something, you need

12   to not necessarily prove that you're innocent, but you have to

13   have a voice.  You can't just let somebody accuse you of

14   something and just sit there, I don't think.

15           MR. ROBBENHAAR:  I'll try to ask it a different way.

16   If, for example, someone is accused of having done something

17   and doesn't respond as vigorously as you might expect, would

18   you tend to think that that person might be guilty?

19           MR. CHARRETTE:  I think they are trying to hide

20   something and maybe trying not to incriminate themselves,

21   saying something incorrect.

22           MR. ROBBENHAAR:  Can you think of a reason why somebody

23   might not -- someone accused of a crime might not testify?

24           MR. CHARRETTE:  Just afraid of speaking.

25           MR. ROBBENHAAR:  That's fair.  Maybe nerves, right?

 1          MR. CHARRETTE:  Yeah.

 2          MR. ROBBENHAAR:  But you mentioned earlier that you

 3   might also view it as someone trying to hide something.

 4          MR. CHARRETTE:  Possibly, yes.

 5          MR. ROBBENHAAR:  Anybody else think similarly about

 6   that issue as to what Mr. Charrette just said, that if the

 7   person doesn't testify, that he or she might be trying to hide

 8   something?

 9          Now, you may or may not have noticed, but Mr. Fernandez

10   has a headset on, and he's being assisted by a courtroom

11   interpreter.  English is not his first language.  Does that

12   fact play a role in anyone's thinking about him?  It's another

13   broad topic, but does that make a difference to you?  And we

14   live in New Mexico where there is many languages spoken.  And

15   so I'm not hearing any responses, so I'm taking it that just

16   the fact that Mr. Fernandez is utilizing an interpreter here

17   this afternoon doesn't play a role in your judgment or

18   viewpoint of him.  Is that right?

19          All right.  Let me ask it another way, too.  I'm sure

20   living in New Mexico, we've all encountered individuals in our

21   lives whose first language is not English.  You probably had

22   conversations with some of these people.  Some people whose

23   second languages is English.  Can anyone bring up an example of

24   where you have may have felt when you're conversing with this

25   person they're not understanding quite right?  Anybody willing

1    to offer an example?  You're having a conversation with someone

2    whose language is -- second languages is English, not first

3    language.

4          Ms. Desimone, I'm going to ask you to wait for the

5    microphone, but I would like to hear from you.

6          MS. DESIMONE:  Well, I lived in California when I was

7    18, 19, and I had a Mexican boyfriend.  Okay.  Yeah, there was

8    a language barrier because I speak Spanglish, you know, so it

9    was a little difficult, you know, and I felt bad for him.  And

10   I tried to teach him English, you know, but, you know, there

11   was -- I did feel that way.

12         MR. ROBBENHAAR:  Did you ever feel at times that you

13   were saying something to him, and he may have been nodding

14   along but didn't fully understand?

15         MS. DESIMONE:  That's exactly what I'm saying.  Where

16   he would be like, yeah, okay, shut up.

17         MR. ROBBENHAAR:  Anybody else have a similar kind of

18   experience?  Mr. Morin, would you --

19         MR. MORIN:  I was stationed in Japan, and the

20   nationalists there actually made a point to learn English.  It

21   was an ongoing effort by them.  And despite the fact just

22   sitting and having a conversation with them in English, the

23   extra amount of attention that you had to pay to not just what

24   you were trying to tell them but what they were trying to tell

25   you was pretty phenomenal.  Just the stuff that could be

1    missed, I guess.

2         MR. ROBBENHAAR:  So I guess I'm hearing that sounds

3    like oftentimes during your conversations they would say yeah,

4    yeah, but maybe they weren't really getting it?

5         MR. MORIN:  Yeah, like I said, you had to pay attention

6    to what you were saying to them as well as what they were

7    saying to you to make sure that it was clear.  And my best case

8    example is when you get there, you're assigned housing, and

9    they furnish that housing for you, and just trying to make sure

10   the details from anything from I need a three bedroom to a two

11   bedroom could be lost in translation.

12        MR. ROBBENHAAR:  Lost in translation.  Were you in the

13   service there?

14        MR. MORIN:  Yes.

15        MR. ROBBENHAAR:  Thank you.  Anybody else have a lost

16   in translation?

17        MS. SALAZAR:  Many of the children that I worked with,

18   English was a second language, so I did have that where I would

19   talk to them, and they would just agree with whatever I said,

20   and you realized, wait a minute, they are not understanding me.

21   I even had a young man who I was calling him the wrong name,

22   and he never corrected me.  When I found out later, I said,

23   "Why didn't you let me know?"  And he was afraid to let me know

24   because of the position that I was, the court.

25        MR. ROBBENHAAR:  Like the position of authority?

1          MS. SALAZAR:  Yes.  And so I always tried to make sure

2     that when I was speaking with the child that they did

3     understand what I was saying.  If not, we got interpreters.

4          MR. ROBBENHAAR:  Thank you.  Anybody else want to

5     comment on this lost in translation?

6          All right.  Ladies and gentlemen, that's about all I

7     have, so thank you very much.  I appreciate your time.

8          THE COURT:  Ladies and gentlemen, I overlooked one very

9     important question that I normally ask.  Let me give you a

10    little background for the reason for asking the question.

11         It's extremely important that we have a jury with

12    members who can carefully concentrate on the proceedings in

13    court and carefully listen to the questions and the answers of

14    the witnesses.  It's the jury's responsibility to decide the

15    facts based on the evidence presented, and that includes the

16    witnesses' testimony.  And there, the jury is responsible for

17    not only listening carefully but also observing the witnesses

18    when they testify to make a decision about whether they are

19    being truthful or not.  So again, it is important that we have

20    jurors who can keep their mind in court and not be distracted

21    by things outside of court.

22         Let me give you an example of what I'm resisting at the

23    moment.  My wife and I are moving to a new home.  We haven't

24    bought the new home yet.  We have to rent a place first, but we

25    sold our house that we've had for many, many years.  My wife is

1    very anxious about getting everything packed, and I am very

2    concerned about whether I'm meeting her deadlines for doing

3    everything, and I'll probably be thinking about that while the

4    trial goes on.

5            Well, the question that I have is whether there is

6    anything in your life that might make it difficult for you to

7    give your undivided attention to this trial as it proceeds.

8    For example, if you're thinking about an illness of a family

9    member, or if you're thinking about debt obligations that are

10   coming due and maybe the tax refund checks have not arrived

11   yet, or for example, if you're concerned about a romance going

12   on the rocks.  Anything like that that might be on your mind

13   that will keep your attention outside the courtroom.  Any of

14   you have any personal issues like that ongoing at the moment

15   that might make it difficult for you to be a very attentive

16   juror in this case?  Please raise your hand if you think there

17   is anything in your life that would make it hard for you to pay

18   attention.  Anybody?

19           All right.  At this time, it's about 3:34 according to

20   the clock on the wall.  We're going to take a recess.  I'll ask

21   that you be back seated where you're presently seated by four

22   o'clock, so the next thing I need to ask you to do is look at

23   your neighbors so you will know where to sit when you get back

24   to the courtroom.

25           So please be in your present seat by four o'clock

1    according to the clock on the wall.

2           Court's in recess at this time.

3       (Court recessed at 3:34 p.m. to 3:41 p.m.)

4       (In open court, jury not present.)

5           THE COURT:  Court's in session, have a seat, please.

6           First, let me review with you the prospective jurors

7    who have been excused for cause without objection.  Number 1,

8    Timothy Cox; number 6, Deborah Toya; number 17, Audie Myers;

9    number 20, Stephen Carrico; number 26, Jeffrey Hay; number 32,

10   Julian Trujillo; number 37, Roy Clamor; and number 45, Rita

11   Keith.  Do all of you agree with that?

12          MR. HURTADO:  Your Honor, I believe there is one

13   missing, Mr. Michael Feldewert, juror number 22.  As I recall,

14   the court excused him.

15          THE COURT:  That's correct.  Add him if you would.

16          MR. HURTADO:  Yes, sir.

17          MR. ROBBENHAAR:  I think, Your Honor, juror number 32.

18   Was Mr. Trujillo excused?

19          MR. HURTADO:  Yes, Mr. Trujillo.

20          MR. ROBBENHAAR:  I think Priscilla Savedra, 29, was she

21   not let go?

22          THE COURT:  I don't show it on my records, but it may

23   be.  What's the government's position?

24          MR. HURTADO:  Yes, Your Honor, I also show that

25   Ms. Savedra has been excused.  If the court recalls,

1   Ms. Savedra was the young lady who worked at Main Event

2   Entertainment, and she advised that she could not find a

3   substitute to replace her at work.

4           THE COURT:  That's correct.  Okay.  Juror number 29 as

5   well, then.

6           That's a total of 10, then, that were excused for

7   cause.  Is that correct?

8           MR. HURTADO:  Yes, sir, Your Honor.

9           MR. ROBBENHAAR:  Yes, Your Honor, that's correct.

10          THE COURT:  Let me ask Mr. Hurtado, does the government

11  have any other challenges for cause?

12          MR. HURTADO:  Yes, sir.  Your Honor, the United States

13  would renew striking for cause juror number 30, Mr. James

14  Melendrez.  Your Honor, Mr. Melendrez appears adamant that he

15  suffers from mental health issues, specifically autism.  The

16  United States asked Mr. Melendrez point-blank whether he would

17  like to be excused, and Mr. Melendrez indicated that he would.

18  Mr. Melendrez also indicated that given his high level of

19  anxiety it would be difficult for him to listen to the facts of

20  the case and consider the evidence.  So for those reasons, the

21  United States would submit that Mr. Melendrez should be excused

22  for cause.

23          THE COURT:  Mr. Robbenhaar?

24          MR. ROBBENHAAR:  Your Honor, I recall him specifically

25  telling the court, when you asked him initially about whether

1   or not he would like to be excused, his response was something

2   along the lines of "I'll leave it up to the court."  He

3   obviously did tell the court, or we know that he has this --

4   he's on the autism spectrum somewhere.  He's on medication, but

5   I never heard him specifically say that he can't be a fair and

6   impartial juror, and that he can't sit and listen to the

7   evidence.  So at this point, I would suggest that there is not

8   enough for him to be removed for cause.

9        THE COURT:  Let me ask for you to comment on his

10  appearance when he was up here.  I was a little concerned about

11  what appeared to be signs of anxiety when he was talking to us,

12  but Mr. Hurtado, do you have any recollections of that?

13       MR. HURTADO:  Your Honor, I would share the concerns

14  that the court just shared with the parties.  I agree.  It was

15  evident to the United States that he was nervous about being

16  here.  He clearly does not feel comfortable if he were to be

17  selected as a juror.  As such, the United States would renew

18  its objection to proceeding with Mr. Melendrez in this case.

19       THE COURT:  Well, he was fairly clear in saying that he

20  prefer not to serve, but I'm not sure that's sufficient to

21  excuse him.

22       MR. HURTADO:  I would agree, Your Honor, but the

23  problem is Mr. Melendrez articulated other concerns that he had

24  given his high level of anxiety.  It was evident to the United

25  States that he would have difficulty focusing on the task at

1   hand which was to consider the facts and evidence that is

2   presented in this case.

3          THE COURT:  Well, he didn't respond to the question

4   about whether there was anything in his life that would make it

5   hard for him to pay attention.  I was wondering what he would

6   say to that, and he didn't respond.

7          Mr. Robbenhaar?

8          MR. ROBBENHAAR:  He also answered publicly in front of

9   people at one point, suggesting to me that, despite some

10  anxiety, he's able to function in the courtroom with 50 or 60

11  people, not easy for anybody, yet he was able to do it.

12         THE COURT:  Well, despite my concerns about him, I'm

13  not going to excuse him for cause.

14         Any other jurors or potential jurors that the

15  government believes should be excused for cause?

16         MR. HURTADO:  No, sir, Your Honor.

17         THE COURT:  Mr. Robbenhaar?

18         MR. ROBBENHAAR:  Your Honor, we discussed at the bench

19  Ms. Salazar, juror number 13, and her experience as a program

20  director at the children's court having the job duties of

21  testing and sometimes testifying, being in that position of

22  authority and her experience with chemical testing.  I don't

23  think the court ever ruled on her, and I just at this point

24  would suggest to the court that I do believe that she should be

25  struck for cause.  Her experiences, her job experiences and

1   life experiences, for I think I heard her say the last 20

2   years, I may be wrong on that, suggest that she would give

3   undue weight to a government witness in this case.

4          THE COURT:  Mr. Hurtado?

5          MR. HURTADO:  The United States does not recall

6   Ms. Salazar indicating that she would give unnecessary weight

7   to any witnesses.  As the government recalls, she expressly

8   stated that she could be fair and impartial.

9          I certainly understand that she's been a program

10  director and she's testified for the court about drug tests in

11  the past.  However, that pertains to defendants under her

12  watch.

13          In this particular case, we have a DEA forensic chemist

14  who is analyzing the drugs in this case, analyzing

15  methamphetamine, so her job as a program director is not the

16  same thing as Mr. Paul Galat's role as a DEA forensic chemist,

17  those are two roles, that's the first thing.  But second and

18  most important, she never indicated that she would give undue

19  weight to any government witnesses, and most importantly, she

20  stated she could be fair and impartial.  As such, the United

21  States would object to striking Ms. Salazar for cause.

22          THE COURT:  I don't believe that her answers were such

23  that I have grounds for excusing her for cause.

24          Let me ask Mr. Robbenhaar, any other persons you

25  believe should be excused for cause?

1          MR. ROBBENHAAR:  Yes, Your Honor.  Mr. Charrette, juror

2     number 24.  He's the individual that expressed an opinion that

3     he believed that if you're sitting in the hot seat, if you're a

4     criminal defendant, you need to fight, you need to say

5     something, you need to push back, and if you didn't, he would

6     wonder to himself what are you hiding.  I think he's clearly a

7     biased juror and cannot follow -- and expressed as such in his

8     answers, that he's unable to follow the presumption of not

9     guilty and the fact that Mr. Fernandez here does not have to

10    testify, I'm afraid that he will hold that against shim.

11         THE COURT:  Mr. Hurtado?  Any objection to excusing

12    Mr. Charrette, number 24?

13         MR. HURTADO:  No, Your Honor.  The United States will

14    would share the sentiments of Mr. Robbenhaar.  The United

15    States also recalls Mr. Charrette saying words to the effect of

16    the defendant needs to fight for his rights or something like

17    that.

18         THE COURT:  Okay.  By agreement of the parties, I'll

19    excuse number 24, Zackary Charrette.

20         Any other challenges for cause?

21         MR. ROBBENHAAR:  Nothing further, Your Honor.  Thank

22    you.

23         THE COURT:  What we're going to do is let you divide up

24    and decide how to exercise your peremptory challenges.  You

25    will do that by marking this chart that you have, and you will

1   notice it has three columns:  Plaintiff, Defendant, and Court.

2   I have marked in the Court column the 11 people we have excused

3   so far for cause by agreement.

4        The government is to mark its six challenges in the

5   Plaintiff column, and the defendant is to mark his 10

6   challenges in the Defendant column.

7        Now, I'm going to ask Mr. Hurtado and Mr. Perry to

8   step -- I trust there is nobody in the jury room.  If you would

9   step through that door, and you can visit in the jury room

10  about who you want to use your challenges on.

11       MR. HURTADO:  Yes, sir, very well.

12       THE COURT:  Then what's going to happen, please mark

13  your challenges within five minutes.  We don't have a whole lot

14  of time.  And then when you finish that, come back to the

15  vestibule in back here so I can see who you have challenged.

16  It's not necessary for Mr. Fernandez to join us back in the

17  vestibule.  Is that agreeable, Mr. Robbenhaar?

18       MR. ROBBENHAAR:  Yes, sir, that's fine.

19       THE COURT:  All right.  We'll be in recess, then, until

20  you have made your decision.

21    (Court recessed at 3:52 p.m.)

22    (In vestibule.)

23       THE COURT:  I excused number 1, Timothy Cox, by

24  agreement for cause.

25       The defendant has challenged number 2, Maureen

1   Bixenman.

2            Your first juror, then, is number 3, Jose Urban.  Your

3   next juror is number 4, Debbie Hackman.

4            The government has excused number 5, Lee Ledoux.

5            I excused number 6 by agreement, Debra Toya.

6            Your next juror, then, is number 7, Melissa Madrid.

7            The government excused number 8, Demerie Danielson.

8            Your next juror is number 9, Jaime Ocana.

9            The defendant excused number 10, Karlene Desimone.

10           Your next juror is number 11, Tina Archuleta.

11           The defendant excused number 12, Gretchen Shaffer.

12           The defendant excused number 13, Cynthia Salazar.

13           The defendant excused number 14, Adrian Flores.

14           The defendant excused number 15, Keith Morin.

15           Your next juror is number 16, Mary Austin.

16           I excused by agreement number 17, Audie Myers.

17           The defendant excused number 18, Melinda Otzenberger.

18           Your next juror is number 19, Julieta Guevara.

19           I excused number 20, Stephen Carrico.

20           The defendant excused number 21, Marsha Shade.

21           I excused number 22 by agreement, Michael Feldewert.

22           The defendant excused number 23, Carlos Lucero.

23           I excused by agreement number 24, Zackary Charrette.

24           The defendant excused number 25, Richard Guerra.

25           Let me back up to number 23, Carlos Lucero.  He wasn't

1    very popular.  The government challenged him as well.

2            MR. ROBBENHAAR:  So does that mean the defense has not

3    used its peremptory on Mr. Lucero?

4            THE COURT:  No, I think you did, but --

5            MR. ROBBENHAAR:  They go first in your columns, Judge.

6            THE COURT:  I excused number 26, Jeffrey Hay, by

7    agreement.

8            Your next juror, then, is number 27, Janel Rasmussen.

9            Your next juror is number 28, Michael Sandoval.

10           I excused number 29, Priscilla Savedra.

11           The government challenged number 30, James Melendrez.

12           Your next juror, then, is number 31, Jackee Verhulst.

13           I excused number 32 by agreement, Julian Trujillo.

14           Your next juror is number 33, Aaron Vanevery.

15           Then your next juror is number 34, Michael Montoya.

16           Now, we'll select two alternates, and each side will

17   have a peremptory challenge on the alternates.  So let's take a

18   look at who is eligible.  Number 35, Sean Hudson.  Does either

19   side excuse him?

20           MR. HURTADO:  No, Your Honor, the United States wants

21   to keep him.

22           MR. ROBBENHAAR:  I would use one of my peremptories on

23   him, Judge.

24           THE COURT:  You do want to excuse Mr. Hudson?

25           MR. ROBBENHAAR:  That's my peremptory number 1.

1          THE COURT:  Then Sharla Gonzales, number 36 is

2     available.  I excused number 37, Roy Clamor.  So Sharla

3     Gonzales; Alexandria Valdez, number 38; Garrett Callahan,

4     number 39.

5          MR. ROBBENHAAR:  Did you say the defense has two

6     excusals in the alternates?

7          THE COURT:  No, we are selecting two alternates, but if

8     you want --

9          MR. ROBBENHAAR:  I would use my second peremptory,

10    then, on Ms. Gonzales, number 36.

11         THE COURT:  All right.  Then Mr. Hurtado can decide

12    whether he wants -- I excused number 37, Roy Clamor.

13         MR. HURTADO:  Yes, sir.

14         THE COURT:  So then the next ones eligible for

15    alternate jurors are number 38, Alexandria Valdez, number 39,

16    Garrett Callahan, number 40, Audra Long, and number 41, Justin

17    Bowyer.

18         MR. HURTADO:  The United States exercised a peremptory

19    challenge for Ms. Valdez, same for Mr. Callahan.

20         THE COURT:  Yes, you had already exercised your

21    peremptories on Valdez and Callahan, so that means the four who

22    will be eligible for -- two of whom will be eligible for

23    serving as alternates are number 40, Audra long.

24         MR. HURTADO:  The United States will accept Ms. Long.

25         THE COURT:  Number 41, Justin Bowyer.

1           MR. HURTADO:  The United States will strike Mr. Bowyer.

2           THE COURT:  Audra long is your first alternate.  And

3   42, Joshua Mondary.

4           MR. HURTADO:  The United States will exercise its

5   second peremptory on this alternate.

6           THE COURT:  That means your second alternate is Kevin

7   Cassin.

8           Go on back in the courtroom.  I will call the jurors

9   who have been selected in alphabetical order, seat them

10  accordingly in the jury box.

11          I think this afternoon, we'll probably not be able to

12  get beyond opening statements.  Normally, I allow a maximum of

13  20 minutes a side for opening statements.

14          How long do you think you need, Mr. Hurtado?

15          MR. HURTADO:  I would ask for 15 minutes, Your Honor.

16  There was one issue I did want to bring up.

17          THE COURT:  Go ahead.

18          MR. HURTADO:  I had asked Mr. Robbenhaar whether it

19  would be acceptable for the United States to use during its

20  opening statement exhibits that the parties had already agreed

21  to stipulate to and admit.  So Mr. Robbenhaar didn't get back

22  to me, so I wanted to inquire yet again about Mr. Robbenhaar

23  and whether he would permit the United States to use in opening

24  the exhibits that have already been agreed to by the parties.

25          MR. ROBBENHAAR:  You know, Judge, on one level, since

1    we have stipulated to the admissibility, I would say no, but it

2    seems to me that this is getting a little bit more into

3    argument than just laying out a road map.  That's my only

4    concern.

5           THE COURT:  What exhibits in particular do you have in

6    mind?

7           MR. HURTADO:  So I would like to use the photographs,

8    for example, and I certainly understand Mr. Robbenhaar's

9    concern.  The United States intends in its opening statement to

10   simply provide a road map.  I was not intending to use any of

11   the exhibits to argue the case.

12          THE COURT:  Just tell me the exhibits that you intend

13   to use.

14          MR. HURTADO:  Sure.  So photographs as well as the

15   duffle bag.

16          MR. ROBBENHAAR:  There are 25 photographs.

17          MR. HURTADO:  A handful.  I can't recall off the top of

18   my head how many of the photographs.

19          THE COURT:  What are you going to tell the jury a

20   particular photograph shows?

21          MR. HURTADO:  So, for example, I was going to talk

22   about the bag that Agent Perry found on the Greyhound Bus, that

23   being the black duffle bag that the United States is arguing

24   belongs to the defendant.  So I wanted to present on the

25   overhead projector a photograph of that bag, and then when I

1    got to the clothing, the bundles, basically to help narrate --

2         THE COURT:  Well, my normal practice is to permit both

3    sides to use whatever is already in evidence in their opening

4    statements.  What is your objection to that?

5         MR. ROBBENHAAR:  It's just simply I think it's easy to

6    get into arguing what the particular piece of evidence means,

7    but I'm hearing Mr. Hurtado just say this is what the bag --

8    this is the bag.

9         MR. HURTADO:  Correct.  That's it.

10        MR. ROBBENHAAR:  I'm assuming that there won't be -- he

11   won't be inviting the jury to make any inferences or draw any

12   conclusions about what the evidence really means.

13        MR. HURTADO:  I've given openings many time, and I know

14   the difference between an opening statement and a closing

15   statement.

16        THE COURT:  How long do you need?

17        MR. ROBBENHAAR:  I think we need six or seven minutes,

18   that's all.

19        THE COURT:  Let's just do opening statements today.

20   I'll probably instruct the jury on what to expect during the

21   trial and let you go to opening statements.

22        MR. ROBBENHAAR:  Sure.  Ms. Lujan is going to tender

23   the opening.

24        THE COURT:  Okay.  Go on back into the courtroom.

25   We'll get started shortly.

1       (In open court, venire not present.)

2           THE COURT:  Court's in session, have a seat, please.

3   Let me ask, is there another matter that came up?

4           MR. HURTADO:  Yes, Your Honor.  I wanted to address

5   another preliminary matter with the court if I may.

6           THE COURT:  Go ahead.

7           MR. HURTADO:  I addressed this with Mr. Robbenhaar

8   earlier.  I think there is a misunderstanding between the

9   parties, so the parties wanted clarification from the court.

10          THE COURT:  Go ahead.

11          MR. HURTADO:  That issue concerns the transcripts in

12  this case.  It is the recollection of the United States that

13  the court had ruled that the transcripts would not be admitted

14  as evidence for the jury to consider in deliberating.

15          My understanding was that even though the transcripts

16  would not be admitted as evidence, that the United States could

17  still use those transcripts for purposes of presenting its

18  evidence, namely, the audio recording of the consensual

19  encounter between Agent Perry and the defendant on the

20  Greyhound Bus.

21          THE COURT:  Yes, when you present the evidence, which

22  is the recording, the jurors may have a transcript to help them

23  understand the recording.

24          MR. HURTADO:  Correct.

25          THE COURT:  But the transcript is not evidence.

1            MR. HURTADO:  Yes, sir.  That was my only question, and

2    that is exactly how the United States understood the issue.

3    Thank you.

4            THE COURT:  Anything else?

5            MR. ROBBENHAAR:  Nothing, Your Honor.  I had just been

6    under the impression that the transcripts would not be used at

7    all, but I understand the court's ruling.

8            THE COURT:  Okay.

9            MR. ROBBENHAAR:  So they will -- the transcripts will

10    certainly not go back to the jury for deliberations.

11            THE COURT:  That's correct.

12            MR. ROBBENHAAR:  Thank you.

13        (Venire returned to the courtroom.)

14            THE COURT:  Court's in session, have a seat, please.

15            We have selected a jury of 14 members.  There are two

16    alternates on the jury.  As I call your name, I'll seat you in

17    alphabetical order.

18            Tina Archuleta.  Please come up and have a seat in the

19    jury box.  And take a seat in the front row in the chair

20    closest to me.

21            Mary Austin.  Kevin Cassin.  Julieta Guevara.  Debbie

22    Hackman.  Audra Long.  Melissa Madrid.

23            Michael Gilbert Montoya.  Mr. Montoya, if you would

24    have a seat in the second row, right behind Ms. Archuleta.

25            Jaime Ocana.  Janel Rasmussen.  Michael Sandoval.  Jose

1    Urban.   Aaron Vanevery.   Jackee Verhulst.

2              Now, at this time, I want to thank the ladies and

3    gentlemen who appeared for jury selection today but who were

4    not selected to be on the jury.   Each of you will receive

5    credit for one day of jury service, and I at this time ask

6    everyone to stand while you leave the courtroom with my thanks

7    for being here.

8         (Venire excused from the courtroom.)

9         THE COURT:   Members of the jury, now that you're

10   standing, I'll ask that you raise your right hand and be sworn

11   as the jury in this case.

12        (Jury sworn.)

13        THE COURT:   Please have a seat.

14             Members of the jury, let me ask you to raise your hand

15   if you have been on a jury before.   Okay, there are three of

16   you.

17             Let me explain for those who have not been on a jury a

18   little bit about what's going to happen in the case.   We're

19   going to start with the lawyers presenting what are called

20   opening statements.   Because the government has the obligation

21   of proving the case, it is the government's right and duty to

22   go first at every stage.   So the government's attorney will

23   make the first opening statement to you.

24             The purpose of the opening statement is to outline for

25   you what the lawyers expect the evidence in the case will show.

1    It is not evidence in and of itself.  Whatever the lawyers say

2    to you is not evidence.  When they ask a question of a witness,

3    the real evidence is the answer the witness gives, for example.

4          You will hear the lawyers make their opening

5    statements, which should not be argument but should be simply a

6    presentation of what they expect the evidence to show, and at

7    the end of all the evidence, they will then present what are

8    called closing arguments.  That's where they will argue to you

9    how they think you should find the facts from the testimony and

10   exhibits in the case and how you should reach your verdict

11   under the instructions given to you after you find the facts.

12         Now, the lawyer for the defendant has a right to follow

13   the lawyer for the government and present an opening statement.

14   That's as far as we're going to go this afternoon.  So after

15   the opening statements, I'll excuse you for the evening with a

16   few more instructions at that time.

17         Basically, what happens in the trial, after the lawyers

18   complete their opening statements, you will then hear the

19   testimony of witnesses for the government and the presentation

20   of the government's exhibits that you are to consider.  After

21   the government has completed its presentation of evidence, it's

22   the defendant's right but not obligation to present evidence if

23   he chooses to do so.  You may hear from a witness that I've

24   identified who will testify in the defendant's case, but

25   remember my earlier instructions, the defendant has no

1    obligation to present any evidence or to testify, and if the

2    defendant chooses not to do that, you are to give that no

3    consideration.  You are to focus on the evidence presented by

4    the government to determine whether that evidence proves the

5    defendant's guilt beyond a reasonable doubt.

6           Now, after all of the evidence is presented to you, I

7    will then instruct you on the law that you must follow in

8    reaching your verdict, and here again, your responsibility is

9    to decide the facts from the testimony you have heard and the

10   exhibits presented for your consideration and then apply the

11   jury instructions to those facts in reaching your verdict.

12          Now, after I instruct you on the law, the lawyers will

13   make their closing arguments.  Again, that's not evidence.  But

14   they will tell you how they think you should reach your verdict

15   from the evidence presented in the case.  After that occurs, I

16   will then send the 12 of you who are the real jurors in the

17   case to the jury room to begin your deliberations.  My

18   expectation is that that will be sometime late Wednesday

19   morning or early Wednesday afternoon.

20          Mr. Hurtado, are you ready to present the government's

21   opening statement?

22          MR. HURTADO:  Yes, sir.

23          THE COURT:  Did you have a matter you need to take up?

24          MR. ROBBENHAAR:  If we could approach very briefly,

25   Judge.

1        (At the bench.)

2           MR. ROBBENHAAR:  I apologize, Your Honor, I should have

3    brought this up just moment ago.  I would like to renew our

4    objection to the government -- the court's ruling on defense

5    Motion in Limine number 4 which is seeking to exclude reference

6    to the prior trip and the use of a so-called fake name on the

7    21st.  I would just reiterate my earlier argument that under

8    Rule 403 the probative value is severely outweighed by the

9    danger of unfair prejudice, so I'll just renew that for the

10   record right now.

11          And then secondly, regarding document 78, which was

12   concerning whether or not the defense would be able to get into

13   the del Campo Rangel issue.  Obviously, credibility and bias

14   are very central matters to the defense.  They are part of the

15   defense.  The credibility and potential bias of Agent Perry,

16   his years and experience and training, will be highlighted by

17   the government for sure, and the incident of the del Campo

18   Rangel matter, I believe, is relevant and should not be

19   excluded under Rule 403, so I'll just raise those just for the

20   record.

21          THE COURT:  Well, on the matter of the Tenth Circuit's

22   concern in the Rangel case, I may or may not permit you to ask

23   some questions about that depending on what Agent Perry

24   testifies to during his direct examination.

25          MR. ROBBENHAAR:  Okay.

1          THE COURT:  So I'll reserve --

2          MR. ROBBENHAAR:  Before I do ask any questions, I would

3     approach the bench.

4          THE COURT:  All right.

5          MR. ROBBENHAAR:  Thank you, Judge.

6     (In open court.)

7          THE COURT:  Mr. Hurtado, you may present the

8     government's opening statement at this time.

9          MR. HURTADO:  Yes, sir, Your Honor.  May it please the

10    court, counsel for the defense.

11         Ladies and gentlemen, the defendant in this case is

12    charged with possession with the intent to distribute more than

13    500 grams of methamphetamine.

14         Ladies and gentlemen, this is a case in which all of

15    the evidence to be presented points squarely in the direction

16    of that man there, the defendant, Mr. Jesus Francisco

17    Fernandez.

18         The background to this case began on the morning of

19    October 25th, 2017.  On that date, two DEA agents were on

20    official duty conducting drug interdiction investigations at

21    the Greyhound Bus Station here in Albuquerque.

22         Those DEA agents were Agent Jay Perry and his partner

23    for the day, Agent Lemmon.  Agent Perry and Agent Lemmon were

24    dressed in regular street clothes and their firearms were not

25    visible to the public.  Their firearms were concealed in their

1    clothing.

2            Agent Perry and Agent Lemmon waited for the Greyhound

3    Bus to arrive for its regularly scheduled stop here in

4    Albuquerque.  When the bus arrived, the passengers got off the

5    bus for a brief layover to allow for any necessary bus

6    refueling, cleaning and maintenance service.

7            Agent Perry and Agent Lemmon boarded the bus curbside

8    after it had pulled out of the wash bay for cleaning.  Agent

9    Perry and Agent Lemmon then began to look at the bags that the

10   passengers had left behind in the Greyhound Bus.

11           Agent Perry noticed one bag in particular.  It was a

12   black duffle bag bearing the brand name Protege.  Bear with me

13   one moment as I publish a photograph of that exhibit.  Agent

14   Perry saw that black bag in the overhead compartment area.

15   Agent Perry noticed that the black bag did not have a name tag

16   attached.  Agent Perry retrieved the bag from the overhead

17   compartment area, and he noticed that the bag appeared to be

18   very heavy despite the fact that it appeared to be only

19   partially full.  Agent Perry then returned the bag to the

20   overhead compartment area.

21           Sometime later, Agent Perry and Agent Lemmon got off

22   the bus.  The bus then returned to the terminal area for

23   passenger reloading.  At that time, Agent Perry and Agent

24   Lemmon boarded the bus again.  Agent Lemmon stayed at the front

25   of the bus to provide security for Agent Perry who was at the

1   back of the bus.

2          As the passengers boarded the bus, Agent Perry began

3   speaking with the passengers.  Generally, Agent Perry would

4   introduce himself as a police officer stating that he was there

5   to check the bus for security reasons.

6          When the defendant boarded the bus, Agent Lemmon who

7   was at the front of the bus noticed that the defendant

8   displayed a surprised or panicked look on his face when he saw

9   Agent Perry on the bus.  The defendant took a seat

10  approximately in the middle of the bus.  The black bag that

11  Agent Perry had seen earlier was three or four rows behind and

12  on the opposite side of the aisle from the defendant's seat.

13         Agent Lemmon noticed that shortly after taking his seat

14  the defendant got out of his seat and went to the lavatory from

15  the back of the bus.  Agent Lemmon saw the defendant open the

16  door to the lavatory, poke his head out, and appeared to look

17  in the direction of Agent Perry.  Agent Lemmon then saw the

18  defendant take his seat less than two minutes after he had gone

19  inside the lavatory.

20         Once the defendant resumed his seat on the bus, Agent

21  Perry approached the defendant.  Agent Perry identified himself

22  as a police officer, and he stated that he was there to check

23  the bus for security reasons.  Agent Perry asked the defendant

24  for permission to speak with him.  Agent Perry used a low key,

25  professional, polite and respectful tone of voice and demeanor

1   with the defendant at all times.  The defendant agreed to speak

2   with Agent Perry.

3          Agent Perry began to ask the defendant some questions

4   about his travel.  Agent Perry learned that the defendant was

5   traveling under the name Frank Dreke.  When Agent Perry asked

6   the defendant to produce his Greyhound Bus ticket, the name

7   listed was Frank Dreke.

8          Sometime while he was speaking with the defendant,

9   Agent Perry recognized the defendant from a previous encounter

10  at the Greyhound Bus Station a few days earlier.  The defendant

11  also indicated that he had recognized Agent Perry from that

12  previous encounter a few days earlier at the same Greyhound Bus

13  Station.

14          During that previous encounter a few days earlier,

15  Agent Perry learned that the defendant had also been traveling

16  under the name Frank Dreke.  During the previous encounter a

17  few days earlier, Agent Perry had asked the defendant for

18  identification.  During that previous encounter, the defendant,

19  instead of producing identification, produced medical records

20  in the name Jesus F. Fernandez Rodriguez.  During the encounter

21  on this date for which the defendant is being prosecuted, as I

22  stated, Agent Perry learned that the defendant was again

23  traveling under the name Frank Dreke.

24          Agent Perry began asking the defendant some questions

25  about his travel.  Specifically, Agent Perry asked the

1  defendant whether he was traveling with any luggage.  The

2  defendant stated he was not traveling with any luggage.  Agent

3  Perry terminated his encounter with the defendant after asking

4  a few more questions and proceeded to speak with the other

5  passengers on the bus.

6        After Agent Perry spoke with the other passengers on

7  the bus, he decided to retrieve the black duffle bag bearing

8  the brand name Protege.  Agent Perry began showing the bag to

9  the other passengers on the bus each of whom denied owning that

10 bag.

11        Agent Perry then approached the defendant again who was

12 still sitting in his seat.  Agent Perry presented the defendant

13 with that bag.  Agent Perry asked the defendant if he

14 recognized that black duffle bag.  The defendant admitted that

15 the bag belonged to him.  The defendant then offered to give

16 Agent Perry permission to search that bag.  Agent Perry

17 confirmed that the defendant was giving him permission to

18 search that bag, and the defendant responded by stating,

19 "Yeah."

20        Agent Perry then took the bag and placed it in the seat

21 directly in front of the defendant.  Agent Perry unzipped the

22 bag and found several plastic bundles that were wrapped in

23 clear Saran Wrap and brown tape.  Based on his training and

24 experience, Agent Perry knew that those packages were bundles

25 of illegal drugs.  At that time, Agent Perry decided to place

1    the defendant under arrest.  It was at that time that the

2    defendant tried to deny ownership of the bag by stating, "It's

3    not my bag."

4          Agent Perry, with the assistance of Agent Lemmon,

5    escorted the defendant off the bus.  Agent Perry and Agent

6    Lemmon then transported the black bag back to the DEA

7    Albuquerque office for a more thorough search of that bag.  A

8    more thorough search of the bag showed that there were seven

9    total bundles of illegal drugs in the black duffle bag.  Agent

10   Perry and Agent Lemmon field tested the substance inside the

11   packages, the results of which were positive for the presence

12   of methamphetamine.  Agent Perry and Agent Lemmon also weighed

13   the substance -- excuse me, the packages along with the

14   packaging, and the total amount of methamphetamine was 3.9

15   gross kilograms.  That's with packaging.

16         Additional search of the bag showed that the black

17   duffle bag contained medical records in the defendant's name:

18   Jesus Fernandez Rodriguez.  After Agent Perry and Agent Lemmon

19   field tested the methamphetamine and weighed the

20   methamphetamine, they shipped the methamphetamine off to the

21   DEA South Central Lab in Dallas, Texas.  There, a DEA forensic

22   chemist conducted a formal forensic analysis of the

23   methamphetamine.  The results were positive for the presence of

24   methamphetamine.  The methamphetamine weighed 3,104 net grams.

25   That's without all the packaging that you see in one of the

1   exhibits here.  The methamphetamine was 96 percent pure

2   resulting in a total of 2,979 actual grams of pure

3   methamphetamine.

4           Ladies and gentlemen, the United States bears the

5   burden of proof in this case.  The United States is obligated

6   to prove to defendant's guilt beyond a reasonable doubt, and I

7   accept that burden without any hesitation whatsoever, and I

8   will prove that the defendant is guilty as charged.

9           The United States intends to present its case through

10  three witnesses:  Agent Perry; his partner, Agent Lemmon; as

11  well as the DEA forensic chemist.

12          Agent Perry is a DEA veteran.  He has approximately 20

13  years of experience.  He has conducted more than 1,600 drug

14  interdiction investigations throughout the course of his

15  career.  Agent Lemmon is also an experienced DEA agent having

16  been with the DEA since 2011.  The name of the forensic chemist

17  in this case is Paul Galat.  He is a senior forensic chemist.

18  He has expertise in the area of drug chemistry.  He has

19  conducted analyses of thousands upon thousands of drug

20  exhibits, and he has received the DEA's exceptional performance

21  award on numerous occasions throughout his career.

22          Ladies and gentlemen, in addition to the witness

23  testimony, you will also have the opportunity to inspect the

24  physical evidence in this case.  You will have the opportunity

25  to listen to an audio recording that was made of the encounter

1   between Special Agent Perry and the defendant on the Greyhound

2   Bus.  In addition to that audio recording, you will have the

3   opportunity to follow along using written transcripts that the

4   United States has prepared.

5          To clarify one matter, the transcripts that you will

6   see are not evidence.  They are simply designed to assist you

7   in understanding the audio recording that you will hear later

8   on.  So the actual audio recording is the evidence.

9          In addition to that audio recording, you will have the

10  opportunity to inspect the physical evidence.  You will see,

11  for example, the black duffle bag bearing the brand name

12  Protege as well as the contents of that bag.  You will also see

13  the drugs and the photographs and the Greyhound Bus ticket in

14  the name of Frank Dreke that the defendant was using.

15         At the close of the government's case-in-chief, I will

16  return to address you for my closing arguments at which time I

17  will ask that you find the defendant guilty of the crime as

18  charged.  I thank you for your time.

19         THE COURT:  Ms. Lujan, you may present the defendant's

20  opening statement.

21         MS. LUJAN:  Thank you, Your Honor.

22         MS. LUJAN:  May it please the court, counsel.

23         Good afternoon, ladies and gentlemen.  Good afternoon.

24  This case is about the targeting of a single black duffle bag

25  found in a Greyhound bus.  A bag that was located at the rear

1    of the bus and had no name tag or any other identifying

2    information.

3           DEA Agent Jay Perry, day in and day out, looks for

4    drugs.  You will hear him talk about the thousands of seizures

5    that he's been involved in.  You will hear him explain how he's

6    trained to look for clues that suggest that someone might be

7    involved with drugs.  But plain and simple, Agent Perry

8    routinely and randomly searches people, bags, and the luggage

9    at the Greyhound Bus Station and the Amtrak Train Station in

10   Albuquerque.

11          On October 25th, 2017, a Greyhound Bus pulled into

12   Albuquerque close to about 10:00 a.m.  Now, that bus, that same

13   bus, was scheduled to leave at about 11:15 a.m. after a

14   one-hour-20-minute delay.  During that layover, the bus was

15   brought to another area of the bus station to be serviced and

16   cleaned.  All of the passengers got off of the bus at that

17   time.  It was there over near what's called the wash bay that

18   Agent Perry and his partner, Agent Lemmon, boarded the bus to

19   inspect the items that had been left on the bus by the

20   passengers who had gotten off.

21          Now, two of them, Agent Perry and Agent Lemmon are

22   alone with everyone's personal belongings on the bus.  There

23   are no bus employees there.  There is no bus driver.  The

24   agents are completely unsupervised and entirely unrecorded.

25          It was then that Agent Perry spied this black duffle

1   bag.  Somehow, this one, lone black duffle bag piques Agent

2   Perry's interest.  This bag again has no name tag, and it was

3   near the bag of the bus in an overhead compartment above where

4   the passengers sit.  Agent Perry is determined to find the

5   owner of this bag.  He will tell you that he lifted up the bag

6   and that it felt heavier than what he expected.  It was a bag

7   of interest to him.

8           Later, Agent Perry and Agent Lemmon, they reboard the

9   same bus a second time but in a different area of the bus

10  station, and they reboarded the second time in the passenger

11  loading area.  And this second time that they get onto that

12  bus, the agents are caught on the bus station surveillance

13  video, and you will get to see that video as part of this

14  trial.

15          Now, at this point, the passengers began to reboard the

16  bus, including Mr. Fernandez.  On the video is Mr. Fernandez

17  carrying some white paperwork in his left hand as he steps up

18  onto the bus.  Mr. Fernandez takes a seat in about the middle

19  of the bus in an area that's completely different from the rear

20  of the bus where that black bag was found by Agent Perry.

21          Agent Perry speaks to passengers on the bus before he

22  gets to Mr. Fernandez, but eventually he gets to Mr. Fernandez,

23  and he talks to Mr. Fernandez.  Agent Perry recognizes

24  Mr. Fernandez from just four days earlier when Perry targeted

25  Mr. Fernandez for questioning and a search of his belongings

1    inside the actual bus terminal.  And on that day, four days

2    earlier, Agent Perry found no drugs on Mr. Fernandez's person

3    when he searched him, and he found no drugs inside of

4    Mr. Fernandez's bag when he searched him four days earlier.

5           Well, fast forward to a few days later to October 25th

6    for the case that we're here for today.  Agent Perry targets

7    Mr. Fernandez again.  He searches Mr. Fernandez again on the

8    bus, and Agent Perry finds nothing on Mr. Fernandez's person on

9    the bus the day of October 25th.

10          After speaking with the rest of the passengers, Agent

11   Perry tells his partner, "I'm going to go get that bag."  He

12   heads to the back of the bus.  He grabs the bag from the rear

13   of the bus where it was.

14          Agent Perry did not have any specific lead about that

15   black bag.  He was not called there by anyone to report a

16   suspicious person or situation.  Agent Perry targeted that bag.

17   He had his sights on connecting that bag to somebody on that

18   bus that day.  And that person that he focused his sights on

19   that day was Mr. Fernandez.  Agent Perry was bound and

20   determined to get that bag, and he ultimately pinned it on

21   Mr. Fernandez, someone who he wrongfully suspected just a few

22   days earlier.

23          The government will present no evidence that anyone saw

24   Mr. Fernandez touch that black duffle bag on October 25th.  The

25   government will present no witness who ever saw that bag near

1    or around Mr. Fernandez's seat on the bus on October 25th.

2          You will hear and see evidence that Agent Perry,

3    carrying the black bag, approached Mr. Fernandez from behind on

4    the bus.  And you will hear the conversation between them.

5    Agent Perry finds what he believes are bundles of drugs in the

6    bag when he opens it.  He immediately upon seeing what's in the

7    bag, and while being arrested, Mr. Fernandez says, "That's not

8    my bag.  That's not mine."

9          What occurred and what followed was an incomplete

10   investigation by Agent Perry rife with important and key things

11   that he did, and more importantly, what he did not do.  You

12   will hear about those things as we progress through this trial.

13         We will ask you, the jury, not to fill in the gaps left

14   by Agent Perry and not to jump to conclusions like he did.

15   Remember, as the judge will instruct you later in the case, the

16   government has the heaviest of burdens to prove this case

17   beyond a reasonable doubt.  Your job is not to fill in the gaps

18   in this case by speculating.  That bag did not belong to

19   Mr. Fernandez, and we will ask that you find him not guilty.

20         THE COURT:  Members of the jury, it's a little before

21   five o'clock, and we're going to recess in just a moment.

22   There are a couple of instructions I need to tell you.  First,

23   be here by nine o'clock in the jury room.  I'm going to ask

24   Mr. Gonzales to escort you to the jury room when you leave.

25         The good news is that Mr. Gonzales will have available

1   in the jury room tomorrow morning coffee and donuts or other

2   pastries, so the first to arrive tomorrow morning gets the best

3   selection.  Keep that in mind.

4           You have not heard any testimony yet, but despite that,

5   I need to tell you not to discuss the opening statements with

6   anyone.  You're not to discuss the evidence in the case with

7   anyone as you hear it.  The first point that you can discuss it

8   is with each other in the jury room which will probably be

9   around Wednesday morning or Wednesday afternoon.  It's a

10   difficult instruction to follow because the first thing that

11   will be asked of you when you get home tonight is what is this

12   case all about, and you will have to tell whoever inquires,

13   "Well, I can't tell you now, but as soon as the jury reaches a

14   verdict, probably on Wednesday, I can tell you all about it,

15   but not before."

16           Also, you're to decide the case solely on the basis of

17   the evidence presented here in the courtroom.  So that means

18   you're not to go snoop around the depot tonight or before you

19   reach a verdict in the case.

20           Let me ask, do any of you have any questions before I

21   excuse you for the evening?

22           What I want you to do now is follow Mr. Gonzales into

23   the jury room, and that's where you're to be by nine o'clock

24   tomorrow morning.

25           Everyone please rise while the jury leaves.

1        (Jury excused from the courtroom.)

2            THE COURT:  Have a seat, please.

3            I'm going to ask that you remain in the courtroom for

4    about five to 10 minutes so that all the jurors can leave the

5    courthouse before you leave.

6            Let me ask Mr. Hurtado, is there anything we need to

7    take up before the first witness in the morning?

8            MR. HURTADO:  No, sir.

9            THE COURT:  And Mr. Robbenhaar or Ms. Lujan?

10           MR. ROBBENHAAR:  No, Your Honor, nothing.

11           THE COURT:  All right.  I'll ask you, then, to wait

12   where you are.  Let's wait about 10 minutes.  Then leave for

13   the day.  I'll see you tomorrow morning at nine o'clock.

14           Court's in recess.

15       (Court recessed at 5:01 p.m.)

16

17

18

19

20

21

22

23

24

25

1                          I N D E X                     PAGE

2    PRETRIAL MATTERS                                      2

3    VENIRE VOIR DIRE EXAMINATION                          4

4    JURORS EXCUSED FOR CAUSE                             87

5    JURY SELECTED IN VESTIBULE                           93

6    JURY SWORN                                          102

7    PRELIMINARY INSTRUCTIONS TO JURY                    102

8    OPENING STATEMENT BY MR. HURTADO                    104

9    OPENING STATEMENT BY MS. LUJAN                      113

10   REPORTER'S CERTIFICATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         C-E-R-T-I-F-I-C-A-T-E

2    UNITED STATES OF AMERICA

3    DISTRICT OF NEW MEXICO

4

5        I, John De La Rosa, RPR, CCR, Official Court Reporter for

6    the State of New Mexico, do hereby certify that the foregoing

7    pages constitute a true transcript of proceedings had before

8    the said Court held in the City of Albuquerque, New Mexico, in

9    the matter therein stated.

10       In testimony whereof, I have hereunto set my hand on this

11   11th day of April, 2019.

12

13

14

15

16                  _____
                    JOHN DE LA ROSA, CCR
17                  United States Official Court Reporter
                    421 Gold Avenue, Southwest
18                  Albuquerque, New Mexico  87102
                    Phone:  505.348.2249
19

20

21

22

23

24

25