```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF NEW MEXICO

 3

 4   UNITED STATES OF AMERICA,

 5        Plaintiff,

 6     vs.                    1:17-CR-3237-JAP

 7   JESUS FRANCISCO FERNANDEZ,

 8        Defendant.

 9

10        Transcript of Jury Trial before The Honorable James A.
     Parker, Senior United States District Judge, held in
11   Albuquerque, Bernalillo County, New Mexico, commencing on
     Wednesday, March 6, 2019, at 9:11 a.m., and concluding at 5:29
12   p.m.

13

14   For the Plaintiff:  Samuel A. Hurtado, Esq.

15

16

17   For the Defendant:  John F. Robbenhaar, Esq.

18                       Esperanza S. Lujan, Esq.

19

20

21

22

23                       John De La Rosa, CCR
                  United States Official Court Reporter
24                  421 Gold Avenue, Southwest
                    Albuquerque, New Mexico  87102
25                     Phone:  505.348.2249
```

1      (In open court, jury not present.)

2           THE COURT:  Court's in session, have a seat, please.

3           Does the government have any objections to the court's

4  instructions?

5           MR. HURTADO:  No, sir.

6           THE COURT:  And does the defendant have any objections

7  to the court's instructions?

8           MR. ROBBENHAAR:  No, Your Honor.

9           THE COURT:  Okay.  Let me visit with you about how long

10  you want for closing argument.

11           MR. HURTADO:  The United States anticipates about 15

12  minutes for its closing argument.

13           THE COURT:  And for the defendant?

14           MR. ROBBENHAAR:  Probably a little bit longer, maybe

15  20, no more than 25.

16           THE COURT:  Let me see if we have any means of warning

17  you when you're getting close in this courtroom.  I'm not sure.

18           MR. ROBBENHAAR:  Your Honor, I haven't timed my

19  closing.  Would you permit me to go to 25?

20           THE COURT:  Sure.

21           MR. ROBBENHAAR:  Thank you, Judge.

22           THE COURT:  When do you want a warning before the 25

23  minutes?

24           MR. ROBBENHAAR:  Maybe at 20, something like that.

25  Hopefully, I'll be done by then.

1          THE COURT:  And you're only going to use 15 minutes.

2    Is that correct?

3          MR. HURTADO:  For my closing.  I can't speak for

4    rebuttal.

5          THE COURT:  For the closing.  So 15 minutes for the

6    closing.

7          MR. HURTADO:  So 15 minutes for the closing argument.

8    I don't know exactly how long I'll need for the rebuttal.

9          THE COURT:  I understand.

10         MR. HURTADO:  Because I don't know what Mr. Robbenhaar

11   is going to say.

12         MR. ROBBENHAAR:  Can I make a suggestion?  Would you

13   permit total us a total of half an hour?

14         THE COURT:  Sure, that's fine.

15         MR. HURTADO:  That's fine.

16         THE COURT:  But I need to know when you want warning

17   signs.

18         MR. ROBBENHAAR:  That would be five, then, thank you.

19         THE COURT:  Okay.  Anything else we need to take up

20   before the jury enters?

21         MR. HURTADO:  No, sir.

22         MR. ROBBENHAAR:  Nothing further from the defense, Your

23   Honor.

24         THE COURT:  It's about 10 after 9:00.  I told the jury

25   to be here at 9:30, so we'll be in recess for about 20 minutes.

1          Court's in recess.

2      (Court recessed at 9:12 to 9:32 a.m.)

3      (In open court, jury not present.)

4          THE COURT:  There anything we need to take up before

5  the jury enters?

6          MR. HURTADO:  No, Your Honor.

7          MR. ROBBENHAAR:  No, sir, Your Honor.

8          THE COURT:  Okay.  Let's bring the jury in, then.

9      (Jury returned to the courtroom.)

10          THE COURT:  Good morning, jurors.  Please have a seat.

11  You will find in your chair a copy of the jury instructions

12  that I'm about to read to you, and you may read along as I give

13  you these instructions.

14          Members of the jury, you have now heard all of the

15  evidence in the case.

16          It becomes my duty, therefore, to instruct you on the

17  rules of law that you must follow and apply in arriving at your

18  decision in the case.

19          In any jury trial, there are in effect two judges.  I

20  am one of the judges.  The other is the jury.  It is my duty to

21  preside over the trial and to determine what evidence is

22  relevant under the law for your consideration.  It is also my

23  duty at the end of the trial to instruct you on the law

24  applicable to the case.

25          You as jurors are the judges of the facts, but in

1   determining what actually happened in this case, that is, in

2   reaching your decision as to the facts, it is your sworn duty

3   to follow the law I am now in the process of defining for you.

4        And you must follow all of my instructions as a whole.

5   You have no right to disregard or give special attention to any

6   one instruction or to question the wisdom or correctness of any

7   rule I may state to you.  That is, you must not substitute or

8   follow your own idea or opinion as to what the law is or ought

9   to be.  It is your duty to apply the law as I give it to you

10  regardless of the consequences.

11       By the same token, it is also your duty to base your

12  verdict solely upon the evidence in the case without prejudice

13  or sympathy.

14       The defendant is on trial before you upon an indictment

15  brought by the grand jury charging as follows:

16       On or about October 25, 2017, in Bernalillo County, in

17  the District of New Mexico, the defendant, Jesus Francisco

18  Fernandez, unlawfully, knowingly, and intentionally, possessed

19  with intent to distribute a controlled substance, 500 grams and

20  more of a mixture and substance containing a detectable amount

21  of methamphetamine.

22       In violation of 21 United States Code Sections

23  841(a)(1) and (b)(1)(A).

24       The indictment or formal charge against a defendant is

25  not evidence of guilt.  Indeed, a defendant is presumed by the

1   law to be innocent.  The law does not require a defendant in a

2   criminal case to prove the defendant's innocence or testify or

3   to produce any evidence at all.  A defendant has an absolute

4   right not to testify and may not be compelled to testify.  No

5   inference of any kind should be drawn from the election of a

6   defendant not to testify, and that fact should not be

7   considered by you in any way or even discussed in your

8   deliberations.  The government has the burden of proving a

9   defendant guilty beyond a reasonable doubt, and if it fails to

10  do so, you must acquit the defendant.

11          Thus, while the government's burden of proof is a

12  strict or heavy burden, it is not necessary that the

13  defendant's guilt be proved beyond all possible doubt.  It is

14  only required that the government's proof exclude any

15  reasonable doubt concerning the defendant's guilt.  A

16  reasonable doubt is a real doubt based upon reason and common

17  sense after careful and impartial consideration of all the

18  evidence in the case.

19          Proof beyond a reasonable doubt, therefore, is proof of

20  such a convincing character that a person would not hesitate to

21  rely and act upon it in the most important of affairs.

22          The defendant is charged with a violation of 21 United

23  States Code Section 841(a)(1).  This law makes it a crime to

24  possess a controlled substance with the intent to distribute

25  it.  To find the defendant guilty of this crime, you must be

1   convinced that the government has proved each of the following

2   beyond a reasonable doubt:

3          First:  the defendant knowingly and intentionally

4   possessed a controlled substance as charged;

5          Second:  the substance was in fact methamphetamine;

6          Third:  the defendant possessed the substance with the

7   intent to distribute it; and

8          Fourth:  the amount of the controlled substance

9   possessed by the defendant was at least 500 grams.

10          Methamphetamine is a controlled substance within the

11   meaning of the law.

12          To possess with intent to distribute means to possess

13   with intent to deliver or transfer possession of a controlled

14   substance to another person with or without any financial

15   interest in the transaction.

16          The law recognizes two kinds of possession:  actual

17   possession and constructive possession.  A person who knowingly

18   has direct physical control over an object or thing at a given

19   time is then in actual possession of it.

20          A person who, although not in actual possession,

21   knowingly has the power and intent at a given time to exercise

22   dominion or control over an object either directly or through

23   another person or persons is then in constructive possession of

24   it.

25          As stated earlier, it is your duty to determine the

1    facts, and in so doing, you must consider only the evidence I

2    have admitted in the case.  The term "evidence" includes the

3    sworn testimony of the witnesses, the exhibits admitted in the

4    record, and any stipulations to which the parties agree.

5          Remember that any statements, objections or arguments

6    made by the lawyers are not evidence in the case.  The function

7    of the lawyers is to point out those things that are most

8    significant or most helpful to their side of the case, and in

9    so doing, to call your attention to certain facts or inferences

10   that might otherwise escape your notice.

11         In the final analysis, however, it is your own

12   recollection and interpretation of the evidence that controls

13   in the case.  What the lawyers say is not binding upon you.

14         So, while you should consider only the evidence in the

15   case, you are permitted to draw such reasonable inferences from

16   the testimony and exhibits as you feel are justified in the

17   light of common sense.  In other words, you may make deductions

18   and reach conclusions which reason and common sense lead you to

19   draw from the facts which have been established by the evidence

20   in the case.

21         You may also consider either direct or circumstantial

22   evidence.  Direct evidence is the testimony of one who asserts

23   actual knowledge of a fact such as an eyewitness.

24   Circumstantial evidence is proof of a chain of facts and

25   circumstances indicating either the guilt or innocence of the

1   defendant.  The law makes no distinction between the weight to

2   be given to either direct or circumstantial evidence.  It

3   requires only that you weigh all of the evidence and be

4   convinced of a defendant's guilt beyond a reasonable doubt

5   before that defendant can be convicted.

6          Now, I have said that you must consider all of the

7   evidence.  This does not mean, however, that you must accept

8   all of the evidence as true or accurate.

9          You are the sole judges of the credibility or

10  believability of each witness and the weight to be given to the

11  witness' testimony.  In weighing the testimony of a witness,

12  you should consider the witness' relationship to the government

13  or the defendant; interest, if any, in the outcome of the case;

14  manner of testifying; opportunity to observe or acquire

15  knowledge concerning the facts about which the witness

16  testified; candor, fairness and intelligence; and the extent to

17  which the witness has been supported or contradicted by other

18  credible evidence.  You may, in short, accept or reject the

19  testimony of any witness in whole or in part.

20         Also, the weight of the evidence is not necessarily

21  determined by the number of witnesses testifying as to the

22  existence or nonexistence of any fact.  You may find the

23  testimony of a smaller number of witnesses as to any fact to be

24  more credible than the testimony of a larger number of

25  witnesses to the contrary.

1            The defendant did not testify, and I remind you that

2    you cannot consider his decision not to testify as evidence of

3    guilt.  You must understand that the Constitution of the United

4    States grants to a defendant the right to remain silent.  That

5    means the right not to testify.  That is a constitutional right

6    in this country.  It is very carefully guarded, and you must

7    not presume or infer guilt from the fact that a defendant does

8    not take the witness stand and testify or call any witnesses.

9            A witness may be discredited or impeached by

10   contradictory evidence by a showing that the witness testified

11   falsely concerning a material matter or by evidence that at

12   some other time the witness has said or done something or has

13   failed to say or do something which is inconsistent with the

14   witness' present testimony.  If you believe that any witness

15   has so been impeached, then it is your exclusive province to

16   give the testimony of that witness such weight or credibility,

17   if any, as you may think it deserves.

18           The Rules of Evidence provide that if scientific,

19   technical or other specialized knowledge might assist the jury

20   in understanding the evidence, or in determining a fact in

21   issue, a witness qualified as an expert by knowledge, skill,

22   experience, training or education, may testify and state

23   opinions concerning such matters.  You should consider each

24   expert opinion received in evidence in this case and give it

25   such weight as you may think it deserves.  If you should decide

1    that the opinion of an expert witness is not based upon

2    sufficient education and experience, or if you should conclude

3    that the reasons given in support of an opinion are not sound,

4    or that the opinion is outweighed by other evidence, then you

5    may disregard the opinion entirely.

6           I caution you, members of the jury, that you are here

7    to determine the guilt or innocence of the defendant from the

8    evidence in this case.  The defendant is not on trial for any

9    act or conduct or offense not alleged in the indictment.

10   Neither are you called upon to return a verdict as to the guilt

11   or innocence of any other person or persons not on trial as a

12   defendant in this case.

13          Also, the punishment provided by law for the offense

14   charged in the indictment is a matter exclusively within the

15   province of the judge and should never be considered by you in

16   any way in arriving at an impartial verdict as to the guilt or

17   innocence of the defendant.

18          Any verdict must represent the considered judgment of

19   each juror.  In order to return a verdict, it is necessary that

20   each juror agree to it.  In other words, your verdict must be

21   unanimous.

22          It is your duty as jurors to consult with one another

23   and to deliberate in an effort to reach agreement if you can do

24   so without giving up your individual judgment.  Each of you

25   must decide the case for yourself, but only after an impartial

1    consideration of the evidence in the case with your fellow

2    jurors.  In the course of your deliberations, do not hesitate

3    to reexamine your own views and change your opinion if

4    convinced it is erroneous.  But do not surrender your honest

5    conviction as to the weight or effect of the evidence solely

6    because of the opinions of your fellow jurors or for the mere

7    purpose of returning a verdict.

8           Remember at all times, you are not partisans.  You are

9    judges, judges of the facts.  Your sole interest is to seek the

10   truth from the evidence in the case.

11          During your deliberations, you must not communicate

12   with or provide any information to anyone by any means about

13   this case.  You may not use any electronic device or media such

14   a telephone, smart phone, computer, the Internet, any text or

15   instant messaging service, blog or any website such as

16   Facebook, LinkedIn, YouTube or Twitter to communicate to anyone

17   any information about this case or to conduct any research

18   about this case until after I accept your verdict.  In other

19   words, you cannot talk to anyone on the phone, correspond with

20   anyone, or electronically communicate with anyone about this

21   case.  You can only discuss the case in the jury room with your

22   fellow jurors during deliberations.

23          You may not use electronic means to investigate or

24   communicate about the case because it is important that you

25   decide the case based solely on the evidence presented in this

1    courtroom.  Information on the Internet or available through

2    social media may be wrong, incomplete or inaccurate.  You are

3    permitted to discuss the case only with your fellow jurors

4    during deliberations because they have seen and heard the same

5    evidence you have.  In our judicial system, it is important

6    that you are not influenced by anything or anyone outside this

7    courtroom.  Otherwise, your decision may be based on

8    information known only by you and not by your fellow jurors and

9    the parties in the case.  This would unfairly and adversely

10   impact the judicial process.

11          Upon retiring to the jury room, you should first elect

12   a foreperson who will preside over your deliberations and will

13   be your spokesperson in court.

14          A form of verdict has been prepared for your

15   convenience.  You will take the verdict form to the jury room,

16   and when you have reached unanimous agreement as to your

17   verdict, you will have your foreperson fill in, date, and sign

18   it and then notify the court security officer that you have

19   reached a verdict.

20          If, during your deliberations, you should desire to

21   communicate with me, please put your message or question in

22   writing signed by the foreperson and pass the note to the court

23   security officer who will bring it to my attention.  I will

24   then respond as promptly as possible either in writing or by

25   having you returned to the courtroom.  I caution you, however,

1   with regard to any message or question you might send that you

2   should never state your numerical division.

3          Now, you'll find as the last page with the jury

4   instructions a copy of the verdict form.  The form is very

5   simple.  You are to, after you reach a unanimous verdict,

6   indicate your verdict either as not guilty or guilty in the

7   blank space provided, and your foreperson is then to date and

8   sign the verdict form.

9          I will send the original verdict form with this

10  envelope to the jury room, and the foreperson needs to fill out

11  only the original verdict form, not each copy that you have

12  with you with your copy of the jury instructions.

13         At this point, we're going to proceed with the closing

14  arguments.  I remind you that the arguments by the lawyers are

15  not evidence in the case.  They will discuss the evidence in

16  the case with you during their closing arguments.

17         Let's see, Mr. Hurtado, are you ready to proceed with

18  your argument?

19         MR. HURTADO:  Yes, sir, Your Honor, if I may.

20         THE COURT:  You may.

21         MR. HURTADO:  Ladies and gentlemen, as I advised at the

22  very beginning of the trial, the United States fully accepted

23  the burden of proving the defendant's guilt beyond a reasonable

24  doubt.  The prosecution submits to you that the prosecution has

25  done precisely that.  So what I would like to do at this time

1   is walk you through how the United States went about proving

2   the defendant's guilt beyond a reasonable doubt.

3           As an initial matter, I would like to walk through the

4   elements of the crime charged against the defendant.

5           As I indicated before, I would like to walk through the

6   elements of the crime charged to show how the United States has

7   proven the defendant's guilt beyond a reasonable doubt.  As

8   displayed on the the projector, the first element is the

9   defendant knowingly or intentionally possessed a controlled

10  substance as charged.  That first element is really the reason

11  why we're here today.  It's so important I actually want to

12  come back to it and address the other elements before going

13  back to that one.

14          So with that said, let's proceed to the second element

15  which reads as follows, "The substance was in fact

16  methamphetamine."  As to that second element, I would

17  respectfully invite your attention to the testimony of the

18  forensic chemist in this case, Mr. Paul Galat.  Mr. Galat is a

19  veteran forensic chemist with the DEA who has 20 years of

20  experience.  Mr. Galat indicated that he conducted a forensic

21  chemical analysis of the substance in this case, and in no

22  uncertain terms, Mr. Galat stated that in his expert opinion

23  the substance that was tested was methamphetamine.  So very

24  simply, I would submit to you that this second element has been

25  proven beyond a reasonable doubt by virtue of the testimony of

1    the expert in this case, Mr. Galat.  As such, you can very

2    simply check that element off the list.

3            The third element is "the defendant possessed the

4    substance with the intent to distribute it."  Once again, I

5    would respectfully invite your attention to the testimony of

6    Agent Perry, a 20-year veteran of the DEA.  He testified in no

7    uncertain terms that the amount of methamphetamine seized in

8    this case was a distributable quantity, and at this time, I

9    would like to publish for a brief moment Defendant's

10   Exhibit B24.  Defendant's Exhibit B24 is a photograph which

11   depicts the seven bundles of drugs that Agent Perry found in

12   the defendant's black duffle bag.  I would submit to you that

13   the amount of methamphetamine seized is such a large amount

14   that it is reasonable for you to infer that no person can

15   consume such a large amount of methamphetamine in a single

16   sitting.  As such, it stands to reason that the defendant must

17   have intended to deliver this to somebody else or some other

18   person.  As such, I would submit to you that that third element

19   has been satisfied beyond a reasonable doubt, and you can check

20   that one off your list as well.

21           The fourth element is "the amount of the controlled

22   substance possessed by the defendant was at least 500 grams" as

23   charged.  As to that element, I would again invite your

24   attention to the testimony of the DEA forensic chemist,

25   Mr. Galat.  Mr. Galat indicated that after his forensic

1   chemical analysis he also weighed the drugs.  The chemist, Paul

2   Galat, testified that the total weight of the methamphetamine

3   was 3,104 net grams.  Mr. Galat also indicated that the

4   methamphetamine was 96 percent pure which, when you multiply by

5   3,104 net grams, you get a total of 2,979 actual grams of

6   methamphetamine.  So, ladies and gentlemen, whether you choose

7   to accept the net amount of methamphetamine or the actual

8   amount of methamphetamine, both amounts are well above the 500

9   grams as set forth in the fourth element of the crime charged

10  against the defendant.  So I would submit that you can now

11  cross off your list the second element, the third element, and

12  the fourth element.

13          Now, ladies and gentlemen, I want to go back to the

14  first element as I indicated I would before, which reads, "the

15  defendant knowingly or intentionally possessed a controlled

16  substance as charged."  As an initial matter, you have now been

17  instructed by the charge that methamphetamine is a controlled

18  substance, so what do we have to show that the defendant

19  knowingly or intentionally possessed with the intent to

20  distribute methamphetamine?  Ladies and gentlemen, I submit to

21  you that you have both direct evidence in this case and

22  circumstantial evidence to show that the defendant knowingly or

23  intentionally possessed methamphetamine.

24          What do you have in the form of direct evidence to show

25  that the defendant possessed the methamphetamine?  Ladies and

1    gentlemen, you have the fact that the defendant admitted to

2    Agent Perry without any hesitation that the black bag

3    containing methamphetamine belonged to him.  As a matter of

4    fact, the defendant stated that he would give Agent Perry the

5    opportunity to search that bag.  Ladies and gentlemen, you do

6    not give somebody permission to search a bag that does not

7    belong to you.  As such, I would submit that that is the first

8    critical piece of evidence to show that the defendant knowingly

9    or intentionally possessed the methamphetamine in this case.

10            Let's take a look at the transcript.  Ladies and

11   gentlemen, just as a reminder, the transcript is not evidence.

12   The actual audio recording is the evidence.  The transcript is

13   simply being used to assist you in understanding the audio

14   recording.

15            Agent Perry asks the defendant, "Is this your bag,

16   sir?"

17            The defendant responds, "Yeah, it's my bag."

18            Agent Perry confirms, "Your bag.  Okay."

19            The defendant responds by asking Agent Perry a

20   question.  "You wanna check it out?"

21            Agent Perry responds, "It is your -- okay.  Will you

22   give me permission to search it?"

23            The defendant responds, "Yeah."

24            Agent Perry then says, "Okay.  Thank you.  Will it be

25   okay if I jut set it up here?"

1          The defendant responds by saying, "Yeah."

2          During his cross examination of Agent Perry, the

3    defense tried to suggest that perhaps there was a language

4    barrier between Agent Perry and the defendant.  The prosecution

5    would submit that the facts of this case do not support the

6    defendant's contention that there was some kind of language

7    barrier.  There is no indication from the transcript or the

8    audio recording that the defendant did not understand what was

9    going on.  His responses to Agent Perry's questions were clear

10   and direct.  The defendant did not express any confusion about

11   what was going on.  And as a matter of fact, if the defendant

12   did have any problem understanding what Agent Perry was saying,

13   Agent Perry can speak Spanish, and he could have easily began

14   speaking Spanish with the defendant.  Agent Perry did not feel

15   the need to do that in this case because the conversation was

16   clear.  There was no ambiguity involved in this case.

17         Once Agent Perry searched the bag, the defendant

18   immediately tried to disclaim ownership of the bag, and of

19   course, he would.  He knows that there is methamphetamine in

20   that bag, and he wants to distance himself by saying, "It's not

21   my bag."

22         The circumstances surrounding that are telling.  I'll

23   tell you why.  If you recall, Agent Perry retrieved the black

24   duffle bag, Government's Exhibit 3, from the overhead

25   compartment area.  He presents it to the other passengers on

1   the bus each of whom disclaimed ownership of that bag.  When he

2   presents that bag to the defendant, the defendant recognizes

3   the bag and admits that it's his bag as referenced in the

4   transcript that I just showed you.

5         Agent Perry receives permission to search that bag.  As

6   you recall, Agent Perry indicated that he placed the bag in the

7   seat directly in front of the defendant's seat.  Imagine Agent

8   Perry is the defendant and he's seated there.  Agent Perry sets

9   the black duffle bag in the seat directly in front of the

10   defendant.  Agent Perry unzips the bag and finds what he

11   believes to be packages of drugs.  It was at that time that

12   Agent Perry decides to place the defendant under arrest, and he

13   instructs the defendant as follows:

14         "Go ahead and stand up for me, sir."

15         And what does the defendant say immediately?  He says,

16   "It's not my bag.  I don't know.  It's not my bag."

17         Ladies and gentlemen, he says that, the defendant says

18   that, because he knows what's in that bag.  Do you recall Agent

19   Perry's testimony?  He stated that when he searched the

20   defendant's bag, Agent Perry never notified the defendant about

21   what he saw in that bag.  He never told the defendant what he

22   found in that bag.  He never showed the defendant what he found

23   in that bag.  Agent Perry did not have to tell the defendant

24   what he had found in that bag because the defendant already

25   knew what was in that bag.  That's why he says immediately,

1   "It's not my bag."

2          What else is there to show a connection between this

3   bag and the defendant?  As I mentioned before, we have the

4   defendant's direct admission that the bag belonged to him, but

5   you also have the fact that there were medical records inside

6   that black duffle bag in the defendant's name.

7          I would like at this time to publish Defendant's

8   Exhibit B18.  Ladies and gentlemen, those medical records

9   establish additional evidence to show a connection between the

10  defendant and that bag.

11         What other evidence has the prosecution presented to

12  you which relates to the first element of the crime charged,

13  that being whether the defendant knowingly or intentionally

14  possessed methamphetamine in this case?  I would respectfully

15  invite yourself to the testimony of Agent Kirk Lemmon.  Agent

16  Lemmon testified that when the defendant boarded the bus, the

17  defendant had a surprised or panicked look on his face when he

18  saw Agent Lemmon and Agent Perry who was in the back of the

19  bus.  Notably, Agent Lemmon noted in his testimony that no

20  other passenger reacted the way the defendant did.  You can

21  infer from the defendant's behavior on that bus consciousness

22  of guilt.  You can infer that he knew that he was in possession

23  of a large amount of methamphetamine.

24         Remember that the judge's instructions provide that you

25  are permitted to draw reasonable inferences from the testimony

1   and exhibits in this case.  Inferences that you feel are

2   justified in the light of common experience.  An inference is

3   simply a conclusion that reason and common sense may lead you

4   to draw from the facts which have been proved in a case.

5          Ladies and gentlemen, why else would the defendant,

6   shortly after taking his seat on the bus, get out of his seat

7   and go to the lavatory in the rear of the bus?  When the

8   defendant gets inside the lavatory, he opens the door, pokes

9   his head out, looks in the direction of Agent Perry, retreats

10  back inside the lavatory and shuts the door.  Then he takes his

11  seat a few moments later.

12         The reason the defendant did that, the reason you can

13  infer he did that, is he was panicked, and he didn't know what

14  to do.  And he also recognized Agent Perry from a few days

15  earlier at the same Greyhound Bus Station.  He was panicked

16  because he knew he was transporting a large amount of

17  methamphetamine, and he did not want to get in trouble.

18         To be sure, the United States is relying a lot on

19  circumstantial evidence.  But please remember as a general rule

20  the law makes no distinction between direct evidence and

21  circumstantial evidence.  The law simply requires that you find

22  the facts in accord with all the evidence in the case, both

23  direct and circumstantial.

24         I would also like to remind you of a promise you made

25  very early on during jury selection.  I asked every one of you

1    if you would promise to consider circumstantial evidence in

2    this case.  If you recall, I asked you whether you watched "Law

3    and Order" or "CSI," and I was up front.  I told you that this

4    case would not be like that.  And when I asked you will you

5    consider circumstantial evidence in this case, every single one

6    of you said, "Yes, I promise."  Nobody forced you to make that

7    promise.  As a matter of fact, you had the opportunity to say

8    "No, I don't promise, and I want to see only direct evidence."

9    But none of you did that.

10           I did what I said I was going to do, and it was to

11   prove this case beyond a reasonable doubt, and now I'm asking

12   you to do your part and find the defendant guilty not because I

13   say so, but because the facts show that he's guilty.  So ladies

14   and gentlemen, based upon all this evidence, I now submit to

15   you that all elements of the crime against the defendant have

16   been satisfied beyond a reasonable doubt.  The first element

17   has now been satisfied.  The second element has now been

18   satisfied.  The third element has now been satisfied.  The

19   fourth element has now been satisfied.

20           Ladies and gentlemen, that constitutes the sum of the

21   prosecution's evidence in this case.  Mr. Robbenhaar will have

22   the opportunity to address you next, and after he presents his

23   closing remarks, I'll have one last chance to address you.

24           I thank you for your time.

25           THE COURT:  Mr. Robbenhaar, you may present the

1    defendant's closing argument.

2            MR. ROBBENHAAR:  Thank you, Your Honor.

3            May it please the court, counsel, members of the jury.

4            Not guilty.  That's the verdict I'm asking you to reach

5    when you go back to deliberate the facts of this case.  This is

6    a case of tunnel vision.  It's a case of lost in translation.

7    It's a case built on a shoddy investigation.  It's about

8    officers looking for shortcuts.

9            This morning, I'll review the evidence with you and

10   point out some key facts to help you understand my points.  But

11   first, let me talk a little bit about the government's burden.

12   In our country, the beyond-a-reasonable-doubt standard is the

13   highest standard imposed on a party at any trial.  It's a

14   standard that Judge Parker has instructed you on that the

15   government must meet.  This standard requires the government to

16   present you proof that leaves you firmly convinced without

17   reasonable doubt that Jesus Francisco Fernandez committed the

18   alleged crime of possession with the intent to distribute a

19   controlled substance.  And we have it -- I'm sorry.

20           Thank you, Dan.

21           You have the reasonable doubt instruction on the

22   screen.

23           Now, I won't read it in full, but the part that's on

24   the screen, "A reasonable doubt is a real doubt based on reason

25   and common sense after careful and impartial consideration of

1    all the evidence in the case.  Proof beyond a reasonable doubt,

2    therefore, is proof of such a convincing character that a

3    person would not hesitate to rely on it and act upon it in the

4    most important of affairs."

5           So that's a tall order.  Before you can convict, you

6    must be firmly convinced.  If you have any hesitations about

7    the government's case that the particular proof lacks a

8    convincing character or you would hesitate to rely on it in the

9    most important of affairs, then you have a reasonable doubt.  I

10   would suggest there is much to be wary of in this case, much to

11   caution you to hesitate in relying on the government's

12   evidence.  Let's talk about some of that.

13          The government wants you to believe that Mr. Fernandez

14   was traveling with a black bag which contained drugs.  The

15   officers believe so.  They saw that bag as suspicious and

16   intended to search it and find its owner.  You heard that from

17   officers Perry and Lemmon.  But they have no evidence that

18   links the bag to Mr. Fernandez.  They don't have any witnesses.

19   They don't have fingerprints, we know.  They don't have DNA

20   evidence.  They don't have surveillance video that might help

21   them.  Rather, they rely on a questionable statement made by

22   Mr. Fernandez and equally questionable testimony by the agents.

23          The government needs to stretch to make their

24   connections.  How do that they do that?  A few things.  Medical

25   discharge paperwork.  We've heard a lot about that in this

1    case.

2            First, they point to the discharge papers as some sort

3    of smoking gun that ties Mr. Fernandez to the bag.  But there

4    is no way that these papers could have ended up in the bag.

5    Why?  You have seen Mr. Fernandez board the bus with papers in

6    his hand.  It's clear on that surveillance video that he's

7    walking to board the bus, and there is a big thing of white in

8    his hand flashing in the sunlight when he boards the bus.

9    That's what this is.  You will note also -- this will go back

10   to you in the jury room.  There is a center crease on this

11   paperwork.  Why is that important?  Because it was folded and

12   placed in Mr. Fernandez's hoodie pocket.

13           The only other paperwork, the only other paperwork in

14   this case, in this entire case, is this.  What are these?

15   Government's Exhibit 2, a bus ticket, another bus ticket, and a

16   little reboarding tag.  I would submit to you that you know

17   that when you see that video of Mr. Fernandez approaching the

18   bus flashing what clearly is white, what clearly is paperwork

19   in his hand -- it can't be -- it cannot be those little

20   tickets.  The only other paperwork in this case is this.  And

21   they are coming apart.  I'm sorry.  But they were stapled.

22           Yet the government -- the agents will say that that

23   paperwork was in the bag, and yet we know from the video that

24   Mr. Fernandez never approaches his bag, that bag.  He never

25   touched the bag.  So the government will have you believe that

1    that paperwork was in there from the start, but it's not.

2           Of course, the government will say you can't be sure

3    what the item is in his hand.  The video is too grainy.  It's

4    unclear.  It can't be relied upon.  But you've seen it, and I

5    trust you recognized it.

6           First, you know that that is Mr. Fernandez walking to

7    the bus, that person who has that white bundle of paperwork,

8    sits in the very seat that we know Agent Perry encounters

9    Mr. Fernandez.  We know that's the same seat where he arrests

10   Mr. Fernandez.  There is no question that that's Mr. Fernandez

11   walking to the bus with a white bunch of papers in his hand.

12          The video also confirms that after reboarding, as I

13   just mentioned, Mr. Fernandez never stopped by where we know

14   the black bag is.  We know that that black bag is three to four

15   rows behind where Mr. Fernandez's seat was.  So if the

16   discharge papers were in his hand when he boarded the bus, how

17   did they get into the bag?  That's really the million dollar

18   question here.

19          I talked about the center crease on the paperwork.  I

20   talked about the hoodie.  Yet these agents will have you

21   believe that these papers were discovered during the unpacking

22   of the bag, during that methodical processing of the evidence.

23   We heard about that, and we saw the photos.  One by one by one,

24   you see the JPEG, the camera numbering system on the bottom of

25   the photos.  That's why the defense introduced the photos that

1    are kind of redundant to the government.  They are the same

2    photos, but the format produced by the government, these are

3    directly from the camera, and they show the sequencing.  There

4    is no question of the sequence of those photos.  You look at

5    the JPEG numbers on the bottom.  Step by step, first photos,

6    there are a number of photos of the bag from different angles.

7    Then the bag is opened, and then one by one, items are removed,

8    placed on the floor, then opened, and then the next layer and

9    the next layer, and not one of those photos, not one, shows you

10   the paperwork.

11            You would think that the paperwork would appear in the

12   bag.  They are claiming it does.  And if it does, it's such an

13   important piece of evidence, don't you think it would be

14   photographed?  Of course, they would document this.  They are

15   trained to make their case.  They are trained officers.  They

16   would have photographed that paperwork coming out of the bag.

17            Agent Lemmon yesterday, he hedged his testimony.  You

18   remember that.  He says, "I didn't see it in the bag.  Agent

19   Perry told me it came out of the bag.  I don't know where it

20   came out of the bag.  Maybe it came out of one of those side

21   pockets."  Agent Perry didn't say that.  He said it came out of

22   the bag.  Nothing about a side pocket.  That's the first we've

23   heard anything about a side pocket here.

24            Agent Lemmon just says, "He showed it to me, and I took

25   a photo."  And that photo of the paperwork is conveniently

1   placed on top of the bag.  And if you look carefully, all the

2   clothing is back in the bag.  Everything has been put back in.

3   Obviously, not the controlled substances, but all the items are

4   back in the bag, and then this bundle of paperwork is just

5   conveniently placed on top of the bag.  Agent Lemmon, click.

6   That should give you hesitation.  Can you rely on that?  I

7   would suggest you can't.

8            Why would the agents manipulate the evidence like this?

9   Because they had nothing else to directly tie Mr. Fernandez to

10  that black bag.  They knew it.  No personal items or effects

11  with identifying labels, no nametags, no fingerprints, no DNA,

12  no surveillance video.

13           More importantly, ladies and gentlemen, what does the

14  fact that they had to concoct this story, to manufacture this

15  fake photo, tell you?  That they had doubt.  That's what it

16  tells you.  Agent Perry realized he didn't have it, and what he

17  needed was something concrete.  Put that paperwork right on top

18  of the bag.  Let's take that photo.  Got it.  They have a

19  questionable claim of ownership by Mr. Fernandez and knew they

20  needed more.  So they had to come up with something to tie

21  Mr. Fernandez to the bag.  Aha, medical paperwork.  Bingo.

22           Now, these are not just some police officers.  They are

23  federal agents.  Agent Perry has 20 years experience as a

24  federal agent.  We don't want to believe that officers plant

25  evidence, but it happens.  It's happened before, and it will

1   happen again.  We rely on police officers to keep us safe.  We

2   respect police officers.

3          And let me be clear, these are good men.  Agent Perry

4   and Agent Lemmon are good men.  But they knew that they lacked

5   an essential ingredient in their case and felt that they could

6   get away with it.

7          We can debate whether Agent Lemmon was maybe a little

8   arrogant during his testimony, whether he was somewhat

9   dismissive during his testimony.  We argued whether the report

10  contains errors.  We went back and forth.  They can't own up to

11  a mistake.  But the important thing is that we as a society

12  demand the highest level of trust in police officers, and

13  unfortunately, here, we're not seeing it.  I think you

14  recognize that.

15         In their tunnel vision, the agents planted that

16  paperwork to confirm their suspicions and make their case

17  against Mr. Fernandez.  It's just not right.  We have a case

18  here of agents falling prey to their own tunnel vision.  They

19  knew that bag was suspicious.  They checked it out.  They

20  wanted to find its owner.

21         But consider this.  I played you that long video, and

22  it was long.  For that, I apologize.  But I think and I know

23  it's crucial for you to have the entire video from start to

24  finish.

25         Alexis Merritt, the first person that Agent Perry spoke

1    to on the bus.  She was supposedly traveling by herself to

2    Connecticut, going to school, to move in with her boyfriend.

3    She's thinking she's going to be in maybe Stamford or Norwalk,

4    I think it was.  She doesn't really know what school she's

5    going to.  She says she's traveling alone.  She doesn't want

6    Agent Perry to search her bag, though.  She does allow -- she

7    does open it up and show the items to Agent Perry, but she

8    didn't want him to search it.  After being pressed, she opens

9    the bag and then shows him the items.  Agent Perry then wants

10   to see under her shirt, and she said, "Really?"  No way.

11   That's Ms. Merritt.

12          Then a few minutes later -- Agent Perry had gone down

13   the bus a couple of rows, somebody passed him in the aisle.  A

14   few minute later, he comes back to where he met Ms. Merritt,

15   and what do you know?  He meets Christopher Merritt.

16   Christopher Merritt is also traveling eastbound on the bus.

17   Now, he's going to Florida, not Connecticut, apparently.  They

18   are sitting basically next to each other, maybe one row apart.

19   He allows himself to be searched.  He allows himself to be

20   searched.  He's got nothing.

21          But don't you know?  The black bag with the dope is

22   right above them.  Right above the Merritts, two individuals

23   with the same last name traveling on the same bus, but they

24   don't know each other.  The odds.  And yet was there any

25   follow-up on this?  No, not a thing.

1            Watch the video.  The video doesn't lie.  I know we

2    watched that long video, but it is vital, as I stated, to

3    understanding this case.

4            We know that Mr. Fernandez takes his seat, but he waits

5    10 minutes.  After 10 minutes of sitting in his seat, he gets

6    up and goes to the rest room.  Agent Perry wrote in his report

7    that he saw him take his seat and get up immediately.  Small

8    detail you might say, but this is a report that without the

9    video we would have had to have just accepted as fact.  We know

10   that's not true.  And there is other details in the report that

11   I questioned Agent Perry about yesterday that we know there are

12   errors in the report.  That's why this video is so important,

13   because it fleshes out what really happened.  Without that

14   video, we have to accept at face value everything that's stated

15   by the agent.  The government doesn't like the video.  That's

16   the reason why.

17           In fact, the government would prefer that this

18   surveillance video just simply doesn't exist.  That's why they

19   dismiss it so vigorously.  You can bet your last dollar that

20   their tune would be different if they had obtained video

21   showing some actual connection to the bag.  If it were a

22   different case and the government were relying on that video,

23   you know they would be standing here just like I am now saying,

24   "Look at that video, rely on the video."  Remember, they didn't

25   obtain the video in this case.  The defense did.  And why?

1    Because we suspected something was up.

2              Keep in mind that they didn't show it to you; we did.

3    They only wanted you to hear Perry's audio recording.  But I'm

4    sure you see now that the synced audio-video file gives context

5    to what you're viewing.  It also reveals a fuller picture of

6    what really happened.

7              So why are these discrepancies important?  I would

8    suggest they reveal a police investigation that reached its

9    conclusion before all the evidence was in.

10             Recall that when Agent Perry first confronts

11   Mr. Fernandez, Agent Lemmon inches close.  You see it on the

12   video.  It's very subtle, but if you pay attention to that area

13   that I pointed out during my cross examination yesterday, Agent

14   Lemmon is standing in the front of the bus, inches closer.  He

15   doesn't do that with anybody else, just Mr. Fernandez.  And

16   why?  Because he and Agent Perry were looking for

17   Mr. Fernandez.  They were focusing on him.

18             Then after Mr. -- after Agent Perry concludes with the

19   encounters of the other passengers, you hear him state, "Let me

20   go get that bag."  They knew all along that that was purpose of

21   their job that morning, was to pin that bag on somebody.

22             You recall the remarkable coincidence with the two

23   Merritts sitting almost directly underneath the bag.  No

24   follow-up.

25             Think about the fact that there was never an attempt to

1   get fingerprints or DNA. No witness statement. Didn't talk to

2   the bus driver, apparently. Didn't try to get any other

3   witness statements of anybody who might see who brought that

4   bag on the bus.

5          The actions of the agents caught on videotape show that

6   they are focused on Mr. Fernandez. I ask you to consider this

7   when you evaluate their credibility.

8          Now, how about this notion of lost in translation? The

9   audio indicates that Agent Perry confronted Mr. Fernandez a

10  second time. This time with a bag, holding it, and apparently

11  Mr. Fernandez was quick to respond, yeah, the bag was his, but

12  did he mean the bag was his? Or the bag was like one he had

13  traveled with previously?

14         Keep in mind a few things. We know that

15  Mr. Fernandez's native language is not English. You can hear

16  it on the tape. His English is terrible. Lidia Fernandez

17  testified to that. Second, he and Agent Perry had just been

18  speaking about luggage and bags. Mr. Fernandez admitted that

19  he had traveled with a brown and black bag days before, and

20  when Agent Perry appears suddenly the second time now carrying

21  a bag, he could have been confused, startled, that all of a

22  sudden this black bag was shown to him. Third, there is a

23  difference between luggage and a bag, and for someone whose

24  first language is not English, that could surely affect that

25  person's comprehension. And fourth, and perhaps more

1    importantly, would Mr. Fernandez have said the bag was his if

2    he knew there was drugs inside of it?  Of course not.  Why

3    would he have done that?

4         If the government's case is the way they make it sound,

5    there is no paperwork in the bag, all Mr. Fernandez would have

6    had to have done is say, "No, it's not my bag," and the bag

7    would have been deemed abandoned, and it would have been taken

8    off the bus by the agent.  When Perry opened the black bag and

9    found the drugs inside, Mr. Fernandez quickly said that was not

10   his bag.

11        Mr. Hurtado pointed out something earlier.  He argued

12   that Agent Perry placed the bag in front of Mr. Fernandez.

13   That might be true, but you know there is two seats, the aisle,

14   two seats.  Those seats are not one, big seat.  They are two,

15   separate seats with a gap.  Agent Perry was searching the bag.

16   Agent Lemmon was in the front of the bus.  Agent Perry wouldn't

17   have been watching what Mr. Fernandez was looking at.  They

18   can't tell you today that Mr. Fernandez didn't see what was

19   going on during the search of the bag.  He said, "It's not my

20   bag" when he's getting arrested.  Clearly, he saw that there

21   was contraband inside.

22        Now, where is the evidence of possession?  There is no

23   evidence of actual possession.  I think the government will

24   concede that.  So the government has to stretch.  They have to

25   prove what's known as constructive possession.  Keep in mind

1    the legal instruction you've been given on constructive

2    possession.  "A person who although not in actual possession,

3    knowingly has the power and intent at a given time to exercise

4    dominion and control over an object either directly or through

5    another person or persons is then in constructive possession."

6    Power, intent.  So the government must not only prove that

7    Mr. Fernandez had the power to exercise control the bag but the

8    intent to do so.

9           Where is the evidence?  The bag was three to four rows

10   back.  Mr. Fernandez is never seen with the bag.  There is no

11   witness saying that they saw him touch it or carry it.  There

12   is no fingerprint, no DNA.  Who else had access to the bag?

13   Remember that short, little video clip of the individual

14   walking on the bus and off the bus?  That's one thing we got

15   from the video.  Who knows if there is other incidents where

16   other people had access to that bag before the passengers

17   reboard?

18          We live in an age of surveillance.  There is no getting

19   around it.  So you know it wouldn't have been that difficult

20   for the government to come up with its surveillance video, but

21   they didn't.  We had no problem getting it.  It suggests that

22   the government's lack of evidence here is telling.  Speaks

23   volumes.

24          Now, another thing.  Frank Dreke.  Don't believe the

25   government's story.  That's not a false name.  I mean, it's not

1   lost on me, and it should not be lost on you, that

2   Mr. Fernandez Rodriguez as we know from the paperwork in this

3   case is being indicted and charged under Mr. Fernandez.  Is

4   that a false name?  Well, no.  It's a name that he uses just as

5   in his family he uses Frank Dreke.  He uses it since it's

6   shorter and it's easier to use than his given name, Fernandez

7   hyphen Rodriguez.  Frank is short for Francisco, while Dreke,

8   as we know, is his father's mother's name, I believe.

9           Mr. Fernandez found it easier to use this name, less

10  spelling.  He uses it publicly.  Call for a pizza, "What's your

11  name?"  He could say Fernandez Rodriguez, but Dreke is a lot

12  easier.  Lidia Fernandez, his daughter, says he's always used

13  the name.  She's heard him use it over the years.  He has a

14  Facebook account in that name.  He's never tried to hide

15  himself by using the name.

16          There is no law, by the way, also, that says when you

17  buy a bus ticket on Greyhound you have to use the name on your

18  birth certificate.  Don't fall for that.  He used it because

19  it's easier.  Everyone knows him as Frank Dreke.  The

20  government would have you turn this into something very

21  sinister, but it's not.  So another example of the government

22  stretching and stretching to pin the blame on Mr. Fernandez.

23  Just as the photo of the paperwork coming from the bag is

24  manipulated evidence, so is the name Dreke as a way or a means

25  of hiding.  That's manipulated.

1          Let me sum up.  No touching of the bag, no DNA, no

2     fingerprints, no witnesses, no video that shows possession, no

3     papers in the bag, no name tag.  There is no evidence of that

4     intent to possess the bag.  A whole lot of nothing.

5          Certainly enough, though, to constitute reasonable

6     doubt.  If there is anything here that makes you hesitate in

7     the most important affairs of life, you have reasonable doubt.

8          For government agents trained on the importance of

9     documenting, on the methods, on the process, of documenting a

10    search, and yet they come up with that photo of the paperwork,

11    don't accept that.

12         Now, this is my only opportunity to speak to you this

13    morning, and unlike the government, I don't get a second

14    chance, so first let me thank you very much, all of you very

15    much, for taking the time out of your busy days and schedules

16    these last three days.  I know I appreciate it.  I can speak

17    for Mr. Hurtado and, of course, my client, Mr. Fernandez,

18    appreciates it very much.

19         Now, the government has the burden, they get the last

20    word, and during Mr. Hurtado's final comments, I would ask you

21    to keep thinking and asking yourselves, does the government's

22    story add up.  Where are the gaps in the evidence that I've

23    described?  Does it all fit together?  Can we really believe

24    the agents' testimony when they stretch evidence to make it fit

25    their case?

1           Mr. Hurtado will vehemently deny, I'm sure, that
2    federal law enforcement officers will break the rules, but if
3    you watch the news, you surely knows it happens, and it's
4    happened before, and it's going to happen again.  But a badge
5    does not give you carte blanche to act above the law.  Officers
6    must enforce the law but not bend it to their will.  They don't
7    get to create dishonest stories to convict innocent people.
8           Demand justice here.  The government must prove that
9    Mr. Fernandez possessed that bag.  They must prove that he
10   possessed the drugs within the bag.  Put the government to its
11   burden of having to prove beyond a reasonable doubt each and
12   every element of the crime.  If you do this faithfully and
13   honestly, as I know you will, there is really only one verdict
14   here.  There is too much here.  Not guilty.  Thank you.
15          THE COURT:  Mr. Hurtado, you may present the
16   government's rebuttal argument.
17          MR. HURTADO:  Yes, sir, thank you.
18          Ladies and gentlemen, this will be the final
19   opportunity I have to address you, and I wanted to take that
20   time to respond to many of the arguments that defense counsel
21   has made in its closing remarks.
22          Defense counsel relies heavily in his closing remarks
23   on the video that was obtained by defense counsel and
24   subsequently paired with the audio of the encounter between
25   Agent Perry and the defendant on the Greyhound Bus.

1    Mr. Robbenhaar suggests that the video that was made somehow

2    contradicts the testimony of Agent Perry and Agent Lemmon.

3            Mr. Robbenhaar, the defense attorney, goes so far as to

4    say that the government does not like that video, and he is

5    right.  The United States prosecution does not like that video

6    because that video proves nothing.  That video is bogus, it is

7    irresponsible, and it is irrelevant to the facts of this case.

8            The defense attorney had the opportunity to conduct a

9    cross examination of Agent Perry and Agent Lemmon, neither of

10   whom were able to definitively confirm the version of the facts

11   as set forth by defense counsel.  That should bother you,

12   because there is no way to know whether that video in fact

13   accurately and fairly depicts the events as they actually

14   occurred on that Greyhound Bus.  You have no evidence to show

15   what actually happened from the inside of that bus.  And

16   Mr. Robbenhaar is right, I'm going to attack the quality of

17   that video.  That video is poor quality.  It is grainy.  There

18   is no way to see what's going on inside.

19           The defense counsel also goes further in attacking the

20   quality of this investigation by submitting to you that there

21   is no DNA evidence, there is no fingerprint evidence.  Ladies

22   and gentlemen, you knew that from the very beginning, because I

23   told you as far back as jury selection, that there would be no

24   such evidence, and every single one of you stated that would be

25   okay.  Because this is not an episode of "CSI."

1          Now Mr. Robbenhaar is going so far as to accuse the

2    agents of planting evidence.  Perhaps he's the one that's been

3    watching too many movies and television shows.  The facts of

4    this case do not support that Agent Perry or Agent Lemmon

5    planted any evidence in this case.  But with respect to

6    fingerprints and DNA and additional surveillance video, let's

7    take a look at what the jury instructions provide.

8          Just for the record, I'm publishing Jury Instruction

9    Number 1.

10         The judge has instructed you as follows:  "It is also

11   your duty to base your verdict solely upon the evidence in the

12   case without prejudice or sympathy."

13         Ladies and gentlemen, you may not speculate about what

14   fingerprint evidence may have produced or DNA evidence may have

15   produced.  There is no evidence of such items in this case.

16   Even if there were fingerprint evidence, you heard testimony

17   from Agent Perry who indicated that in his 20 years of

18   experience he has requested fingerprint analysis hundreds of

19   times, and only on one occasion has a fingerprint match ever

20   come back positive to the suspect he's arrested in connection

21   with one of his investigations.

22         I'm now publishing Defendant's Exhibit B18 on the

23   projector.  It's a photograph of the paperwork that was seized

24   from the defendant's bag.

25         The defendant is trying to argue that this photograph

1    somehow contradicts or undercuts the testimony of the agents in

2    this case.  That photograph does no such thing.  As an initial

3    matter, that photograph is simply one snapshot in time, and

4    contrary to what Mr. Robbenhaar is trying to argue, we don't

5    necessarily know the time frame.

6         Agent Perry and Agent Lemmon have both stated in no

7    uncertain terms that those medical records came from the bag.

8    Now, it's true, we don't necessarily know from where inside the

9    bag.  But I would like it noted that that bag actually does

10   have compartments on the side.  There are compartments on

11   either side of the bag as well as in the front.

12        Yes, the medical paperwork was important, and that's

13   why there was a photograph of that medical record.  But there

14   is also evidence in the bag that was important that was not

15   photographed.  It doesn't mean that the agents were being lazy

16   or haphazard in the manner in which they were doing their

17   investigation.  They focused on what was important.

18        For example, let's take a look at an important piece of

19   evidence that was not photographed.  That's the Saran Wrap that

20   was found in the bag.  There is no photograph of this Saran

21   Wrap, but it is just as important as the medical records

22   because it matches the wrapping that was used on the drugs that

23   were found in the defendant's bag.

24        The prosecution would also like to argue that nothing

25   in that video contradicts the evidence that's been presented

1    today.  That video doesn't contradict the fact that the

2    defendant admitted ownership of the bag.  It doesn't somehow

3    contradict the fact that the defendant had a surprised or

4    panicked look on his face when he saw Agent Lemmon and Agent

5    Perry on the bus.  It doesn't contradict the fact that he was

6    using two different names.

7         Now, I understand that the defense put on a witness,

8    Lidia Fernandez, daughter of the defendant.  I submit to you

9    that there are some problems with her testimony.  Number one,

10   she's too closely related to this case.  She's biased in favor

11   of the defendant.  Now, even if you believe it's true that the

12   defendant also uses the name of Frank Dreke, I would submit to

13   you he's still using two different names, and in the experience

14   of Agent Perry, people who use different names, not necessarily

15   false names but different names, do so in order to try to

16   conceal their criminal activity.

17        Now, another thing that I would like to address with

18   respect to the video is Mr. Robbenhaar seems to be fixated on

19   the fact that he claims the video shows the defendant not

20   holding Government's Exhibit 2, which is the bus ticket to

21   board the bus, but rather Mr. Robbenhaar is suggesting that the

22   defendant had in his possession the medical records in his name

23   when he was boarding the bus.  Ladies and gentlemen, a lot of

24   the government's case rests heavily on just common sense, which

25   I alluded to before.  I would ask you, does it make sense for

1   the defendant to just haphazardly be walking around the

2   Greyhound Bus Station with his medical paperwork?  Do you think

3   it makes sense for the defendant to have in his hand this

4   medical paperwork when he's about to board the bus, or do you

5   think it makes more sense that he would be holding the actual

6   bus ticket that he's going to use to travel to his intended

7   destination?  I submit to you it makes more sense that he's

8   holding the bus ticket than it does that he's holding the

9   medical paperwork.

10          And ladies and gentlemen, please remember Agent Perry's

11   testimony.  When he encounters the defendant, the defendant

12   presents his bus ticket to Agent Perry, not the medical

13   paperwork.  That's not the testimony in this case.  If the

14   defendant would have had his medical paperwork on his person at

15   the time that Agent Perry encountered him, the defendant would

16   have produced the medical paperwork as a source of

17   identification, and how do you know that?  Because that's what

18   the defendant did a few days earlier at the Greyhound Bus

19   Station.  When Agent Perry asked the defendant to produce

20   identification, he produced this, this paperwork, the medical

21   records in this case.

22          As I stated before, that video is grainy.  It is hard

23   to see what he's holding when he tries to board the bus, but

24   again, it simply makes more sense that he's holding the bus

25   ticket than it is the paperwork on the medical records.

1            I have very limited time left, so I want to briefly

2     highlight some -- a few more points.

3            Mr. Robbenhaar brought up the issue of these passengers

4     Alexis Merritt and Christopher Merritt, attacking the quality

5     of Agent Perry's investigation that he should have followed up

6     on these two individuals, but those two individuals in this

7     case were not suspects in the case.  They did not admit

8     ownership of the bag.  That's why Agent Perry did not continue

9     to question them any further.

10           Now, the defendant is trying to argue that there is

11     nothing to show that the defendant possessed the bag in this

12     case, but the United States submits that there is an

13     instruction on actual versus constructive possession.  I ask

14     you to read it.  For example, right now, I'm in actual

15     possession of this wallet.  If I leave it here, I am still in

16     constructive possession of this wallet.  I do not have it

17     physically in my custody, but it is constructively in my

18     possession.  It is still mine.  So if Agent Perry takes that

19     wallet, I can say, "Hey, what are you doing?  That's mine."

20     Because I'm able to exercise dominion and control over that

21     wallet.  I do not relinquish custody just because it is not in

22     my physical custody.

23           Also, ladies and gentlemen, with respect to the

24     Merritts, please remember Jury Instruction Number 12:  "Neither

25     are you called upon to return a verdict as to the guilt or

1    innocence of any other person or persons not on trial as a

2    defendant in this case."  In other words, the fact that another

3    person may also be guilty, which the United States denies, is

4    no defense to the crime charged.

5          As I stated at the very beginning of this case, ladies

6    and gentlemen, all the evidence presented in this case points

7    squarely in the direction of that man there, the defendant, and

8    I ask that you please return a verdict of guilty not because I

9    said so, but because the facts say so.

10          I thank you for your time.

11          THE COURT:  At this time, with my thanks, I'm going to

12   excuse Ms. Long and Mr. Cassin.  You're the alternate jurors in

13   the case.  It was very important that you be here in case one

14   of the regular jurors was unable to proceed.  So I'm going to

15   ask everyone to stand while you leave the courtroom with our

16   thanks for your service.

17       (Alternate jurors excused.)

18          THE COURT:  Please be seated.

19          Members of the jury, this is the point at which you

20   will go to the jury room to begin your discussions with each

21   other about the evidence in the case.  This is the jury verdict

22   form and has the original verdict in it that you're to fill

23   out, or your foreperson is to fill out, when the jury has

24   reached a unanimous verdict.

25          I'm going to ask Ms. Carey to hand this to

1    Ms. Archuleta to take into the jury room.

2            It is a little before eleven o'clock.  Do any of you

3    have any questions at this point before I ask you to go to the

4    jury room to begin your deliberations?

5            Take your notes with you.

6            Everyone please rise while the jury goes to the jury

7    room.

8        (Jury excused from the courtroom.)

9            THE COURT:  Please be seated.

10           I don't require that the parties and counsel remain in

11   the courtroom throughout jury deliberation.  If you will give

12   Ms. Carey a telephone number where you can be reached so that I

13   can ask you to return if we get a message from the jury, that

14   would be all right.  You're welcome to leave the courtroom and

15   the courthouse.

16           Let me ask Mr. Hurtado, is there anything you want to

17   bring up before we recess?

18           MR. HURTADO:  No, sir.

19           THE COURT:  Mr. Robbenhaar?

20           MR. ROBBENHAAR:  No, Your Honor.

21           THE COURT:  Let me compliment both of you on your

22   closing arguments.  I thought both were very well done.  You're

23   going to make it difficult for the jury.

24           Anyway, court will be in recess.

25       (Court recessed at 10:55 a.m. to 2:02 p.m.)

1       (In open court, jury not present.)

2           THE COURT:  Court's in session.  Have a seat, please.

3           Let's take up first the question from the jury which is

4    "Agent Perry testimony copy of."

5           I think the response should be that "you must decide

6    the case on the basis of the evidence, testimony and exhibits

7    as presented in court."

8           Let me ask Mr. Hurtado your view.

9           MR. HURTADO:  Yes, the United States would agree with

10   that.

11          MR. ROBBENHAAR:  We would concur.

12          THE COURT:  Okay.  Let me write it out and make sure

13   there is no question.

14          Let me read it again to make sure you're agreement with

15   it.  The response would be, "You must decide the case on the

16   basis of the evidence, the testimony and the exhibits as

17   presented in court."

18          MR. HURTADO:  Yes, sir, the United States agrees.

19          MR. ROBBENHAAR:  I think that's appropriate, Judge.

20   Sometimes I've had the responses include "you must rely on your

21   own memories of the testimony," but if we want to leave it as

22   is, that's fine, too.

23          THE COURT:  Now, I understand you had something you

24   wanted to bring up.  Is that correct?

25          MR. ROBBENHAAR:  Yes, Your Honor.

1          Your Honor, this occurred at the close towards the end

2     of Mr. Hurtado's rebuttal closing argument.  I didn't raise an

3     objection at the time, but I fear that Mr. Hurtado misstated

4     the law and made a misrepresentation of Jury Instruction Number

5     5.  You will recall during that rebuttal argument he pulled his

6     wallet out of his pocket to demonstrate the idea of

7     constructive possession.  And I think as I recall, and we

8     collectively recall, held his wallet and said, "Now I'm in

9     actual possession," basically, and then he placed the wallet on

10    the table, stepped back to the podium, and said, "I'm still in

11    possession, I still have control or dominion," I forget the

12    word.  "If someone touches it, I can say, 'Hey, back off,'" or

13    something like that, "I'm still in control."

14          I don't think that's accurate, and maybe the court

15    reporter can clarify exactly what was stated, but during

16    Instruction Number 5, it's very clear when it talks about

17    constructive possession, it frames it the person must knowingly

18    have the power and intent at a given moment in time to exercise

19    dominion and control.

20          Intent was never mentioned, to my knowledge, by

21    Mr. Hurtado.  I might be wrong.  Clearly, the court reporter

22    can tell us otherwise, but I'm afraid that if intent wasn't

23    mentioned, and I don't think it was, that's a misstatement,

24    mischaracterization of the law, and I would fear that that

25    would place the jury in a bind because they heard him describe

1    what actual possession is, and constructive possession, they

2    saw him demonstrate this example which it turns out the way he

3    phrased it is incorrect under the law.

4              Under those circumstances, the case law is pretty clear

5    that if you mischaracterize or misstate jury instructions, that

6    in this circumstance could be prosecutorial misconduct.

7    Obviously, I don't think he has any intent to do that, I'm not

8    claiming that, but that's the legal analysis it would fall

9    under.  So this is very concerning to the defense.

10             Under these circumstances, we would move for a mistrial

11   on those grounds, or in the alternative, a reinstruction to the

12   jury on Instruction Number 5 with the additional point made

13   that the government's argument regarding constructive

14   possession and the use of the wallet was incorrect, and so the

15   jury should disregard that aspect or that portion of the

16   government's argument.

17             THE COURT:  Mr. Hurtado?

18             MR. HURTADO:  Your Honor, the United States' position

19   is that the prosecution correctly made an analogy to

20   differentiate the distinction between actual versus

21   constructive possession.  Also, what is stated in rebuttal is

22   just that.  It's just argument.  It's not evidence.  And it is

23   further the position of the United States that it was accurate

24   with respect to the analogy that the United States used with

25   the wallet example that Mr. Robbenhaar made reference to.

1          With that said, however, because Mr. Robbenhaar has

2    made a motion for a mistrial, the United States would, of

3    course, oppose that motion, ask the court to deny that motion.

4    The United States would further request that the court deny

5    Mr. Robbenhaar's request to reinstruct the jury.  And also the

6    United States, given the importance of the issue that

7    Mr. Robbenhaar raised, would respectfully ask that the court

8    make a finding with respect to the wallet argument, I'll call

9    it, that Mr. Robbenhaar has made.  Thank you, sir.

10          THE COURT:  Does either side have any cases close in

11   point?

12          MR. HURTADO:  Your Honor, I do not at this time.

13          MR. ROBBENHAAR:  The question was?

14          THE COURT:  Any authority close in point?

15          MR. ROBBENHAAR:  I don't in hand at the moment.

16          THE COURT:  Well, I'm going to deny the motion for

17   mistrial based on the part of the closing argument to which the

18   defendant failed to object at the time it was made.  The jury

19   has now been deliberating for over three hours.  I think it

20   would cause confusion to single out parts of closing arguments

21   at this point.

22          I note that in Jury Instruction Number 1 the jury was

23   told to follow my instructions and to apply the law as I give

24   it to them regardless of the consequences.

25          In Instruction Number 5, it clearly sets forth the

1    definition of actual and constructive possession.  The jury is

2    required to follow that instruction.

3           With respect to Instruction Number 6, the jury was told

4    that "remember that any statements, objections, or arguments

5    made by the lawyers are not evidence in the case.  It is your

6    own recollection and interpretation of the evidence that

7    controls in the case.  What the lawyers say is not binding upon

8    you."  I think the instructions adequately protect the

9    defendant from concerns expressed about Mr. Hurtado's analogy

10   to the location of his wallet and whether that constituted

11   constructive possession, so I'm going to deny the motion for

12   mistrial based on that ground.

13          Now, again, I don't require you to remain in court for

14   the duration of the jury's deliberation, just provide us with

15   phone numbers where we can reach you to return if necessary.

16          Court's in recess.

17   (Court recessed at 2:12 p.m. to 2:36 p.m.)

18   (In open court, jury not present.)

19          THE COURT:  Court's in session.  Have a seat, please.

20          The jury foreman sent out another note that simply

21   added below the prior question, "Jury Instruction Number 6."

22   It's possible that the jury thinks that the term "sworn

23   testimony" means transcribed testimony.  Instruction Number 6

24   says, "The term 'evidence' includes the sworn testimony of the

25   witnesses, the exhibits admitted in the record, and the

1    stipulations to which the parties agreed."

2          The earlier response was that "you must decide the case

3    on the basis of the evidence, the testimony and the exhibits as

4    presented in court."  I don't know how otherwise to interpret

5    the reference to Jury Instruction Number 6 unless the jury

6    thinks it means that sworn testimony includes transcription of

7    the sworn testimony.

8          My suggestion would be to do somewhat like

9    Mr. Robbenhaar proposed previously and say, "You must rely on

10   your recollection of the sworn testimony that you heard and

11   observed when it was presented in court."  Is that satisfactory

12   to the government?

13         MR. HURTADO:  Yes, sir, and it appears also consistent

14   with Jury Instruction Number 6.

15         THE COURT:  Mr. Robbenhaar?

16         MR. ROBBENHAAR:  Yes, I think that's right, Judge.  I

17   have no problem with telling them to rely on their -- probably

18   say "individual memories," something along that line.  I don't

19   think the phrase "collective memories" is appropriate.  I think

20   they have to reflect that each individual juror is going to

21   remember his or her own way.  That's what they are going to

22   rely upon.

23         THE COURT:  You like the word "individual" in front of

24   the word "recollection"?  The way I have proposed it is, "You

25   must rely on your recollection of the sworn testimony that you

1    heard and observed when it was presented in court."

2          MR. ROBBENHAAR:  Perhaps each of your individual

3    recollections or -- what do you think?

4          MR. HURTADO:  I prefer the word "recollection."  The

5    reason for that is I just wanted to mirror what is stated in

6    Jury Instruction Number 6.

7          THE COURT:  Why don't we put the words "each of you" in

8    front of this.

9          MR. ROBBENHAAR:  Okay.  I think that's fair.

10          MR. HURTADO:  Sure.

11          THE COURT:  Okay.  We'll do it and read, "Each of you

12    must rely on your own recollection of the sworn testimony that

13    you heard and observed when it was presented in court."  Is

14    that satisfactory?

15          MR. HURTADO:  Yes, sir.

16          MR. ROBBENHAAR:  Yes.  Thank you, Judge.

17          Jury Instruction Number 6 does actually reference,

18    final sentence, "It is your own recollection and

19    interpretation," so I think what the court is proposing I think

20    is consistent with Jury Instruction Number 6.

21          MR. HURTADO:  Your Honor, may I throw something out

22    there?

23          THE COURT:  Sure.

24          MR. HURTADO:  I'm wondering if it wouldn't be

25    worthwhile to just state that they are not entitled to a copy

1   of the transcript, that seems to be where their attention is

2   focused, in addition to what the court is writing.  Maybe just

3   include something along the lines of "you are not entitled to

4   the transcript."  It's just an idea.

5           THE COURT:  Well, if both sides agree to it, I can

6   include that, sure.

7           MR. ROBBENHAAR:  I think our position would be to

8   answer as the court proposed and just let the jury rely upon

9   the instructions.

10          THE COURT:  Yes, I think I'll just first start with

11  this.  Listen carefully.  "Each of you must rely on your own

12  recollection of the sworn testimony that you heard and observed

13  when it was presented in court."

14          MR. HURTADO:  That's fine with the government.

15          MR. ROBBENHAAR:  Agreed.

16          THE COURT:  All right.  That's the response I'll send.

17  Court's in recess.

18      (Court recessed at 2:43 p.m. to 3:01 p.m.)

19      (In open court, jury not present.)

20          THE COURT:  Court's in session.  Have a seat, please.

21          The last message from the jury was, "We are at a

22  deadlock, cannot come to an unanimous decision."

23          Let me ask first Mr. Hurtado how you would like to

24  respond to this.

25          MR. HURTADO:  Your Honor, the prosecution suggests that

1    the court proceed with an Allen charge at this time.  I think

2    it's appropriate.  That's the government's suggestion.

3              THE COURT:  And Mr. Robbenhaar?

4              MR. ROBBENHAAR:  Your Honor, we would move for a

5    mistrial at this time.

6              THE COURT:  You would object to an Allen charge?

7              MR. ROBBENHAAR:  Yes, sir.

8              THE COURT:  Okay.  Let me ask Mr. Hurtado why you think

9    an Allen charge is appropriate in this circumstance.

10             MR. HURTADO:  Your Honor, the reason the United States

11   feels an Allen charge is appropriate is that the Allen charge

12   is specifically designed to address this kind of situation.  As

13   the court is no doubt aware, the Allen charge indicates that it

14   is not uncommon for a jury to find themselves in this position,

15   but with a little bit more deliberation perhaps they can reach

16   a unanimous decision.

17             Also, Your Honor, as the court is no doubt aware, this

18   is going to require another trial and a significant investment

19   of the court's resources, time and staff.  As such, I think it

20   would benefit actually both parties to have this case resolved,

21   and I think one way to go about potentially resolving this is

22   through an Allen charge.

23             I actually don't see a reason why not to do it.

24             THE COURT:  Do you have a draft of a proposed Allen

25   charge?

1          MR. HURTADO:  No, sir, I do not.

2          THE COURT:  Mr. Robbenhaar?

3          MR. ROBBENHAAR:  Your Honor, this is the third

4    essentially -- it's not really a question, but the third note

5    from the jury in very short sequence.  They have been out for

6    four hours or so, roughly.  Obviously, there is a lunch in the

7    middle.  But at this point, we would move for a mistrial.  I

8    would draw back on my earlier concern with the first -- for the

9    part that I raised earlier regarding the rebuttal argument by

10   counsel during closing and the constructive possession issue.

11   I think all of that combined, I am suggesting that a mistrial

12   at this time is appropriate.

13         THE COURT:  Okay.  Let me take a recess, and I'll get

14   back to you.

15      (Court recessed at 3:04 p.m. to 3:23 p.m.)

16      (In open court, jury not present.)

17         THE COURT:  Court's in session.  Have a seat, please.

18         I've provided for your consideration the Tenth

19   Circuit's Modified Allen Instruction.  Let me ask counsel if

20   you have comments on this.  Mr. Hurtado?

21         MR. HURTADO:  Your Honor, United States finds it

22   acceptable and would propose to use this Allen instruction to

23   the jury.

24         THE COURT:  Mr. Robbenhaar?

25         MR. ROBBENHAAR:  Your Honor, we have some concerns with

1    the Modified Allen Instruction as written.  We think of this in

2    terms of the sixth paragraph would be on page 2 of the handout.

3    The first paragraph, I really don't have a problem with.

4              First of all, I oppose the giving of the instruction.

5    Okay?  But that said, paragraph number one, we don't have an

6    objection to.  Paragraph number two, that's concerning to the

7    defense for a number of reasons.  The jury has been instructed

8    throughout this case, at least initially, and then I think at

9    the final instruction, that it should give no concern to its

10   verdict, the consequences of its verdict to play no role in

11   this particular case.

12             Paragraph number two basically says, "Oh, boy, if we

13   don't get a verdict, we may to come back and have another

14   trial" and to "make another large investment of time and

15   effort."  I think that's kind of placing a little bit of guilt

16   upon the jury, responsibility for its failure to reach a

17   decision.  So I would oppose on those grounds regarding

18   paragraph number two.

19             THE COURT:  What exact language are you concerned about

20   in two?

21             MR. ROBBENHAAR:  It says in paragraph number two, "If

22   you should fail to agree upon a verdict, the case is left open

23   and must be tried again.  Obviously, another trial would

24   require the parties to make another large investment of time

25   and effort, and there is no reason to believe that the case can

1    be tried again by either side better or more exhaustively than

2    it has been tried before you."  That language is concerning

3    because it's having the jury then consider the consequences of

4    its inability to reach a verdict, and it's basically making the

5    jury potentially feel guilty or bad because it can't reach a

6    verdict.  So that's injecting into jury deliberations a whole

7    element, an emotional element, feeling responsibility for its

8    inability to reach a verdict which I think is entirely improper

9    in this.

10          Moving on to paragraph number three, the first sentence

11   is fine:  "You are reminded that the defendant is presumed

12   innocent, and that the government, not the defendant, has the

13   burden of proof and it must prove the defendant guilty beyond a

14   reasonable doubt."  However, the balance of paragraph three, I

15   feel, is inherently coercive.  It is not needed, especially

16   what's stated in paragraph four; but before I get to paragraph

17   four, if you look at the application note or the use note

18   that's attached, the citation at the end of that use note is

19   United States versus McElhiney, 275 F.3d 928, Tenth Circuit

20   opinion from 2001, in which the Tenth Circuit strongly urged

21   that to avoid impermissible coercion certain language should be

22   included, and there is a quotation.  That language is not in

23   this proposed instruction.

24          Getting back to paragraph three, the language that

25   starts the second sentence, "Those of you who believe that the

1    government has proved the defendant guilty beyond a reasonable

2    doubt should stop and ask themselves if the evidence is really

3    convincing enough," and then it continues, "And those of you

4    who believe the government has not proved the defendant guilty

5    should stop and ask yourselves if the doubt you have is a

6    reasonable one."  I just feel that that is coercive to each

7    individual juror and is potentially causing that juror to

8    relinquish his or her own conscientiously held conviction.

9            Paragraph four, starting with "It is your duty as

10   jurors," that first sentence is fine.  Really, I think the

11   fourth paragraph is fine in my mind.

12           THE COURT:  Well, it is essentially the same as the

13   instruction --

14           MR. ROBBENHAAR:  Excuse me --

15           THE COURT:  -- already given.

16           MR. ROBBENHAAR:  Right.  I think it is also duplicative

17   and redundant to what's trying to be stated in number three.

18   So four is still, I think, coercive, but it is better than

19   paragraph three.  So we would prefer four in lieu of three.

20   Excluding the first sentence of paragraph three is fine.

21           Moving down to five, the little, tiny paragraph at the

22   bottom, is fine.

23           And paragraph six which starts on the second page is

24   fine.

25           So those are my concerns with this Modified Allen

1   Instruction, Your Honor.

2           THE COURT:  Let me state that paragraph four is

3   virtually identical to the instruction given to the jury as

4   Instruction Number 13.  I'm not sure that it is necessary to

5   repeat it in an Allen instruction.

6           Let me ask you to do this.  Let me ask counsel to meet

7   to see if you can come to an agreement on a modified Allen

8   instruction by focusing on the first three paragraphs of the

9   Modified Allen Instruction from the Tenth Circuit that I've

10  given you, see if you can maybe revise the language to the

11  point that it would be acceptable to both sides.  I'll be in

12  recess while you work on that.  And I would leave out of the

13  charge paragraph four because it's included as Instruction 13

14  in the court's instructions.

15          Court's in recess.

16      (Court are you received at 3:31 p.m. to 3:44 p.m.)

17      (In open court, jury not present.)

18          THE COURT:  Court's in session.  Have a seat, please.

19          What I intend to do is to give a somewhat shortened

20  Modified Allen Instruction.  Do each of you have the Tenth

21  Circuit --

22          MR. HURTADO:  Yes, sir.

23          MR. ROBBENHAAR:  Yes, Your Honor.

24          THE COURT:  This is what I would propose:  Leave the

25  first paragraph as is.

1          In the second paragraph in the second sentence, revise

2  it to say that "if you fail to agree upon a verdict, the case

3  is left open and may be tried again" instead of "must be tried

4  again."  Then in the next sentence, I would edit to read,

5  "Obviously, another trial would require the parties to spend

6  more time and effort."  And the last sentence would be, "There

7  is no reason to believe the case can be tried again by either

8  side better or more exhaustively than it has been tried before

9  you."

10          Leave the third paragraph intact, eliminate the fourth

11  paragraph, leave the fifth paragraph as is, and then make a

12  minor change in the wording in the sixth paragraph so that it

13  would read, "I will ask now that you return to the jury room

14  and continue your deliberations," et cetera.

15          Let me ask for your comments on those edits.

16          MR. HURTADO:  Yes, Your Honor, that is acceptable for

17  the United States.

18          THE COURT:  Mr. Robbenhaar?

19          MR. ROBBENHAAR:  I'm sorry, Judge, would you repeat the

20  modified language or the modification to paragraph 2?

21          THE COURT:  Sure.  The first sentence remains the same.

22          MR. ROBBENHAAR:  Yes.

23          THE COURT:  The next sentence reads the same except the

24  word "must" is changed to "may."  Then the third sentence would

25  read, "Obviously, another trial would require the parties to

1   spend more time and effort," delete the "and," and then begin

2   the fourth sentence with "there is no reason."

3            MR. ROBBENHAAR:  Thank you.  I would reiterate my

4   earlier objection to paragraph 2 in its entirety.  I feel that

5   it just places a weight upon the jury to try to reach a verdict

6   for the sake of the court and for the sake of the parties.  It

7   feels -- it seems to me that this places a burden on the jury

8   and can make them feel responsible if they don't reach a

9   verdict.

10           Regarding the third paragraph, I would simply restate

11  my earlier argument.  I would say the first sentence which

12  reminds the jury of its burden, ending upon the language

13  "beyond a reasonable doubt," I think that's fine.  If the court

14  were to -- the rest of the paragraph, I would move to have it

15  struck and omitted.  If the court required or felt the need to

16  have some sort of language, I would refer the court to the

17  McElhiney language on the use note which is a quotation

18  inserted at the end of the use note.

19           I agree with the court regarding paragraph four.

20           I have no problem with paragraph five, and I have no

21  problem with paragraph six.  So that would be the defense

22  position.

23           I guess the default would be, Your Honor, paragraphs

24  one, five and six, but if the court is going to impose -- put

25  in language from paragraph two, three or even four, then I just

1    stated how I would have that read.

2            THE COURT:  Let me ask Mr. Hurtado, what about instead

3    of paragraph three in its entirety using the first sentence and

4    then the language from the McElhiney case?

5            MR. HURTADO:  Your Honor, here is the issue the United

6    States has.  First of all, the United States would accept the

7    Modified Allen Instruction as initially proposed by this court.

8    The United States would have no problem with that.

9            The problem with paragraph number three is that the

10   language is neutral in the sense that it addresses matters that

11   are favorable to the defense and the United States.  The United

12   States believes that the language in McElhiney is not

13   necessary.  This is a stock instruction that has already passed

14   muster with the Tenth Circuit.  There is no reason to modify

15   the language in paragraph three.  The United States agrees with

16   the court's initial assessment that that paragraph in its

17   entirety should be included for purposes of this Allen

18   instruction.

19           If the court wishes to incorporate McElhiney in

20   addition to what it has already provided in paragraph three,

21   the United States would have no objection.  Other than that,

22   Your Honor, the United States would be in agreement with, as I

23   stated, the court's initial modified Allen instruction as

24   proposed.

25           THE COURT:  What I propose doing now is to some extent

1    incorporating language from McElhiney into the third paragraph

2    so that it would read as follows.  The third paragraph would be

3    attached down to the last sentence which would be deleted, and

4    in place of the last sentence, there would be a sentence

5    stating, "Although no juror should relinquish either his or her

6    conscientiously held convictions simply to secure a verdict,

7    every individual juror should reconsider his or her views

8    whether in the majority or the in the minority."

9         MR. HURTADO:  Yes, sir, that would be acceptable to the

10   United States.

11        THE COURT:  Let me ask Mr. Robbenhaar, do you have

12   comments on that?

13        MR. ROBBENHAAR:  My only comment is that it appears to

14   be the intent of the McElhiney language essentially what's

15   already stated in paragraph three.  That seems duplicative to

16   me to have both in there.  I think the quoted language that the

17   court just used from the McElhiney opinion is more appropriate

18   than what's previously or what's presently in paragraph three.

19   So I just don't think we need both.

20        Again, so the record is perfectly clear, I think it is,

21   but I wanted the record to be clear that we don't believe a

22   modified Allen instruction at all should be given by this

23   court.

24        THE COURT:  Let me ask Mr. Hurtado, what is your view

25   as suggested by Mr. Robbenhaar?

1          MR. HURTADO:  The United States would oppose, Your

2    Honor.  Once again, the United States is in agreement with the

3    proposed modified Allen instruction as set forth by the court.

4          The United States agrees specifically that paragraph

5    three should be incorporated into the Modified Allen

6    Instruction to include the McElhiney language that the court

7    recited earlier on the record.  The United States believes that

8    paragraph three and the language incorporated in McElhiney

9    fully addresses the situation that we have here with respect to

10   the deadlocked jury.  The United States does not believe it's

11   duplicative.  There is a reason that the Tenth Circuit held

12   that the language in McElhiney should be used as well as the

13   language set forth in paragraph three of the Modified Allen

14   Instruction.

15         I believe that the court's suggestion is a reasonable

16   compromise, and the United States would not oppose the Modified

17   Allen Instruction as provided by the court.

18         THE COURT:  I tend to agree that Mr. Robbenhaar's

19   correct when he says that incorporating the language from

20   McElhiney that I had proposed into paragraph three creates a

21   redundancy, so what I intend to do now is have paragraph three

22   as follows:  "You are reminded that the defendant is presumed

23   innocent and that the government, not the defendant, has the

24   burden of proof, and it must prove the defendant's guilt beyond

25   a reasonable doubt.  Although no juror should relinquish his or

1    her conscientiously held convictions simply to secure a

2    verdict, every juror, every individual juror, should reconsider

3    his or her views whether in the majority or in the minority."

4    That's what I propose as paragraph three.

5           Any further comment on that?

6           MR. HURTADO:  No, sir, not from the government.

7           MR. ROBBENHAAR:  No, Your Honor.

8           THE COURT:  All right.  Let's rise while the jury

9    enters, please.

10     (Jury returned to the courtroom.)

11          THE COURT:  Please be seated.

12          Mr. Ocana, you're the foreperson of the jury.  Is that

13   correct?

14          MR. OCANA:  Yes, sir.

15          THE COURT:  At this point, the jury is unable to reach

16   a unanimous verdict?

17          MR. OCANA:  Yes, sir.

18          THE COURT:  I'm going to give you a further instruction

19   and ask that you listen carefully as I read this to you.

20          Members of the jury, I'm going to ask that you return

21   to the jury room and deliberate further.  I realize that you

22   are having some difficulty reaching a unanimous agreement, but

23   that is not unusual.  Sometimes, after further discussion,

24   jurors are able to work out their differences and agree.

25          This is an important case.  If you should fail to agree

1   upon a verdict, the case is left open and may be tried again.

2   Obviously, another trial would require the parties to spend

3   more time and effort.  There is no reason to believe that the

4   case can be tried again by either side better or more

5   exhaustively than it has been tried before you.

6         You are reminded that the defendant is presumed

7   innocent and that the government, not the defendant, has the

8   burden of proof and it must prove the defendant guilty beyond a

9   reasonable doubt.  Although no juror should relinquish his or

10  her conscientiously held convictions simply to secure a

11  verdict, every individual juror should reconsider his or her

12  views whether or not in the majority or in the minority.

13        What I have just said is not meant to rush or pressure

14  you into agreeing on a verdict.  Take as much time as you need

15  to discuss things.  There is no hurry.

16        I will ask now that you return to the jury room and

17  continue your deliberations with these additional comments in

18  mind.  Of course, in conjunction with all of the instructions I

19  have previously given to you.

20        Everyone please rise while the jury goes back to the

21  jury room.

22     (Jury excused from the courtroom.)

23        THE COURT:  Okay.  We'll be in recess, but at this

24  point, I would ask that you remain in the courtroom if you

25  don't mind.

1        MR. HURTADO:  Yes, sir.

2        THE COURT:  Court's in recess.

3      (Court recessed at 4:00 p.m. to 5:10 p.m.)

4      (In open court, jury not present.)

5        THE COURT:  Court's in session, have a seat, please.

6  We have received another note from the jury that states "once

7  again still on a deadlock, still not unanimous, no change."

8  Let me ask counsel for your comments on this note.

9        Mr. Hurtado?

10        MR. HURTADO:  Looks like the jury is on a definite

11  impasse at this time.  The United States would ask the court to

12  find manifest necessity in light of the fact that the jury was

13  unable to reach a verdict in this case.

14        THE COURT:  Mr. Robbenhaar?

15        MR. ROBBENHAAR:  I tend to agree.  I think it appears

16  to us that the jury is unable to reach a verdict.  I think

17  under the circumstances a mistrial should be granted.

18        THE COURT:  Okay.  They have been deliberating since

19  about 11:00 this morning, so that's now roughly six hours, a

20  little more.  It's about 5:15.  When we selected the jury, I

21  had told them that the trial might extend into Thursday and

22  asked them to be available until then.  I could, if there is no

23  objection, suggest that they go home and relax and return

24  tomorrow to see in they could reach a verdict tomorrow morning.

25        MR. HURTADO:  Actually, Your Honor, that sounds like a

1    good idea.  I think maybe a fresh set of eyes and a fresh mind

2    might serve them well to come back and reconsider the evidence.

3    The United States would agree with that proposal.

4            THE COURT:  Mr. Robbenhaar?

5            MR. ROBBENHAAR:  I don't have a strong objection to

6    that.  It seems to me that we're deadlocked, and I would move

7    for a mistrial, but if the court --

8            THE COURT:  Well, one of my concerns is the length of

9    time the defendant's been in custody.  How long is that now?

10           MR. ROBBENHAAR:  Since October 25, 2017.  So about a

11   year and five months, I think.

12           THE COURT:  You, of course, have no idea of what the

13   result might be if the jury deliberated further, but if it were

14   a verdict of acquittal, I hate to see the defendant remaining

15   in custody until we can try the case again.

16           MR. HURTADO:  That sounds like a totally reasonable

17   concern that the court has expressed.  In light of that

18   concern, the United States is not opposed to resuming the jury

19   and have them deliberate starting fresh tomorrow morning.

20           THE COURT:  Mr. Robbenhaar?

21           MR. ROBBENHAAR:  I share your concern, Your Honor.

22   Obviously, my client's pretrial detention has been very

23   lengthy.  There has been a lot of litigation in the case, but

24   nonetheless, I would hate to have it drag out for however long

25   it takes to retry the case.  I have no strong objection to

1    holding the jury over to tomorrow, but...

2            THE COURT:  Let's do this.  Let's invite the jury in.

3    I'll ask if -- well, I could ask the foreman if he thinks there

4    is a possibility that that would work, or any of the other

5    jurors if they think it might work.  I guess if they are

6    adamant, I probably don't have an option to make them come back

7    tomorrow.

8            MR. ROBBENHAAR:  I would only state on that issue if we

9    were to poll the jury I would be cautious about doing so.  I

10   think it would be appropriate perhaps to ask the jury foreman a

11   simple question along the lines, "Do you feel there is any

12   chance that further deliberations might result in a verdict,"

13   but I wouldn't want to get into having individual jurors --

14           THE COURT:  No, I wouldn't intend to poll them.

15           MR. ROBBENHAAR:  Okay.

16           THE COURT:  Well, everyone rise while the jury enters.

17       (Jury returned to the courtroom.)

18           THE COURT:  Please be seated.  Let me say this.  I sent

19   you out to start your deliberations about 11:00 this morning,

20   so you have now been working hard for more than six hours.  I,

21   in particular, and the parties appreciate your hard work in the

22   case.  And there are times when, as happens here, a jury simply

23   cannot reach a unanimous verdict.

24           When I selected the jury on Monday afternoon, one of

25   the questions I asked you is if you could be available through

1    Thursday, tomorrow, and the question we have for Mr. Ocana, the

2    foreperson of the jury, is whether you think by going home and

3    getting a rest finally, there might be a possibility with a

4    fresh start tomorrow morning that the jury would be able to

5    reach a unanimous verdict.

6              MR. OCANA:  At this time, sir, I don't think so.

7              THE COURT:  All right.  Under the circumstances, then,

8    I'm going to declare a mistrial, which means that there is no

9    result in this case, and the case may have to be tried before a

10   different jury in the future.

11             What I'm going to ask you to do is to go back to the

12   jury room, wait a few minutes.  The court has a gift for you

13   for your service.  I want to bring that to you, and then we'll

14   let you go home.

15             Everyone please rise while the jury goes to the jury

16   room.

17        (Jury excused from the courtroom.)

18             THE COURT:  Have a seat, please.  I'm going to visit

19   with the jury briefly and give them coffee cups that we now do

20   for their service, and I will tell them while visiting with

21   them that the lawyers may be interested in talking to them

22   about their performances in the case, but I'll also tell them

23   they are not required to talk to you, and that if they prefer

24   not to that they tell you that, and that you are not to bother

25   them any further.

1           Why don't you wait here for just a little bit.  I'll go

2    back and visit with them and come back to tell you if any of

3    them want to stick around and talk.

4       (Court recessed at 5:21 p.m. to 5:27 p.m.)

5           THE COURT:  Let me say that there are several jurors

6    that are perfectly happy to talk to the lawyers about the case,

7    and they will be out in the hallway, so you can visit with them

8    out there.

9           All right.  Let me ask you one other thing.  Could you

10   retry this case beginning two weeks from Monday which would be

11   the 18th, 19th and 20th?  I'm not sure I can do it then because

12   I may not have a court reporter available.

13          MR. HURTADO:  The 18th would work for the United

14   States, Your Honor.  How about next week on Monday?

15          THE COURT:  I cannot do it next week.

16          Well, let me get back to you about it.  Why don't you

17   go on and visit with the jurors at this time.

18       (Court recessed at 5:29 p.m.)

19

20

21

22

23

24

25

74

```
1                    I N D E X                      PAGE

2

3   JURY CHARGE                                      4

4   CLOSING ARGUMENT BY MR. HURTADO                  14

5   CLOSING ARGUMENT BY MR. ROBBENHAAR               24

6   REBUTTAL ARGUMENT BY MR. HURTADO                 39

7   ALTERNATES EXCUSED                               46

8   JURY NOTE 1                                      48

9   DEFENDANT'S MOTION FOR MISTRIAL                  50

10  JURY NOTE 2                                      52

11  JURY NOTE 3                                      55

12  DEFENDANT'S MOTION FOR MISTRIAL                  56

13  ALLEN CHARGE DISCUSSION                          56

14  ALLEN CHARGE BY THE COURT                        67

15  JURY NOTE 4                                      69

16  DEFENDANT'S MOTION FOR MISTRIAL                  69

17  MISTRIAL DECLARED                                72

18  REPORTER'S CERTIFICATE

19

20

21

22

23

24

25
```

```
 1                          C-E-R-T-I-F-I-C-A-T-E

 2    UNITED STATES OF AMERICA

 3    DISTRICT OF NEW MEXICO

 4

 5        I, John De La Rosa, RPR, CCR, Official Court Reporter for

 6    the State of New Mexico, do hereby certify that the foregoing

 7    pages constitute a true transcript of proceedings had before

 8    the said Court held in the City of Albuquerque, New Mexico, in

 9    the matter therein stated.

10        In testimony whereof, I have hereunto set my hand on this

11    11th day of April, 2019.

12

13

14

15

16                _____
                  JOHN DE LA ROSA, CCR
17                United States Official Court Reporter
                  421 Gold Avenue, Southwest
18                Albuquerque, New Mexico  87102
                  Phone:  505.348.2249
19

20

21

22

23

24

25
```