**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

  vs.                             **No. CR 1:17-03237-001 JAP**

JESUS FERNANDEZ,

        Defendant.

**Mr. Fernandez's Objections to the Presentence Report**

Jesus Fernandez, by and through his attorney, Assistant Federal Public Defender Esperanza Lujan, hereby notes his objections to the Presentence Report (PSR) and requests that this Court impose a reasonable sentence of 120 months, the statutory minimum sentence. Such a sentence would be sufficient, but not greater than necessary, to satisfy the statutory purposes of sentencing in 18 U.S.C. § 3553(a).

**Introduction**

A jury found Mr. Fernandez guilty of possessing with intent to distribute 500 grams and more of a mixture and substance containing a detectable amount of methamphetamine, as charged in the indictment.  Doc. 189 (jury verdict); Presentence Report (PSR) ¶ 2. The probation office prepared a presentence report and applied a base offense level of 36, a

1

criminal history category of IV, and a resulting guideline range of 262 to 327 months.  PSR ¶¶ 23, 33, 68.  The minimum mandatory sentence is ten years.  *Id*. ¶ 67.

## OBJECTIONS TO THE PRESENTENCE REPORT

1.      Mr. Fernandez objects to his status being listed as an "illegal alien" on page 2 of the PSR.  Mr. Fernandez is from Cuba and was granted political refugee status in the 1980s.  Mr. Fernandez has not been deported or formally stripped of his refugee status.[1] Mr. Fernandez also objects to the assertion that he was "arrested" by Immigration and Customs Enforcement in 2005 and 2015. PSR ¶ 34.

2.      Mr. Fernandez objects to the description of the offense conduct in paragraphs 5-11 of the PSR.  Mr. Fernandez specifically objects to the allegation that on the date of the instant offense several medical documents were found in the bag bearing the name "Jesus F. Fernandez."  PSR ¶ 8. A suppression hearing and two separate jury trials were held in this case detailing the defense's assertion that Mr. Fernandez boarded the greyhound bus with his medical paperwork in his hand, as depicted in the video obtained from Greyhound. The trial transcripts and video are lodged as part of the record of this case.  Mr. Fernandez also objects to the assertion that he possessed the bag and its contents.

---

[1] Counsel has requested from the probation office the immigration documents used to classify Mr. Fernandez's immigration status.  The probation office has not yet provided those documents.

3.      Mr. Fernandez objects to Section B regarding his criminal history, specifically PSR ¶¶ 29-32.   Defense Counsel has requested from the probation office the documents it used to calculate the criminal history score. The office has not yet provided those documents. Counsel anticipates filing more detailed objections to the PSR when she receives them.

4.      Mr. Fernandez clarifies that the scar on his left arm for a "shot" that became infected is from a vaccine, not a bullet. PSR ¶ 59.

5.      Mr. Fernandez asks that the Court  apply the methamphetamine-mixture base offense level or grant a departure or variance from the base offense level of 36.  PSR ¶15. The reasons for this request are outlined below.

## LEGAL STANDARD

"Since the Supreme Court's decision in *Booker*, which relegated the Sentencing Guidelines to an advisory status, district courts have been free to apply any sentence that is 'reasonable' under the sentencing factors listed at 18 U.S.C. § 3553(a)." *United States v. Smart*, 518 F.3d 800, 803 (10th Cir. 2008) (*citing United States v. Booker*, 543 U.S. 220, 261 (2005)). While the guidelines must serve as the "starting point and the initial benchmark" of this inquiry, the sentencing court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The sentencing court's central task must

be to impose a sentence "sufficient, but not greater than necessary," to comply with the

purposes set forth in 18 U.S.C. § 3553(a)(2).

## DISCUSSION

I.    **Mr. Fernandez objects to the application of the methamphetamine actual guideline: the court should use the methamphetamine mixture guideline or alternatively vary downward based on that guideline.[2]**

A.    **Introduction**

Mr. Fernandez asks this Court not to adopt the probation office's offense level

calculations.  He asks that the Court find the base offense level is 32, which according to

U.S.S.G. § 2D1.1(a)(4), is the offense level for an accused who possessed between 1.5 to

5 kilograms of methamphetamine.  At criminal history category IV, Mr. Fernandez's

advisory guideline imprisonment range would be 168 to 210 months.

The PSR says that Mr. Fernandez is responsible for 2.979 net kilograms of actual

methamphetamine, which by weight corresponds to a presumptive methamphetamine-

mixture base offense level of 32.  *See* § 2D1.1(a)(4).  The amount of mixture was 3.104

net kilograms, which has the same base offense level.  *Id.*  The decision by the

government to test the purity of the methamphetamine increased the advisory

imprisonment range from 168 to 210 months to 262 to 327 months, adding 94 to117

months to the presumptive imprisonment range.

---

[2] Counsel has requested from the probation office the documents it used to calculate the criminal history score.  The office has not yet provided those documents.  Counsel anticipates filing additional objections to the PSR when she receives them.

This drastic increase is unwarranted and disproportionally driven by the lab tests that indicated the methamphetamine qualified for the methamphetamine-actual base offense level rather than the methamphetamine-mixture base offense level. For reasons detailed below, reliance on the fundamentally flawed methamphetamine-actual base offense level is inappropriate and fundamentally unfair. To avoid an unduly harsh sentence as compared to similarly-situated defendants, the Court should apply the methamphetamine-mixture base offense level or grant a departure or variance to 120 months.

**B.      Increasing possible penalties for methamphetamine possession based on the substance's purity yields sentences significantly out of proportion to the culpability of a low level participant**.

Base offense levels for federal drug crimes are calculated using the Drug Quantity Table found in § 2D1.1(c) of the guidelines, which uses a graduated scale based on the type and quantity of drugs involved. Methamphetamine, unlike most controlled substances, is quantified based on purity, using either the weight of a mixture containing the drug or the weight of the pure drug itself contained within the mixture, whichever yields the greater offense level. *See* U.S.S.G. § 2D1.1, Notes to Drug Quantity Table (B).

By applying the methamphetamine actual guideline rather than the mixture guideline, the Court will add 7½ to 9½ years to the imprisonment range corresponding to the base offense level for methamphetamine-mixture. As neither logic, nor the law insist

on this result, a prison term unduly influenced by the methamphetamine actual guideline necessarily will be unreasonable and a clear error of judgment. *United States v. Amezcua-Vasquez*, 567 F.3d 1050, 1055 (9th Cir. 2009); *see also United States v. Ressam*, 679 F.3d 1069, 1087 (9th Cir. 2012) (sentence substantively unreasonable because court "committed a clear error of judgment" in relying on flawed findings). Indeed, the higher offense level prescribed for methamphetamine actual is not derived from the Sentencing Commission's exercise of its "characteristic institutional role" of basing its determinations on "empirical data and national experience." *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007).

A court does not have to defer to the guidelines if the "validity of its reasoning" or the guidelines' "consistency" with legal decisions is questionable. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see also Kimbrough*, 552 U.S. at 109 (citing crack guidelines as examples that "do not exemplify the Commission's exercise of its characteristic institutional role"). Naturally, if a court relies on such an aberrant guideline provision, on appeal, the reasonableness of the court's decision and the deference accorded it evaporates. In turn, a prison term based on legally and logically unsound guideline is substantively unreasonable because it is "unsupportable as a matter of law." *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010).

6

Any base offense level dictated by the methamphetamine actual guideline is inherently flawed for a mere courier.  Normally, in developing offense levels and corresponding imprisonment ranges, the Sentencing Commission uses an empirical approach based on data from past sentencing practices.  As Mr. Fernandez explains, the Commission abandoned this approach with the methamphetamine actual guidelines. Sentencing courts know this and many have imposed prison terms below the recommended imprisonment range.[3]  Instead of lowering sentences to conform with sentencing practices in the district courts, the Commission stands by its exacting offense levels even though they are not empirically based.  As the methamphetamine actual guidelines are not empirically grounded like most guidelines, any prison term within their suggested range creates an unwarranted disparity with other similarly situated defendants sentenced to lesser terms for equivalent amounts of the same drug.

Due to the present high average purity of methamphetamine across the country, whenever purity is tested, an accused almost always will be sentenced under the actual methamphetamine guideline rather than a methamphetamine mixture.  This harsher

---

[3] *See* e.g.*, United States v. Ortega*, 2010 WL 1994870 (D. Neb. May 17, 2010) (recognizing that purity-based penalties "illogically skew[ ] sentences for 'average' defendants to the upper end of the sentencing spectrum, blurring the distinctions between high and low level distributors in a hierarchy"); *United States v. Rodriguez*, 2019 WL 1508036 (D. Alaska April 5, 2019); *United States v. Hoover*, 2018 WL 5924500, at *4 (D. Idaho Nov. 13, 2018); *United States v. Ferguson*, 2018 WL 3682509, at *3-4 (D. Minn. Aug. 2, 2018); *United States v. Saldana*, 2018 U.S. Dist. LEXIS 110790, at *7-10 (W.D. Mich. July 3, 2018); *United States v. Diaz-Ariaiza*, 2018 WL 2390586, at *4 (D. Idaho May 25, 2018); *United States v. Witt*, 2018 WL 2390586, at *4 (D. Idaho Mar. 21, 2018); *United States v. Harry*, 313 F. Supp. 3d 969, 974 (N.D. Iowa 2018); *United States v. Nawanna*, 321 F. Supp. 3d 943, 955 (N.D. Iowa 2018); *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1256 (D.N.M. 2017); *United States v. Hartle*, 2017 WL 2608221, at *4 (D. Idaho June 15, 2017).

treatment of nearly all defendants based on one factor – purity – obscures other sentencing factors and creates "false uniformity."  *Cf. United States v. Cabrera*, 567 F. Supp. 2d 271, 273 (D. Mass. 2008) ("False uniformity occurs when we treat equally individuals who are not remotely equal because we permit a single consideration, like drug quantity, to mask other important factors.").  This is because the purity of methamphetamine is not an accurate indicator of culpability.  That fact is demonstrated here: the quantity and purity of methamphetamine attributed to Mr. Fernandez was a factor over which he had no control.  That decision was made by those higher up the trafficking organization.  Yet, that decision has become the single most important factor in the sentencing matrix.  In the end, an accused with minimal involvement, like Mr. Fernandez, is punished like one whose complicity is greater, simply because of the drug's purity.

In determining the base offense level, there is a 10:1 ratio between pure or "actual" methamphetamine and an equivalent weight of methamphetamine mixture.  For example, 15 grams of pure methamphetamine is treated the same as 150 grams of methamphetamine mixture.  The practical effect of the ratio is to impose a presumed purity of 10 percent for untested methamphetamine mixtures.  The question is whether this dramatic increase in punishment is warranted, either by the misconduct in this case, or by comparison to similar offenders.  The answer is no.  A study of methamphetamine

8

chemistry, dangers, and federal sentencing statistics shows that tying the guideline range to the methamphetamine-actual guideline table unjustly penalizes Mr. Fernandez based solely upon a decision unrelated to the criminal conduct in this case.  This is reflected by the fact that Mr. Fernandez, who was at most a low-level player, can still be subjected to an guideline imprisonment range that reaches well beyond the mandatory minimum sentence and is intended for a drug king-pin or major dealer.  Thus, if the Court uses the drug's purity to determine the base offense level it will treat Mr. Fernandez differently from similar defendants who share the same degree of participation.

> 1. **Methamphetamine guideline history shows the methamphetamine actual guideline is not grounded in empiricism.**

The current system of sentencing based on the weight of drugs was developed by Congress based on the belief that greater weight should trigger more severe sentences, because those amounts were associated with "drug king-pins" and other "high level offenders."  Judge Patti B. Saris, "Reevaluating the Effectiveness of Federal Mandatory Minimum Sentences," pp. 2, 5, 5 n.2, (September 18, 2013) ('Commission Statement').[4] Congress enacted the statutory mandatory minimums accordingly.  *Id.*; *Kimbrough*, 522 U.S. at 97; *United States v. Hayes*, 948 F.Supp.2d 1009, 1024 (N.D. Iowa 2013).  The Commission then amended the guidelines to correspond with the mandatory minimums.

---

[4] http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_ Testimony_and_Reports/Submissions/20130918_SJC_Mandatory_Minimums.pdf

U.S. Sentencing Commission, "*Methamphetamine: Final Report of the Working Group*,

pp 7-10 (1999) ('Meth Report') (setting out the history of drug statutes and corresponding

guidelines amendments).[5]  But now, the Commission knows that the mandatory

minimums, and thus the corresponding guidelines, often apply to low-level offenders.

Commission Statement, p. 5.[6]

        Initially, the guidelines treated one gram of methamphetamine as the equivalent of

two grams of cocaine or 0.4 grams of heroin. *See* Meth Report at 7. In theory, this was a

value judgment that one gram of methamphetamine was twice as dangerous as cocaine

but only 0.4 as harmful as the same weight of heroin. Over years of persistent upward

directives, methamphetamine punishments increased relative to these other serious drugs.

One gram of methamphetamine (actual) is now considered the equivalent of 20 kilograms

of marijuana. *See* § 2D1.1 Application Note 8(D) – Equivalency table.

        In *United States v. Hayes*, Judge Bennet joined a growing number of district court

judges rejecting the methamphetamine guidelines on the basis that they are

"fundamentally flawed" and "fail to promote the purposes of sentencing."  948 F. Supp.

2d. at 1029.  In setting out the reasoning for his policy disagreement, Judge Bennet

---

[5] http://www.ussc.gov/Research/Working_Group_Reports/Drugs/
199911_Meth_Report.pdf

[6] *See also* Brennan Center for Justice at New York University School of Law, *How the First Step Act Became Law and What Happens Next* ("Federal mandatory minimum sentences were a catalyst for the recent surge of unnecessarily harsh prison sentences.  More than two-thirds of federal prisoners serving a life sentence or virtual life sentence have been convicted of non-violent crimes . . . . [The First Step Act is] the largest step the federal government has taken to reduce the number of people in federal custody.") accessed at https://www.brennancenter.org/print/21114.

provided a detailed analysis of the history of the methamphetamine guidelines.  *Id.* at

1018-28; *see also United States v. Diaz*, 2013 WL 322243, **4-12  (E.D.N.Y. 2013)

(describing the evolution of the drug trafficking guidelines overall); Meth Report at 7-9

(providing the legislative history of methamphetamine statutes and amendments to the

guidelines).

Through a series of amendments directed by Congress, the methamphetamine

guidelines have evolved to dramatically increase the punishment for methamphetamine

offenses. *Hayes*, 948 F. Supp. 2d. at 1023-25; Meth Report at 7-9.  In 1987,

methamphetamine was not included in the Drug Table, but was given a drug equivalency

of 1 gram of methamphetamine to 2 grams of cocaine.  *Hayes*, 948 F. Supp. 2. at 1023;

Meth Report at 7; U.S.S.G. § 2D1.1 (1987).  In 1988 and 1989 the statutes and guidelines

changed to provide alternative sentences for methamphetamine-actual and

methamphetamine-mixture.  Meth Report at 8.  For a defendant in Criminal History

Category I, the low end of the guidelines ranges for offense levels 26 and 32 exceeded the

mandatory minimum of 5 and 10 years by 3 months and 1 month respectively.  The

Commission has since acknowledged that the guidelines were made slightly higher than

the mandatory minimum to induce the cooperation of defendants.  *See* U.S. Sentencing

Commission, "Special Report to Congress: Cocaine and Federal Sentencing Policy,

Chapter 7 (1995) ("explaining "[t]he base offense levels are set at guideline ranges

11

slightly higher than the mandatory minimum levels to permit some downward adjustment for defendants who plead guilty or otherwise cooperate.")[7]

In 1998, Congress enacted new legislation which "stiffened the mandatory minimums for methamphetamine trafficking offenses" by cutting in half the quantities of methamphetamine mixture and methamphetamine substance necessary to trigger the five and ten-year mandatory minimums. Meth Report at 12. These quantities were intended to equal those for crack cocaine. Id. The Commission recognized that it "was not required by legislation to amend the guidelines," in accordance with the new statute, but that if it did not "the mandatory minimums [would] trump the Guidelines at sentencing." Meth Report at 18. The Commission took note of Congressional statements during the debate on the 1998 bill which indicated that Congress thought the bill may be necessary because of prior inaction by the Commission when Congress sought to increase methamphetamine penalties. Meth Report at 18 n. 50. In light of such statements, the Commission concluded "un-linking the Drug Quantity Table from the mandatory minimum quantities established by Congress in a manner that reduces sentences would vary from past practice of the Commission and may prove politically unwise." Meth Report at 18. Based on what can be considered politics rather than empirical data, the Commission then amended the guidelines to conform with these new statutory triggers. See *Hayes*, 948 F.Supp.2d at 1024.

---

[7] http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Drug_Topics/199502_RtC_Cocaine_Sentencing_Policy/Chap7.htm

Mr. Fernandez's guideline sentencing range is based in significant part on amendments to the sentencing guidelines which were not based on empirical evidence. "[T]he Sentencing Commission departed from the empirical approach when setting the Guidelines range for drug offenses, and chose instead to key the Guidelines to the statutory mandatory minimum sentences that Congress established for such crimes." *Gall*, 522 U.S. at 46, n. 2; *Kimbrough*, 522 U.S. at 97 ("The Commission did not use [the] empirical approach in developing the Guidelines sentences for drug trafficking offenses."). In amending the methamphetamine guidelines the Commission did not act in its institutional role. *Hayes*, 948 F.Supp.2d. at 1018-22.

Rather than basing the methamphetamine Guideline amendments on empirical data about past sentencing practices or the danger of the drug, the Commission developed the guidelines based on Congressional directives and public fears. 948 F.Supp.2d at 1022-27. The result, as *Hayes* illuminates, are guidelines that are "excessive because they subject all defendants to harsh treatment, regardless of their role in the offense." Id. at 1027. Perhaps because the guidelines assess a defendant's offense level based on the weight and purity of the drugs involved in the offense, there are a high number of downward departures and variances in methamphetamine cases. *Id.* at 1030. For this reason, the court in *Hayes* also concluded that the guidelines themselves were flawed and do not represent the "heartland" of cases. *Id.* at 1029-30.

13

Mr. Fernandez asks that the Court consider the bases for policy disagreements set out in *Hayes* and in this case, reject the methamphetamine actual guidelines.  While Mr.

Fernandez asks the Court to disagree with the guidelines on legal and policy grounds, he points to his own case as an example of the methamphetamine actual guidelines' flaws.  Based on the facts before the Court and the facts and circumstances surrounding the offense, it is clear that Mr. Fernandez is not a major offender – the kind of offender the guideline was intended to target.

The guidelines "serve as one factor among several the courts must consider in determining an appropriate sentence."  *Kimbrough*, 552 U.S. at 91.  Mr. Fernandez requests that the Court not apply the methamphetamine actual guideline because it is excessively and unjustly punitive; the guideline was not developed on empirical evidence, and, consequently, does not realistically reflect Mr. Fernandez's role in the offense.

II.    **In the alternative, the Court should vary downward to 10 years because applying base offense levels which rely on the distinction between methamphetamine actual and less pure mixtures undermines the sentences goals of 18 U.S.C. § 3553(a) and creates an arbitrary distinction that is unrelated to an accused's culpability**.

A.    **The Commission's policy belief that purity is a presumptive indication of status in the drug organization chain is not in support in fact or law.**

One justification for distinguishing between methamphetamine-mixture and methamphetamine-actual was the Commission's  presumption that "a defendant [who] is in possession of unusually pure narcotics may indicate a prominent role in the criminal

14

enterprise and proximity to the source of the drugs." U.S.S.G. § 2D1.1. cmt. n.27(c). This presumption depended upon the idea that each successive layer of intermediaries would dilute the methamphetamine to increase the quantity for resale, resulting in increasingly diluted drugs as the drugs journeyed to the eventual user. *Id.* However, data from the Drug Enforcement Agency (DEA) shows that, from 2011 to 2016, the average purity of one gram of methamphetamine has ranged from a low of 85.5 percent in early 2011 to almost 95 percent in early 2014, and most recently, for the third quarter of 2016, averaged 93.5 percent pure. That trend is clearly demonstrated in the following chart, from DEA, 2017 National Drug Threat Assessment 70 (Oct. 2017).



15

The chart demonstrates that, across the United States and across all levels, seized methamphetamine averages 93% purity, meaning that the "average" methamphetamine bought by a user on the streets today incorrectly paints the *user* as a presumptive kingpin. Furthermore, as purity has climbed, the price has plummeted 377% from $306.49 per gram to only $81.28 per gram. *Id.* When the average purity of methamphetamine is 93%, and all methamphetamine over 80% purity is considered "actual," focusing on methamphetamine purity utterly fails to distinguish culpability among drug distributors.

### B.      Testing performed in a minority of cases

The Sentencing Commission, as early as 1999, identified another problem with purity analysis – selective testing. The Commission reported:

> Because of the high purity level of street-level methamphetamine and the higher penalties associated with meth-actual, nearly all cases in which an analysis of drug purity is conducted theoretically should be sentenced using the actual quantity of pure drug contained in the mixture of the substance . . . It is notable, however, that only 36.8 percent of methamphetamine cases (excluding Ice) are sentenced under the meth-actual calculation.

U.S.S.C., Meth Report at 15. Today, it is rare for tested methamphetamine to be less than 80% pure (the cut-off for determining what is "actual" methamphetamine). Thus, the presence of the lab report in this case results in an arbitrary re-structuring of the guidelines relative to other similarly situated defendants. Current statistics showing the number of defendants sentenced for mixture versus actual methamphetamine could not be

16

found in the U.S.S.C.'s statistical yearbooks.  If the ratio is anywhere near what it was in the past however, then methamphetamine defendants face a seriously disparate sentencing problem.  It appears that the majority of offenders are being punished using the methamphetamine-mixture guideline, not because of any factual differences between their cases and this one, but simply because drugs are sent to the lab for testing infrequently or selectively.

> ### C.      Other District Courts Have Rejected the Methamphetamine-Actual Base Offense Level in Favor of the Methamphetamine-Mixture Base Offense Level

As Mr. Fernandez noted earlier, district courts across the country have rejected the methamphetamine-actual base offense level in favor of the methamphetamine-mixture base offense level.  *Supra*, n.2.  Judges in this district also have criticized the distinction between methamphetamine-mixture and methamphetamine-actual in the Guidelines.  In *United States v. Santillanes*, Doc. 60 (Transcript of Sentencing Proceedings) at 31, Docket No. CR 07–619 (D.N.M., Sept. 19, 2008). Judge Black explained:

> I find that there is no empirical data or study to suggest that actual purity should be punished more severely by an arbitrary increase of the four levels in this case or at the higher level.

*Id.* at 31.

Judge Black was concerned with the unfairness of the fact that a defendant could be indicted based on the methamphetamine mixture amount but then sentenced based on

the methamphetamine (actual) amount, saying that this "destroys the appropriate

considerations with regard to the plea colloquy" and "I have some difficulty with that, in

light of the Rule of Lenity, particularly since it doesn't appear to have any rational basis

in any fact." *Id.* at 31–32.

Judge Black further explained:

> The [drug quantity] table . . . seems to be black box science,
> as best I can determine. I probably would not allow it under
> *Daubert*, based on what I know at present. There seems to be
> no rhyme or reason for it. It seems to be contrary to any
> empirical evidence, and really undermines Section 3553(a)(2),
> as it does create an unwarranted disparity within various
> categories of users . . . . It seems to me that this is not even a
> rough approximation to comply with 3553, and is not really
> based on any consultation or criminal justice goals or data.
> And therefore, I would think it's irrational.

*Id.* at 32–33.

In *United States v. Ibarra-Sandoval*, 265 F.Supp.3d 1249 (D.N.M. 2017) Judge

Brack found it significant that the drug guidelines are not based on empirical data. *Id.* at

1253. Rather:

> Perhaps bowing to political pressure, the Commission chose not to use its usual
> empirical approach to determine the appropriate Guidelines sentences for drug
> offenses. Instead, the Commission simply keyed the Guidelines range to the
> statutory mandatory minimum sentences Congress established for drug crimes, *see
> id.*, despite the fact that the resulting Guidelines sentences would be "much
> more severe than the average sentences previously meted out to drug trafficking
> offenders . . . ." Consequently, the drug offense Guidelines are not a reflection of
> the Commission's institutional strengths, and a district court has more discretion
> to vary from the drug offense Guidelines based on policy disagreements than in a

18

case where the applicable guidelines were promulgated pursuant to the
Commission's usual empirical approach.

*Id.* at 1253 (citations omitted).  In the case of methamphetamine, Judge Brack observed

that Mexican drug cartels have exerted increasing control over the entire distribution

chain for methamphetamine, and consequently "the average purity of methamphetamine

has increased to over 90 percent while the price per gram has dropped to about $70." *Id.*

at 1254–55.  The Commission's premise for increasing a defendant's sentence based on

drug purity is the assumption that defendants who possess purer drugs have more

prominent roles in the conspiracy and are closer to the original source. *Id.* at 1255 (citing

§ 2D1.1, cmt. n.27(c)).  Thus, "[t]he point . . . of increasing a defendant's sentence based

on drug purity is to punish defendants who have prominent roles in drug distribution." *Id.*

Judge Brack said that, given that the average purity of methamphetamine is now more

than 90%, this assumption "is divorced from reality" and the guidelines "would treat the

average individual convicted of a crime involving methamphetamine as a kingpin or

leader, even though that simply is not true." *Id.* at 1255–56.  Mr. Fernandez is an example

of this result as he was a low-level courier, not a kingpin.

Judge Brack also observed that, because of the high average purity of most

methamphetamine, most defendants would be sentenced based on the higher

methamphetamine actual guidelines when the methamphetamine was tested. *Id.* at 1256.

However, the drugs are not always tested.  "The high average purity of methamphetamine

19

combined with the arbitrary nature of testing means that sentencing enhancements for drug purity are applied capriciously." *Id.* Judge Brack stated that, when testing had been performed, he would not ignore the results but would determine in each case whether the higher guideline was warranted. *Id.* In *Ibarra-Sandoval*, Judge Brack determined that sentencing according to the methamphetamine mixture guidelines resulted in a more appropriate sentence. Accordingly, Judge Brack rejected the advisory imprisonment range of 63 to 78 months and sentenced Mr. Ibarra-Sandoval to 46 months. *Id.* at 1257.

Similarly, Mr. Fernandez is not a kingpin. Like Ibarra-Sandoval, he was merely a courier. He had no control over the purity of the methamphetamine that he received. Sentencing Mr. Fernandez based on the methamphetamine-actual guideline results in an even greater increase than in *Ibarra-Sandoval*, from 168 to 210 months to 262 to 327 months - an increase of 7½ to 9½ years. Such a dramatic increase is disproportionate to Mr. Fernandez's actual courier role, in which he took all the risk. Additionally, there was no evidence that Mr. Fernanez had any knowledge of details or the scope of the distribution chain beyond what he needed to complete his limited assignment. He also had no proprietary interest in the drugs and would have no reason to know how much or what exactly was wrapped in the packages. Nor was there evidence that he stood to profit from the amount or purity of narcotics involved. Accordingly, as in *Ibarra-*

20

*Sandoval*, sentencing based on the methamphetamine-mixture guideline more accurately reflects Mr. Fernandez's true culpability.

### Conclusion

For the foregoing reasons, Mr. Fernandez requests a prison term of no more than 120 months.  This sentence is the mandatory minimum sentence required by statute, and is sufficient but not greater than necessary to fulfill the purposes of sentencing listed in 18 U.S.C. § 3553(a).

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
111 Lomas Blvd. NW, Suite 501
Albuquerque, New Mexico 87102
(505) 346-2489
esperanza_lujan@fd.org

By:     *s/Esperanza Luján*
        Esperanza S. Luján
        Assistant Federal Public Defender

21