IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cr. No. 17-3237 JAP |
| | ) | |
| **JESUS FRANCISCO FERNANDEZ,** | ) | |
| | ) | |
| Defendant. | ) | |

## **UNITED STATES' SENTENCING MEMORANDUM**

The United States recommends a sentence of 262 months of imprisonment to be followed by a five-year term of supervised release.   The United States submits as follows:

### **FACTS**

On the morning of October 25, 2017, DEA Special Agents (SA) Jarrell Perry and Kirk Lemmon were on official duty conducting drug interdiction at the Greyhound bus station in Albuquerque, New Mexico.   Both agents were wearing civilian clothes and their firearms were concealed.   The agents waited for an eastbound bus from Phoenix scheduled to arrive in Albuquerque around 9:55 a.m.   When the bus arrived, passengers disembarked for a brief layover to allow for any necessary bus refueling, cleaning, and maintenance service.   SA Perry and SA Lemmon boarded the bus curbside after it had pulled out of the wash bay and began looking at the bags left by passengers inside the bus.

SA Perry noticed a black duffel bag with white trim bearing the brand name Protégé in the overhead common luggage area.   SA Perry began looking for a name tag on the bag, picked it up, and noted that it was very heavy despite appearing to be only partially full.   Because SA Lemmon

did not typically participate in drug interdiction at the bus station, SA Perry handed the bag to SA Lemmon for a "teaching moment" to allow him to feel the bag's heft.   SA Lemmon held the bag by its corners because the bottom was sagging.   He then handed the bag back to SA Perry who returned the bag to its previous location in the overhead rack.

After the bus returned to the terminal for passenger reloading, the two agents again boarded the bus.   SA Lemmon remained in the front driver's side area to provide security for SA Perry who commonly handles all of the consensual encounters with passengers.   SA Perry moved to the back of the bus.   SA Perry began approaching each passenger, generally introducing himself as "a police officer" and stating that "we check the bus here for security."   When the defendant boarded the bus, SA Lemmon noticed that he seemed "surprised" and "panicked."   The defendant sat in a seat located approximately in the middle of the bus.   The Protégé bag was stored three or four rows behind and on the opposite side of the aisle from the defendant's seat.   Ten minutes after boarding, the defendant got up from his seat and went to the lavatory in the back of the bus. SA Lemmon observed that the defendant poked his head out of the lavatory doorway, saw where SA Perry was located, and then retreated back into the lavatory.   The defendant returned to his seat less than two minutes after he went to the lavatory.

When the defendant was seated again, SA Perry approached the defendant, introduced himself as a police officer, stated that he was checking the bus for security, and asked for permission to speak with the defendant.   The defendant agreed.   SA Perry asked the defendant several questions in English regarding his travel, and the defendant responded in thickly accented English.   SA Perry noted that the defendant's bus ticket was under the name Frank Dreke.   After SA Perry began speaking with the defendant, SA Perry recognized him from an encounter four or

five days earlier.  The defendant also recalled that encounter.  During the prior encounter, the defendant was also traveling under the name Frank Dreke.  He had been traveling with a black or brown duffel bag and consented to SA Perry conducting a pat down search with negative results.  When SA Perry requested identification during that prior encounter, the defendant handed medical paperwork to SA Perry that bore the name Jesus F. Fernandez Rodriguez.  At that time, SA Perry did not ask the defendant any questions about the discrepancy in names.  SA Perry spoke to the defendant in English during the first encounter a few days earlier, and the defendant had responded in English and appeared to understand SA Perry's questions.

During the October 25, 2017 encounter, after recognizing the defendant, SA Perry asked the defendant several questions regarding the defendant's travel and then began to question him regarding luggage in the following manner:

SA:     Ok. Do you have luggage, do you have luggage on the bus with us?
JF:     No, not (inaudible) I don't got nothing with me today.
SA:     Do you have luggage with you?
JF:     No.
SA:     Did you have luggage on the last trip?
JF:     Nah, I leave it at the house, it's a short trip back home.
SA:     Ok, so you don't have any luggage?
JF:     Nah.
SA:     No weapons, or anything on your body sir?
JF:     No, you want to check me again?
SA:     Do you give me permission to pat you down?
JF:     Yeah.
SA:     Ok, thank you.
JF:     Yeah.
SA:     Thank you. I thought you had a bag the other day though?
JF:     Nah.
SA:     Didn't you have a bag with you the other day?
JF:     (inaudible).
SA:     You did? What did you do with the bag?
JF:     (inaudible).
SA:     What kind of bag was it?
JF:     It's (inaudible) black, brown or something like that.

3

SA:      A black bag?
JF:      Yeah.

SA Perry ended the encounter with the defendant and continued speaking with other passengers. When he was finished speaking with all of the passengers, he said to SA Lemmon "I'm gonna go get that bag."   SA Perry retrieved the black Protégé bag from the common storage area and, starting from the rear of the bus, walked forward through the aisle of the bus showing the bag to each passenger and asking "Is this your bag?."   SA Perry again approached the defendant, this time with the Protégé bag, and the following conversation ensued:

SA:      Ok, is this your bag sir? Is this your bag sir?
JF:      Yeah, that's my bag.
SA:      Your bag? Ok.
JF:      You want to check it out?
SA:      Ok, will you give me permission to search it?
JF:      Yeah.
SA:      Ok, would it be ok if I just set it up here?
JF:      Yeah.

SA Perry unzipped the bag and discovered several oblong shaped bundles wrapped in clear saran wrap and brown tape.   SA Perry immediately recognized the bundles as consistent with bundles of illegal narcotics.   The defendant then stated that it was not his bag.   SA Perry arrested the defendant and led him off of the bus with SA Lemmon's assistance.

SA Lemmon transported the defendant to the DEA Office where he was processed and interviewed by DEA Task Force Officer (TFO) Clarence Davis and TFO Frank Chavez.   TFO Davis asked the defendant in Spanish whether he understood both Spanish and English, and the defendant indicated that he understood both, but responded in English.   TFO Davis referred to an image of the DEA *Miranda* warnings card that he has stored in his phone and read the warnings directly to the defendant.   The defendant indicated that he understood his rights and proceeded to

answer TFO Davis's questions.   The interview lasted approximately 25 minutes.   The defendant denied knowing about the methamphetamine.

SA Perry and SA Lemmon conducted a thorough search of the Protégé bag at the DEA Office.   SA Lemmon documented this process through a series of photographs.   Ultimately, agents uncovered seven bundles from the bag having a combined gross weight of 3.9 kilograms. The agents also found medical paperwork in the bag bearing the name "Fernandez Rodriguez, Jesus F."   The crystalline substance in one of the bundles field-tested positive for the presence of methamphetamine.   The DEA South Central Lab subsequently conducted a forensic chemical analysis of the substance in the bundles, all of which tested positive for methamphetamine.   The methamphetamine weighed 3,104 net grams and 2,979 actual grams.   The methamphetamine was 96% pure.

## PROCEDURAL AND LEGAL BACKGROUND

On November 15, 2017, a federal grand jury returned an Indictment (Doc. 10) charging the defendant with a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), that being possession with intent to distribute 500 grams and more of a mixture and substance containing methamphetamine. The defendant pleaded not guilty and proceeded to trial two times.   The first trial resulted in a hung jury on March 6, 2019.[1]   The second trial resulted in a guilty verdict on March 20, 2019.

On May 17, 2019, the United States Probation Office disclosed the defendant's presentence report ("PSR").   Doc. 204.   The defendant's total offense level was calculated at 36.   PSR Part

---

[1] The prosecutor in this case and SA Perry spoke at length with many of the jurors after the first trial.   They indicated that the hung jury was the result of a lone rogue juror who refused to follow the jury instructions as to the United States' burden of proof in a criminal case.   According to the jurors, the lone rogue juror demanded proof from the United States that overcame every possible doubt.   Such a standard is impossible to meet.   The United States thus disputes any contention from the defendant that his "case was a close one in which the jury could have returned a different verdict, as evidenced by the fact that his first trial ended in a hung jury."   *See Defendant's Motion for a New Trial*, Doc. 203 at 12.   A lone rogue juror does not make a "close" case.

D ¶ 68.   The defendant's criminal history points were calculated at eight (8) resulting in a criminal history category of IV.   PSR Part B ¶ 33.   The resulting imprisonment range is 262 to 327 months.   PSR Part D ¶ 68.   The United States recommends a sentence of 262 months of imprisonment, the low-end of the applicable guideline range.

**RECOMMENDED SENTENCE**

The Guidelines are not the ending point in the sentencing analysis; they are merely one factor for the Court to consider in fashioning a sentence that is "sufficient, but not greater than necessary," to achieve the sentencing goals of 18 U.S.C. § 3553.   Pursuant to this section, judges must consider certain factors when imposing a sentence.   A reasonable sentence is one that "reflect[s] the seriousness of the offense, promote[s] respect for the law, provide[s] just punishment, afford[s] adequate deterrence to criminal conduct" and protect[s] the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(B), (C); *see also United States v. Booker*, 543 U.S. 220 (2005).   The sentence should "avoid[] unwarranted sentence disparities among defendants who have been found guilty of similar conduct."   Based on these factors, a sentence of 262 months of imprisonment is the appropriate disposition here.

<u>**Nature and Circumstances of the Offense**</u>

By definition, this is a serious offense.   The corrosive effect of the distribution and the consumption of controlled substances and their destructive impact on communities is widespread and well documented beyond controversy.   The defendant was involved in transporting approximately 3.1 kilograms of methamphetamine with a purity level of 96 percent.   This quantity of methamphetamine constitutes approximately 31,000 tenth-of-a-gram hits of one of the most destructive and addictive substances known to mankind.   In weighing the seriousness of the

defendant's offense, it is important to factor in the human suffering that would have resulted – the lives that would have been cut short and the futures that would have been lost to addiction – if the defendant had been successful in delivering his destructive payload.    Accordingly, the defendant's total offense level is appropriately driven by the quantity of methamphetamine that he knowingly transported and accurately portrays the severity of his offense.    Moreover, it is important to recognize that the statutory penalties for the defendant's crime include imprisonment for a period of not less than ten (10) years nor more than life.

### History and Characteristics of the Defendant

From the time that the now 59 year-old defendant turned 21 years old in 1981 to this date he has committed himself, without interruption, to criminal activity.    *See* PSR Part B ¶¶ 26-30, 36-52.    The instant offense marks the defendant's third conviction for a felony drug offense. Notably, he committed the instant offense while on parole for a prior 2006 felony drug conviction in Colorado.    PSR Part B ¶ 30.    A warrant for his arrest remains active.    *Id*.

The defendant's criminal history before 1981 is unknown.    In 1980, he fled Cuba in a boat to avoid military service and arrived in Miami, Florida.    PSR Part C ¶¶ 55-56.    It strains credulity to believe that the defendant went from having absolutely no criminal history in Cuba to suddenly engaging in the systematic and relentless pursuit of criminal activity that has defined his unlawful tenure in the United States.[2]    Only the defendant knows for sure the full extent of his criminal history.    It is fair to assume, however, that not all of his criminal history is contained in the PSR.

---

[2] The defendant is in the United States unlawfully.    He is a citizen of Cuba.    He has been detained by immigration officials on several occasions.    However, he has never been deported because of his status as a Cuban immigrant. PSR Part F ¶ 84.    In other words, Cuba does not want him back.

The defendant has had more than 20 arrests.   Most of the charges associated with those arrests were dismissed.   What the defendant lacks for in number of convictions he makes up for in his consistency.   His lengthy criminal history includes numerous drug-related offenses, weapons offenses, resisting arrest, burglary of a habitation, assault, and authorized use of a vehicle. *See* PSR Part B ¶¶ 26-30, 36-52.   He was also arrested in Texas for two counts of domestic violence assault in 2007 after he "intentionally struck, strangled and pulled the hair of Lydia Fernandez (his daughter)."   PSR Part B, ¶ 51.   Notably, the alleged victim, Lydia Fernandez, was the same person who testified on his behalf at the trial in the instant case.   Both counts of domestic violence assault were later dismissed when he was extradited to Colorado to answer for his numerous felony charges there.   *Id*.   In sum, the sentence that this Court imposes should reflect the defendant's danger to the public as a result of all of his criminal conduct.

Unlike many illegal immigrants who enter the United States unlawfully and never commit a crime and only dedicate themselves to hard work, inner drive and resourcefulness, the defendant has shown no interest in leading a productive life.   The defendant, apparently indifferent to developing a stable work history even on a landscape where countless fast-food serving establishments, always hiring, choke the surrounding community, appears by natural disposition comfortable in the criminal milieu.   The context of the defendant's situation is similar to the allure suffered by many criminal defendants motivated by illusory, easy, criminal financial profit and thus there is nothing about this situation that is especially unique or that makes it substantially different than similar cases.

**Promote Respect for the Law**

The defendant has no respect for the law.  The defendant has demonstrated through his unrepentant demeanor and criminal history that he simply does not value the respect and good faith of lawful society.

**Deter Criminal Conduct**

There is strong pressure in the need for a long sentence to achieve specific deterrence.  The defendant has received long prison sentences for his prior felony drug convictions.  In 1991, the defendant was arrested in Colorado and charged with two counts of possession of a controlled substance and two counts of being a habitual offender.  PSR Part B ¶ 29.  He was convicted at trial of one count of possession of a controlled substance (cocaine) and two counts of being a habitual offender.  *Id.*  In 1993, he was sentenced to an unknown term of imprisonment.[3]  *Id.* In 1997, the defendant appealed his sentence and the two counts of being a habitual offender were vacated.  *Id.*  As a result, he was resentenced to a term of 25 years of imprisonment.  *Id.*  He was released on a term of supervised parole in November 2005.  *Id.*

The defendant did not learn his lesson.  Following his release on parole in November 2005, the defendant was again arrested in 2006 in Colorado.  This time, he was charged with 19 counts of possession of a controlled substance.  PSR Part B ¶ 30.  He proceeded to trial where he was found guilty of two counts[4].  On July 14, 2008, he was sentenced to 16 years of imprisonment. *Id.*  He was paroled on September 2, 2015.  *Id.*

---

[3] Records do not indicate what the original sentence was.  *Id.*
[4] The other counts were dismissed or resulted in acquittals.  *Id.*  The defendant was acquitted of one additional count of Prohibited Activities (related to racketeering activities).  *Id.*

9

Clearly, the defendant's prior convictions and sentences were not a sufficient deterrent. He has shown no effort to improve himself or stop his criminal activity.   Significant deterrence will be required to satisfy § 3553(a)'s requirement that the defendant himself be specifically deterred from further criminal conduct.

### Avoid Unwarranted Sentencing Disparities

A sentence within the applicable guideline range is the best approach to preventing unwarranted sentencing disparities between similarly-situated defendants.   The imprisonment range is 262 to 327 months for a defendant who has this criminal history category and who has committed the offense here.

## OBJECTION TO A DOWNWARD VARIANCE

The defendant has requested a downward variance to a sentence of 120 months of imprisonment.   *See Defendant's Objections to Presentence Report*, Doc. 213 at 1.   The PSR author did not identify any factor that would warrant a departure from the applicable guideline range, but stated that a downward variance "may be warranted."   PSR Part F, ¶¶ 83, 85.   The United States opposes a downward variance.   The prosecutor in this case is not authorized to agree to a downward variance, and the United States would strenuously object to simply throwing the sentencing guidelines out of the window in order to give the defendant a downward variance.   The factors delineated under 18 U.S.C. § 3553(a) yield that a sentence within the applicable guideline range is appropriate.   The defendant cannot present a compelling case for a downward variance under any of the factors set forth in 18 U.S.C. § 3553(a).

It is noteworthy that the defendant is no longer subject to an enhanced penalty pursuant to 21 U.S.C. § 851.   Through a stroke of sheer luck, the defendant received a massive benefit from

the recently enacted First Step Act which had the effect of invalidating the United States'

*Information to Establish Prior Conviction Pursuant to 21 U.S.C. § 851* ("*Information*").   As such,

the United States was forced to withdraw its *Information* which had the effect of increasing the

mandatory minimum sentence from ten years to 20 years of imprisonment.   But even without the

*Information*, the defendant's guideline sentencing range of 262 months to 327 months of

imprisonment is well above the otherwise 20-year mandatory minimum sentence of imprisonment

that would have been applicable.   The Court should not vary below the current guideline range.

The applicable guideline sentencing range remains an important factor to consider.   A

guideline sentence takes into account the 18 U.S.C. § 3553(a) sentencing factors and reflects the

seriousness of the defendant's crime.   Indeed, under the Sentencing Reform Act, the United States

Sentencing Commission was explicitly directed to take into account the purposes of sentencing set

forth in 18 U.S.C. § 3553(a).   *See* 28 U.S.C. §§ 994(f), 991(b)(1).   It is fair to assume that this is

one of the primary reasons that the Supreme Court views sentences within the applicable guideline

imprisonment range as presumptively reasonable.   *See Rita v. United States*, 551 U.S. 338, 346-

47 (2007).   On the other hand, unreasonable downward variances can undermine respect for the

law by suggesting that serious offenses, such as transporting large amounts of methamphetamine,

are not really that serious.   Moreover, drug traffickers need to know that they will face substantial

penalties when they distribute their poison to the people of the United States.   Otherwise, they

will not be deterred from their criminal conduct.

There are no mitigating reasons to explain the defendant's criminal conduct and justify a

downward variance.   The defendant said that he had a generally good childhood and reported no

mental or emotional health problems.   PSR Part C ¶ 55, 60.   The defendant reported several

ongoing health issues such as high blood pressure, acid reflux, back pain, arthritis, dental issues, and a hernia.   *Id*. at ¶ 59.   These health issues, however, are unremarkable.   The defendant seemingly had no trouble with his health issues when he made the choice to transport a large amount of methamphetamine.   Further, there is nothing to suggest that he cannot obtain treatment for his health issues when he serves his sentence in prison.

As set forth above, the facts and circumstances of this case and the defendant's criminal history do not support the anticipated recommendation made by the defendant for a downward variance from the established applicable sentencing range of 262 months to 327 months of imprisonment.   The defendant, in the face of this history and with periods where he was on a term of supervised parole wherein access to the opportunity for improving his station in life might logically have been addressed if the interest in so doing was strong enough, once again, on October 25, 2017, committed the instant drug offense.   To grant the defendant's request for a downward variance would be to reward the defendant for continuing to commit serious drug trafficking offenses.   The defendant's request for sentence leniency cannot be sustained upon an analysis of the criteria set forth by 18 U.S.C. § 3553.   Therefore, the history and characteristics of the defendant, as described above, and the nature and circumstances of this offense do not provide a favorable profile of this defendant as a candidate for sentence leniency.

## NO REDUCTION FOR ACCEPTANCE OF RESPONSIBILITY

The PSR author was correct not to assess a three-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1.   PSR Part A ¶ 22.   As such, the United States stands by that position.   The defendant has never claimed to be remorseful about, let alone admit, his relationship with methamphetamine.   When given the opportunity to renounce the relationship

and not transport methamphetamine, instead he chose in this case to affirm it for the slavish and predictable allure of self-gain by boarding a bus in Phoenix with the drugs.   (A bus, of course, in the world of drug transport is the strategically premeditated choice for travel as law enforcement flexes comparatively less security muscle in the context of bus and train travel that it does with the modality of air travel.)

By virtue of the jury's verdict on March 20, 2019, the defendant stands guilty of the instant offense.   He nonetheless has the audacity to proclaim his innocence and falsely accuse the agents in this case of misconduct by planting evidence.   *See* 3-20-19 Tr. 405:11-11; *see also Defendant's Objections to Presentence* Report, Doc. 213 at 2 ("Mr. Fernandez also objects to the assertion that he possessed the bag and its contents.").   It is dirty pool, against any standard of decency and fairness, to drag agents' names through the mud without a good faith basis and for no reason other than the defendant's own self-preservation.   Such conduct by the defendant is especially blameworthy because what the Court knows, that the jury did not know, is that the defendant had been previously convicted of a felony drug offense in Colorado, thereby vitiating the defendant's claim that agents planted evidence.   The only support for the premise that agents planted evidence in this case is the defendant's own self-serving statements – a premise which the jury clearly rejected.

## NO ROLE ADJUSTMENT AS A MINOR PARTICIPANT

The defendant has argued that he was a mere courier who worked at the direction of others. *See id*.   He should not receive a role adjustment as a minor participant.   There is no case, statute, or Guideline rule that automatically grants a defendant a role reduction merely because he works at the direction of others.   Indeed, the very nature of a drug conspiracy is that of a hierarchical

13

organization and that every person in the conspiracy, save for the kingpin himself, works at the direction of somebody else up the organizational chain.   It cannot therefore be said that everybody in the conspiracy is entitled to a reduction merely because they receive orders from another. Certainly there are instances where a top lieutenant of a drug organization would be deserving of an aggravating role adjustment under § 3B1.1, yet still work at the direction of others up the chain in the organization.

The fact that the defendant was a courier, operating at the direction of others, does not mean that he is therefore entitled to a minor role reduction under § 3B1.2.   The Tenth Circuit has rejected this premise, stating, "we have consistently 'refused to adopt a per se rule allowing a downward adjustment based solely on a defendant's status as a drug courier.'"   *United States v. Martinez*, 512 F.3d 1268, 1276 (10th Cir. 2008) (*quoting United States v. Rangel-Arreola*, 991 F.2d 1519, 1524 (10th Cir.1993)).   The Tenth Circuit's justification for the prohibition for such a rule is that "[d]rug couriers are an indispensable component of drug dealing networks."   *Id*.   Put another, more colorful, way, "[t]o debate whether couriers as a group are less culpable would not be productive, 'akin to the old argument over which leg of a three-legged stool is the most important leg.'"   *Martinez*, 512 F.3d at 1278 (*quoting United States v. Carter*, 971 F.2d 597, 600 (10th Cir.1992)).

The defendant has not satisfied his burden in establishing that he is entitled to a minor participant role adjustment.   The defendant cannot treat the role adjustment as a matter of right, to be disproved, as opposed to an affirmative burden on the defendant – a burden that he has failed to satisfy.   *See United States v. Virgen-Chavarin*, 350 F.3d 1122, 1131 (10th Cir. 2003) (acknowledging that a "defendant has the burden of establishing, by a preponderance of the

evidence, that he is entitled to a reduction in [his] base offense level under § 3B1.2") (*quoting United States v. Onheiber*, 173 F.3d 1254, 1258 (10th Cir.1999)).   Accordingly, the defendant should not receive a two-level reduction for a role adjustment as a minor participant.

## CONCLUSION

The defendant should not receive a downward variance.   Nor should he receive a reduction for acceptance of responsibility or a role adjustment as a minor participant.   A sentence of 262 months of imprisonment will be sufficient, but not greater than necessary, to reflect the seriousness of the offense with which the defendant stands convicted.   This sentence will promote respect for the law and attempt to provide just punishment for the offense.   Any lesser sentence will fail to afford adequate deterrence to the potential future conduct of the defendant or others. Furthermore, a sentence of 262 months of imprisonment is necessary to protect the public from further crimes of the defendant.   The filing of this pleading in CM/ECF caused a copy to be served electronically on Esperanza S. Luján, counsel for the defendant.


Respectfully submitted,


JOHN C. ANDERSON
United States Attorney

***Electronically filed***_____
Samuel A. Hurtado
Assistant United States Attorney
P.O. Box 607
Albuquerque, NM 87103
(505) 224-1537