IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

          Plaintiff,

vs.                                                                          No. CR 1:17-03237-001 JAP

JESUS FRANCISCO FERNANDEZ,

          Defendant.

## DEFENDANT'S SENTENCING MEMORANDUM

In his objections to the Presentence Report, Mr. Fernandez requested that the Court impose a sentence of 120 months based on an application of the methamphetamine-mixture base offense level, rather than the methamphetamine-actual base offense level, or that the Court grant a departure or variance to 120 months. [Doc. 213]. Mr. Fernandez provided his legal arguments for this request in his objections to the Presentence Report [Doc. 213] and in his reply to the government's response to his PSR objections [Doc. 216]. Mr. Fernandez supplements his initial additional sentencing arguments based on 18 U.S.C. § 3553 in the following sentencing memorandum.

Under 18 U.S.C. § 3553 a court must impose a sentence that is sufficient but not greater than necessary to accomplish the goals of sentencing – retribution, deterrence, incapacitation, and rehabilitation. *United States v. Booker*, 543 U.S. 220 (2005), *Kimbrough v. U.S.*, 552 U.S. 85 (2007). A sentencing court must impose a sentence with full consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a). After *Booker* a sentencing court must still consider the Guidelines but also tailor the sentence in light of other statutory factors. *Kimbrough*, 552 U.S. at 101. As noted in ¶ 85 of the PSR, a variance may be warranted in this case.

1.  **Nature and circumstances of offense and the history and characteristics of the defendant**

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 528 U.S. 81, 113 (1996).

Mr. Fernandez was born in Havana, Cuba in 1960. In 1959, after the Cuban revolution, Fidel Castro's government began to transform Cuba into a communist nation, and in 1965, the Community Party of Cuba officially began governing the country.[1] The government enacted laws confiscating private property and other legislation limiting the rights of the people, which led thousands of Cubans to flee to the United States over the years.[2] As a result, U.S. immigration law and policy developed to afford unique treatment to Cuban nationals who come to the United States.[3]

Mr. Fernandez grew up in Cuba under the political and socio-economic restraints of the Castro communist regime. Although Mr. Fernandez' father was able to provide basic economic support to his family based on his allegiance to the community party, Mr. Fernandez faced hardships growing up. For example, he was forced – like other children his age – to involuntarily work in the sugar cane fields for certain periods of time. During vocational school, Mr. Fernandez was allowed to pursue only a certain track of studies –radio and television technician - that the government deemed appropriate for him, rather than pursue any individual personal interests.

---

[1] Alanna T. Duong, *The Cuban Adjustment Act of 1966: An Introduction and History*, Immigration Law Advisor, Vol. 11 No. 7 Winter 2017-2018, at 2, https://www.justice.gov/eoir/immigration-law-advisor.
[2] *Id.*
[3] *Id.* at 12.

When Mr. Fernandez reached adulthood, he was opposed to military conscription. Mr. Fernandez feared he could be sent abroad to fight in countries, like Angola, where Cuba had been sending troops to support other leftist-armed groups. In 1975, Fidel Castro sent troops to help Angola's left-wing People's Movement for the Liberation of Angola (MPLA) withstand a joint onslaught by South Africa and other rival armed groups.[4] "Played out on a Cold War stage, the war proved to be one of the longest and bloodiest modern-day conflicts," lasting until the late 1980's.[5] It is estimated that over 337, 000 Cuban soldiers served in Angola.[6] Cuba's involvement in seventeen African nations and three African insurgencies put a drain on Cuba's domestic economic situation and contributed to domestic discontent.[7]

Against this political backdrop, Mr. Fernandez made the decision to get on a boat and risk his life in open waters with the hope of reaching American soil and seeking legal status in the United States where democracy reigns. He did not want to have to fight on the frontline of wars waging abroad in Africa. Mr. Fernandez arrived in the United States as part of the Mariel boatlift of 1980 after Fidel Castro announced that the port of Mariel would be opened up to anyone wishing to leave, as long as they had someone to pick them up.[8] This Day in History 125,000 Cubans fled to U.S. shores in about 1,700 boats during the Mariel boatlift. *Id.* The boatlift was precipitated by housing and job shortages caused by the ailing Cuban economy. *Id.*

Mr. Fernandez faced socio-economic and political restraints while living under Fidel Castro's communist regime. Upon arriving in the United States, Mr. Fernandez obtained a

---

[4] Ron Soodalter, *Over Where? Cuban Fighters in Angola's Civil War*, Spring 2016, https://www.historynet.com/cuban-fighters-angolas-civil-war.htm.
[5] *Id*.
[6] Jamie Miller, *Castro in Africa*, The Atlantic, Dec. 3, 2016, https://www.theatlantic.com/international/archive/2016/12/castro-south-africa-angola/509243/.
[7] Pamela S. Falk, *Cuba in Africa*, Foreign Affairs, V. 65, No. 5 (Summer 1987) at 1077, https://www.jstor.org/stable/pdf/20043202.
[8] *Castro Announces Mariel Boatlift*, History.com, https://www.history.com/this-day-in-history/castro-announces-mariel-boatlift.

family member to sponsor him and eventually applied for adjustment of his status. He had early employment at various factories in El Paso, Texaco and eventually met his wife, Maria Espinoza. They had one daughter together, and now have a five-year old granddaughter. Mr. Fernandez has maintained contact with his family and seeks to continue to be involved in their lives upon release from prison.

### 2. Sentencing Goals

#### a. *The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment*

Mr. Fernandez is before the Court for one count of possession with intent to distribute methamphetamine. None of the testimony or facts presented at trial indicated that violence or weapons were used by Mr. Fernandez during this incident. At no time during the incident did Mr. Fernandez resist arrest or flee from the DEA agents, nor was there any evidence introduced at trial indicating that Mr. Fernandez acted as party of a conspiracy or other large-scale operation. Mr. Fernandez asks the Court to consider the entirety of the incident, including the lack of violence and firearms. A sentence of 120 months would adequately reflect the seriousness of these circumstances, provide just punishment, and promote respect for the law.

#### b. *To afford adequate deterrence to criminal conduct*

A Bureau of Prisons sentence of 120 months would serve as an effective deterrent. Social science research suggests that sending a person convicted of a crime to prison is not always an effective way to deter crime.[9] A bulletin published by the National Institute of Justice notes that "[p]risons are good for punishing criminals and keeping them off the street, but prison

---

[9] National Institute of Justice, *Five Things About Deterrence* (Sept. 2014), https://nij.gov/five-things/pages/deterrence.aspx.

4

sentences (particularly long sentences) are unlikely to deter future crime.  Prisons actually may have the opposite effect: Inmates learn more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment."[10]  In Mr. Fernandez' case, a sentence of 120 months is sufficiently long to have a deterrent effect, but it does not need to be longer than 120 months to achieve this end.

Mr. Fernandez is fifty-nine years old.  He currently takes medication and has undergone surgeries for a hernia within the last two years.  Due to his ailing health, which includes acid reflux, respiratory problems, past hernias, and arthritis, a sentence of over 120 months could conceivably be the functional equivalent of a sentence of life due to his age and health. According to one report, "some administrators recommend that age 50 be the chronological age defining the elderly in prison.  While 50 may seem young to be classified as elderly in the free world, several important factors seem to speed the aging process for those in prison."[11]  Section 3553(a) permits district courts to impose sentences that reflect a defendant's age and or need for medical care. *See e.g*. *United States v. Whipple*, 414 F.3d 887, 891 (8th Cir. 2005)(noting that the defendant's sentence would have been lower had the district court been aware of and applied the legal principles outlined in *Booker* regarding defendant's health and age).  *United States v. Lee*, 725 F.3d 1159, 1169. (9th Cir. 2013)(noting that during resentencing, the district court, in exercising its discretion, should give more serious consideration to whether to impose a sentence that effectively condemns a 72–year–old woman who provided extensive assistance to the government to death in prison for an offense of the nature involved").

---

[10] *Id*.
[11] National Institute of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, at 8 (2004), https://nicic.gov/correctional-health-care-addressing-needs-elderly-chronically-ill-and-terminally-ill-inmates.

Moreover, Mr. Fernandez' chances to recidivate are reduced due to his advanced age. It is generally accepted that the risk of recidivism decreases as an individual ages. Circuit courts explicitly acknowledge that a defendant's age is a relevant consideration in sentencing. *United States v. Payton*, 754 F.3d 375, 379 (6th Cir. 2014); *United States v. Berry*, 565 F.3d 332, 341 (6th Cir. 2009); *United States v. Davis*, 537 F.3d 611, 616–17 (6th Cir. 2008). The fact that Mr. Fernandez is over fifty years old, suggests that he is less likely to commit crimes again.

### c. *To protect the public from future crimes of the defendant*

A 120-month period of incarceration, along with other services of the criminal justice system, can adequately protect the public from future crimes. To the extent that additional training or correctional treatment is necessary, it can also be achieved within a 120-month sentence.

### Conclusion

A Court must consider not merely the offense, but also the offender. Mr. Fernandez' background, age, health status, and his family ties are among the mitigating factors in this case. For these reasons, Mr. Fernandez requests that the Court find that, after consideration of the factors in § 3553(a), and his sentencing arguments made in the PSR objection, a sentence of 120 months is appropriate.

Respectfully Submitted,

FEDERAL PUBLIC DEFENDER
111 Lomas Blvd NW, Suite 501
Albuquerque, NM 87102
(505) 346-2489
esperanza_lujan@fd.org

*filed electronically on July 12, 2019*
ESPERANZA LUJAN
Assistant Federal Public Defender
*Counsel for Mr. Fernandez*